**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION**

|  |  |
|---|---|
| In re:<br><br>**REMINGTON OUTDOOR COMPANY, INC.**, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.  20-81688-CRJ11<br><br>Adv. Case No. _____ |
| **ROUNDHILL GROUP LLC**<br><br>Plaintiff,<br><br>vs.<br><br>**REMINGTON OUTDOOR COMPANY, INC.**, *et al.*,<br><br>Defendant. |  |

## COMPLAINT FOR DECLARATORY RELIEF, BREACH OF CONTRACT AND INJUNCTIVE RELIEF

Roundhill Group LLC ("<u>Plaintiff</u>") an interested party in the bankruptcy of Remington Outdoor Company, Inc., *et al*. (collectively, "<u>Defendants</u>"), brings this action against Defendants and alleges as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC (9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405).  The Debtors' corporate headquarters are located at 100 Electronics Boulevard SW, Huntsville, AL 35824.

## STATEMENT OF JURISDICTION AND VENUE

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This adversary proceeding arises in, and is related to, Defendants' bankruptcy cases, which was commenced through the filing of a voluntary petitions for relief under Chapter 11 of the Bankruptcy Code by Defendants on July 27, 2020 in the Northern District of Alabama.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises under Title 11 or arises under or relates to a case under Title 11 which is pending in this District and does not involve a consumer debt less than $5,000.00.

4.      This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

5.      To the extent this action is deemed to not be a core proceeding, Plaintiff consents to the entry of a final order by the bankruptcy court.

## PARTIES

6.      Plaintiff is a duly formed limited liability company, and pursuant to that certain Asset Purchase Agreement, dated as of September 26, 2020 which was amended and restated on October 7, 2020 (the "Roundhill APA"), was the successful buyer of Defendants' non-Marlin firearms business and all related assets.

7.      Defendants are chapter 11 debtors in the above-captioned bankruptcy case and were sellers under the Roundhill APA.

## GENERAL ALLEGATIONS

8.      Pursuant to the amended Sale Order (docket #983) entered on October 13, 2020, Plaintiff purchased the Acquired Assets (as defined in the Roundhill APA) for $13,000,000.00. A true and correct copy of the amended Sale Order including the Asset Purchase Agreement is attached as **Exhibit A**.  Plaintiff timely and fully paid the $13,000,000.00 purchase price under the

APA, and has timely and completely satisfied all other obligations under the Roundhill APA except as waived or excused by virtue of Defendants' numerous breaches of the Roundhill APA.

9. The Acquired Assets include, but are not limited to, "all of [Defendants'] owned (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property (including without limitation consumables located at the premises of the Business) that is in any of the foregoing cases primarily used for the ownership, operation or management of the Business (the "Owned FF&E"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E."

10. At the time Plaintiff and Defendants closed under the Roundhill APA, a considerable amount of Acquired Assets were housed at, on, or in (the "Huntsville Acquired Assets") that certain real property located at 100 Electronic Blvd. SW, Huntsville, Alabama 35824 (the "Huntsville Facility").

11. Section 3.2 of the Roundhill APA, titled "Seller's Deliveries" provides that "[a]t the Closing, [Defendants] shall deliver or cause to be delivered to [Plaintiff]…all of the Acquired Assets, together with one or more duly executed bills of sale, endorsed certificates of title and other evidence of transfer of motor vehicles and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by [Plaintiff] and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to [Plaintiff] and [Defendants]."

12. The Huntsville Acquired Assets are included within the Acquired Assets that Defendants are required to "deliver or cause to be delivered" to Plaintiff.

13. Plaintiff and Defendants entered into an Amendment #2 to the Roundhill APA, adding Section 3.2(k) to the Roundhill APA, which provided:

*Timely Removal. Notwithstanding the provisions of Section 3.2(a) and Section 3.2(i) of this Agreement, if Buyer has not physically removed all of the Huntsville Other Assets from the Owned Real Property at Huntsville, Alabama by the close of business, Central Time, on Monday, February 15, 2021, then Buyer and Seller hereby agree that Buyer must remove all of the Huntsville Other Assets from the Owned Real Property at Huntsville, Alabama by no later than the close of business, Central Time, on the date that is thirty (30) calendar days after the delivery by Seller, on or after Saturday, January 16, 2021, of a Notice to Buyer demanding removal by Buyer of the Huntsville Other Assets. If Buyer has not removed all Huntsville Other Assets on the Owned Real Property at Huntsville, Alabama by the close of business, Central Time, on the thirtieth (30th) calendar day after delivery of such Notice from Seller, then any Huntsville Other Assets remaining at the Owned Real Property at Huntsville, Alabama shall be automatically and permanently forfeited to Seller or Seller's assignees, and neither Seller nor any assignee thereof will thenceforth have any obligation to Buyer (or any assignee or successor thereof) with respect to any and all such remaining Huntsville Other Assets.*

14. Pursuant to an agreement among and between Plaintiff and Defendants, the deadline for removal of the Huntsville Acquired Assets was extended to 5:00 pm on February 26, 2021 (the "Removal Deadline") so the parties could continue settlement discussions to resolve issues relating to, among other things, Plaintiff's assertion that the Removal Deadline under Section 3.2(k) is inapplicable and unenforceable due to Defendants' failure to make the Huntsville Acquired Assets available for removal.

## FIRST CLAIM FOR RELIEF

### [ Declaratory Relief that the Removal Deadline is Unenforceable ]

15. Plaintiff hereby incorporates by reference paragraphs 1 through 14 and re-alleges these paragraphs as though set forth in full.

16. Due to unexpected delays that were caused in large part by logistical issues of Defendants, a dispute has arisen as to the enforceability of Section 3.2(k) and the Removal Deadline. Specifically, Plaintiff is in the position of potentially losing the value of all Huntsville

Acquired Assets based upon unilateral actions taken by Defendants to jeopardize Plaintiff's realization of value from the Roundhill APA.

17. Plaintiff is informed and believes, and based thereon alleges that Chuck Rink, COO of Remington Outdoor Company, was handling the preparation and decommissioning of the firearm equipment, including the Huntsville Acquired Assets, sold by Defendants to the various parties. Mr. Rink prioritized Ruger's purchased equipment over the Huntsville Acquired Assets and also chose the staffing levels at the Huntsville facility and the Illion facility.

18. Unfortunately, Mr. Rink passed away in late-November of 2020. Plaintiff is informed and believes, and based thereon alleges that shortly after Mr. Rink's passing, Mr. Hogue, the VP, Operational Services & Project Management at Huntsville, replaced Mr. Rink for purposes of addressing the Huntsville Acquired Assets. It took Mr. Hogue approximately two weeks to get up to speed before he determined that Mr. Rink underestimated the amount of work required to make the Huntsville Acquired Assets ready for removal from the Huntsville location.

19. Plaintiff is informed and believes, and based thereon alleges that Mr. Rink determined that the Huntsville staff, in particular, was severely understaffed due to both Mr. Rink's underestimation of the amount of work needed to decommission the Huntsville Acquired Assets and overly aggressive cuts in the workforce (coupled with the Huntsville staff leaving at an unexpectedly rapid pace to find new jobs before their originally anticipated end date).

20. Plaintiff is informed and believes, and based thereon alleges that in late December, Mr. Hogue received approval from Defendants to hire CR Mechanical to fill the gap left by the understaffing of estate employees. CR Mechanical received a five-week contract that began on approximately January 5, 2021 and lasted through the first week of February 2021. At the completion of the contract, CR Mechanical had not completed the decommissioning process for

the Huntsville Acquired Assets and requested an extension of the contract for an additional week (with the associated cost) to complete the job. Defendants rejected CR Mechanical's request leaving a significant amount of equipment remaining to be decommissioned.

21.     The decommissioning process for the Huntsville Acquired Assets is a multi-step process that must be completed by a qualified specialist. The Huntsville Acquired Assets cannot be moved until this process is complete. Generally, the decommissioning process involves: (a) blocking each axis of movement with wood; (b) the draining of hazardous fluids (80-100 gallons per machine) and wiping the internal lines and tanks to prevent the dripping of hazardous materials during the transportation process; (c) disconnecting the machine from electricity; (d) disconnecting the machines from compressed air lines; and (e) disconnecting the machines from coolant lines. In order to properly decommission the Huntsville Acquired Assets, trained mechanics, electricians and plumbers are required.

22.     Furthermore, in order to remove a significant portion of the Huntsville Acquired Assets, interior, non-load bearing walls (some with and some without utilities in the walls) which were built after the Huntsville Acquired Assets was put in place, would need to be removed.

23.     Plaintiff removed two portions of a wall in one area, and shortly thereafter, Defendants and Defendants' agents instructed Plaintiff not to remove any additional walls or move any Huntsville Acquired Assets that were attached to the Huntsville facility until further notice. Defendants than set out a complex and unnecessarily onerous process of "negotiation" for the removal of walls and to detach Huntsville Acquired Assets on a "case by case basis" for each affected piece of equipment.

24.     Plaintiff's representatives and agents were on site full time at the Huntsville Facility for several weeks attempting to work with Defendants and its staff to remove the Huntsville

Acquired Assets, but have been met with onerous conditions and unnecessary restrictions imposed by Defendants that have been made it unduly difficult, if not impossible, to remove the Huntsville Acquired Assets.

25.     Due to the aforementioned restrictions and conditions imposed by Defendants, Defendants have failed "to deliver or cause to be delivered" the Huntsville Acquired Assets to Plaintiff.

26.     As a result of Defendants' failure to fully and completely comply with their duties and obligations under Section 3.2 of the Roundhill APA, Plaintiff is entitled to a declaratory judgment finding Section 3.2(k) and the Removal Deadline unenforceable so as to avoid the irreparable harm Plaintiff will suffer should the Huntsville Acquired Property improperly be deemed forfeited.

## SECOND CLAIM FOR RELIEF

### [ Injunctive Relief ]

27.     Plaintiff hereby incorporates by reference paragraphs 1 through 26 and re-alleges these paragraphs as though set forth in full.

28.     Defendants have refused to deliver, or cause to delivered, the Huntsville Acquired Property to Plaintiff.

29.     Defendants' failure to deliver, or cause to be delivered, the Huntsville Acquired Assets will cause irreparable damage to Plaintiff and its ability to operate the firearms business purchased under the Roundhill APA.  The Huntsville Acquired Property is specifically designed, modified, suited and tailored to manufacture non-Marlin firearms.  The Huntsville Acquired Property cannot be effectively or efficiently replaced before Plaintiff suffers significant and irreparable harm associated with loss of business opportunity, loss of good will and/or an inability

to operate its business. Without the Huntsville Acquired Property, Plaintiff's business will be destroyed.

30.     Pursuant to Federal Rule of Bankruptcy Procedure 7065, the Court should issue a preliminary and permanent injunction restraining Defendant, and all others acting for them, from interfering in any way with the Huntsville Acquired Property.

31.     Pursuant to Federal Rule of Bankruptcy Procedure 7065, the Court should issue a preliminary and permanent injunction requiring Defendants to deliver, or cause to be delivered, the Huntsville Acquired Property to Plaintiff.

32.     The applicable principles of equity dictate that Defendants be preliminarily and permanently enjoined from directly or indirectly transferring, selling, assigning, pledging, hypothecating, encumbering, dissipating or distributing the Huntsville Acquired Property.

33.     The applicable principles of equity dictate that Defendants be preliminarily and permanently mandated to deliver, or cause to be delivered, the Huntsville Acquired Property to Plaintiff.

### **THIRD CLAIM FOR RELIEF**

### **[ Breach of Contract ]**

34.     Plaintiff hereby incorporates by reference paragraphs 1 through 14 and re-alleges these paragraphs as though set forth in full.

35.     The Roundhill APA provides that Plaintiff "shall receive a nonexclusive, perpetual, worldwide, royalty-free license to use Patents Nos. 10,254,063 and 10,718,584" (the "Ruger License"). Similarly, Section 1.7 of Ruger's asset purchase agreement (the "Ruger APA") provides, in relevant part, that "Buyer agrees to enter into a non-exclusive, perpetual, worldwide,

royalty-free license in favor of the buyer or buyers of the Non-Marlin Business to use Patents Nos. 10,254,063 and 10,718,584 in the Non-Marlin Business."

36.     Plaintiff and Ruger hit an impasse in their negotiation of the Ruger License based upon Ruger's untenable position that it will only provide the Ruger License if deemed non-transferrable.

37.     Ruger's insistence that the Ruger License be non-transferrable is a restriction not present in the Roundhill APA or the Ruger APA.

38.     The Ruger License was part of the consideration to be exchanged between Plaintiff and Defendant under the Roundhill APA.

39.     Plaintiff has not received the Ruger License as required under the Roundhill APA.

40.     Defendants have failed to, and have refused to, deliver the Ruger License to Plaintiff.  Furthermore, Defendants have failed to, and has refused to, cause the Ruger License to be delivered to Plaintiff.

41.     Defendants' failure to deliver the Ruger License to Plaintiff is a breach of the Roundhill APA.  Defendants' failure to cause the Ruger License to be delivered to Plaintiff is a breach of the Roundhill APA.

42.     As a direct result of Defendants' aforementioned breach of the Roundhill APA, Plaintiff has been harmed, and continues to be harmed, in an amount to be proven at trial – but in no event less than $1,500,000.00.

## FOURTH CLAIM FOR RELIEF

### [ Breach of Contract ]

43.     Plaintiff hereby incorporates by reference paragraphs 1 through 14 and re-alleges these paragraphs as though set forth in full.

44.     Among the Acquired Assets purchased by Plaintiff was a substantial amount of equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property primarily used for the ownership, operation or management of the Defendants' pre-petition non-Marlin firearms business.

45.     Notwithstanding the Roundhill APA providing that Plaintiff was purchasing all of the Acquired Assets primarily used for the ownership, operation or management of the Defendants' pre-petition non-Marlin firearms business, Defendants improperly provided a substantial number of Plaintiff's Acquired Assets to Ruger (the "Misallocated Assets").

46.     Once Plaintiff became aware that Defendants were to provide the Misallocated Assets to Ruger, Plaintiff informed Defendants' agents that Plaintiff objected and claimed ownership of the Misallocated Assets.

47.     Section 1.8 of the Roundhill APA contains a "cooperate in good faith with any other purchasers" provision, which is substantively identical to that of Section 1.7 of the Ruger APA. Despite the Roundhill APA and the Ruger APA containing these "cooperation" provisions, Defendants and their agents acted as a middle-man in the Ruger equipment dispute since the Effective Date of the Roundhill APA.

48.     Rather than Ruger cooperating in good faith with Plaintiff to resolve the Misallocated Assets dispute, Ruger worked directly with Defendants and Defendants' agents. Defendants and Ruger entered into an amended Ruger APA attempting to revise the original APA to permit Ruger to take possession of the Misallocated Assets.

49.     To add insult to injury, neither Plaintiff nor its known counsel were served with the motion to amend the Ruger APA (a point further exacerbated by the fact that the motion was set

on shortened notice and an order approving same was entered less than three days after it was apparently filed).

50.     The Roundhill APA was not amended to provide that the Misallocated Assets were Ruger's property.

51.     Given that the Roundhill APA provides that Plaintiff was purchasing all assets primarily used in connection with the "Business," the Misallocated Assets clearly fall within this category and Plaintiff properly purchased these Misallocated Assets.

52.     Defendants' and Ruger's attempt to amend the Ruger APA is ineffective and does not alter or impact Plaintiff's claim to the Misallocated Assets – specifically because the order approving the Roundhill APA predates the subsequent order amending the Ruger APA (and because the Roundhill APA was not reciprocally amended or modified to accommodate the changes made to the Ruger APA).

53.     Defendants' failure to provide the Misallocated Assets to Plaintiff is a breach of the Roundhill APA.

54.     As a direct result of Defendants' aforementioned breach of the Roundhill APA, Plaintiff has been harmed, and continues to be harmed, in an amount to be proven at trial – but in no event less than $3,500,000.00.

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, as follows:

A.     Declaratory relief judgment providing that Section 3.2(k) of the Roundhill APA and the Removal Deadline or unenforceable;

B.     A judgment against Defendants preliminarily and permanently enjoining and preventing Defendants from directly or indirectly transferring, selling, assigning, pledging,

hypothecating, encumbering, dissipating, or distributing the Huntsville Acquired Property until judgment in this proceeding has been satisfied;

C.      A judgment against Defendants preliminarily and permanently mandating that Defendants must deliver, or cause to be delivered, the Huntsville Acquired Property to Plaintiff;

D.      A judgment against Defendants for breach of the Roundhill APA for failure to deliver, or cause to be delivered, the Ruger License in an amount to be proven at trial, but in no event less than $1,500,000.00;

E.      A judgment against Defendants for breach of the Roundhill APA for failure to provide Plaintiff the Misallocated Assets, in an amount to be proven at trial, but in no event less than $3,500,000.00

F.      Such other and further relief as the Court deems just and proper.


**SHULMAN BASTIAN FRIEDMAN & BUI LLP**


DATED:  March  5, 2021          By:  _____
                                              */s/ Ryan D. O'Dea*
                                        James C. Bastian, Jr., *admitted pro hac vice*
                                        Ryan D. O'Dea*, admitted pro hac vice*
                                        Attorneys for Plaintiff Roundhill Group LLC

## <u>EXHIBIT A</u>

*Order Amending Order Approving the Sale of Certain of the Debtors'*
*Assets Free and Clear of All Claims, Liens and Interests [Doc. No. 983]*

In re:

REMINGTON OUTDOOR COMPANY,
INC., *et al.*, [1]

           Debtors.

Chapter 11

Case No. 20-81688-CRJ11

Jointly Administered

**RE: Docket Nos. 29, 905, 932**

## ORDER AMENDING ORDER APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL CLAIMS, LIENS, AND INTERESTS

This matter having come before the Court for hearing on October 7, 2020 upon the motion (the "**Motion**")[2] [Docket No. 932] by Remington Outdoor Company, Inc., ("**Remington**" or the "**Company**"), and its affiliated debtors and debtors in possession (collectively the "**Debtors**") in the above-captioned Chapter 11 cases (the "**Chapter 11 Cases**") seeking entry of an order (this "**Order**") amending the *Order Approving the Sale of Certain of the Debtors' Assets Free and Clear of All Claims, Liens, and Interests* [Docket No. 905] (the "**Sale Order**"), regarding the sale of certain of the Debtors' assets to Roundhill Group, LLC (the "**Buyer**"), to substitute the Asset Purchase Agreement, dated as of September 26, 2020 attached to the Sale Order as <u>Exhibit A</u> (the "**Asset Purchase Agreement**") for the Amended and Restated Asset Purchase Agreement, attached hereto as <u>Exhibit 1</u> (the "**Amended Asset Purchase Agreement**"); and the Court having

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Remington Outdoor Company, Inc. (4491); FGI Holding Company, LLC 9899); FGI Operating Company, LLC (9774); Remington Arms Company, LLC (0935); Barnes Bullets, LLC (8510); TMRI, Inc. (3522); RA Brands, L.L.C. (1477); FGI Finance, Inc. (0109); Remington Arms Distribution Company, LLC (4655); Huntsville Holdings LLC (3525); 32E Productions, LLC (2381); Great Outdoors Holdco, LLC (7744); and Outdoor Services, LLC (2405). The Debtors' corporate headquarters is located at 100 Electronics Blvd SW, Huntsville, Alabama 35824.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion or the Asset Purchase Agreement, as applicable.

considered the Motion and the exhibits attached thereto; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding in this District is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and sufficient notice of the Motion having been given under the circumstances; and the Court having determined that sufficient cause exists to enter this Order; and after due deliberation and consideration, and for good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is **APPROVED** as set forth herein.

2.      The Asset Purchase Agreement attached to the Sale Order as <u>Exhibit A</u> shall be deleted in its entirety and replaced with the Amended Asset Purchase Agreement, attached hereto as <u>Exhibit 1</u>.  All references to the "Asset Purchase Agreement" in the Sale Order shall mean the Amended Asset Purchase Agreement.

3.      Except as expressly modified in this Order, no other terms of the Sale Order or the exhibits attached thereto shall be modified.

4.      This Court retains jurisdiction over all matters arising from or related to the interpretation or implementation of this Order.

5.      Notwithstanding the provisions of Bankruptcy Rules 6004(h), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry.


Dated this the 13th day of October, 2020.

<u>/s/ Clifton R. Jessup, Jr.</u>
Clifton R. Jessup, Jr.
United States Bankruptcy Judge

**Exhibit 1**

**Amended Asset Purchase Agreement**

AMENDED AND RESTATED

ASSET PURCHASE AGREEMENT

by and among

ROUNDHILL GROUP, LLC

as Buyer,

and

REMINGTON OUTDOOR COMPANY, INC.

and

EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.,

as Seller

SET FORTH ON THE SIGNATURE PAGES HERETO

Dated as of October __, 2020

# TABLE OF CONTENTS

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS ................................... 6

    Section 1.1    Transfer of Acquired Assets ................................................ 6
    Section 1.2    Excluded Assets .................................................................. 9
    Section 1.3    Assumption of Liabilities .................................................. 12
    Section 1.4    Retention of Liabilities ...................................................... 12
    Section 1.5    Assumed Leases and Assumed Contracts; Cure Amount ................. 13
    Section 1.6    Non-Assignment of Acquired Assets .................................... 15
    Section 1.7    Further Conveyances and Assumptions ............................. 15

ARTICLE 2. CONSIDERATION ................................................................................ 16

    Section 2.1    Consideration ..................................................................... 16
    Section 2.2    Good Faith Deposit ........................................................... 16

ARTICLE 3. CLOSING AND DELIVERIES .............................................................. 16

    Section 3.1    Closing .............................................................................. 16
    Section 3.2    Seller's Deliveries ............................................................. 17
    Section 3.3    Buyer's Deliveries ............................................................. 18

ARTICLE 4. REPRESENTATIONS AND WARRANTIES ....................................... 19

    Section 4.1    Representations and Warranties of Seller .......................... 19
    Section 4.2    Representations and Warranties of Buyer ......................... 21
    Section 4.3    Warranties Exclusive; Schedules ...................................... 23
    Section 4.4    Survival of Representations and Warranties ...................... 23

ARTICLE 5. COVENANTS OF THE PARTIES .......................................................... 24

    Section 5.1    Covenants of Seller ........................................................... 24
    Section 5.2    Covenants of Buyer ........................................................... 25

ARTICLE 6. ADDITIONAL AGREEMENTS ............................................................ 27

    Section 6.1    Bankruptcy Matters ........................................................... 27
    Section 6.2    Transition Arrangements ................................................... 28
    Section 6.3    Further Assurances ............................................................ 28

ARTICLE 7. EMPLOYEES AND EMPLOYEE BENEFITS ..................................... 29

    Section 7.1    Transferred Employees ..................................................... 29
    Section 7.2    Employment Tax Reporting ............................................... 29
    Section 7.3    Benefits ............................................................................. 29
    Section 7.4    WARN Act ........................................................................ 30
    Section 7.5    Third Party Beneficiary ..................................................... 30

ARTICLE 8. TAXES ................................................................................................... 30

    Section 8.1    Taxes Related to Purchase of Assets ................................. 30
    Section 8.2    Cooperation on Tax Matters .............................................. 30
    Section 8.3    Allocation of Purchase Price ............................................. 31

ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ................. 31

Section 9.1      Conditions Precedent to Performance by Seller .............................. 31
Section 9.2      Conditions Precedent to Performance by Buyer .............................. 33

ARTICLE 10. TERMINATION .................................................................................... 34

Section 10.1      Conditions of Termination ................................................................. 34
Section 10.2      Effect of Termination; Remedies ....................................................... 35

ARTICLE 11. MISCELLANEOUS .............................................................................. 36

Section 11.1      Successors and Assigns...................................................................... 36
Section 11.2      Governing Law; Jurisdiction.............................................................. 36
Section 11.3      WAIVER OF JURY TRIAL ............................................................... 37
Section 11.4      Expenses ............................................................................................ 37
Section 11.5      Broker's and Finder's Fees ................................................................ 37
Section 11.6      Severability ........................................................................................ 37
Section 11.7      Notices ................................................................................................ 38
Section 11.8      Amendments; Waivers ....................................................................... 39
Section 11.9      Time of Essence ................................................................................. 39
Section 11.10      Public Announcements ....................................................................... 39
Section 11.11      Entire Agreement ............................................................................... 40
Section 11.12      Parties in Interest ............................................................................... 40
Section 11.13      Bulk Sales Laws ................................................................................ 40
Section 11.14      Construction ....................................................................................... 40
Section 11.15      Counterparts and Facsimile................................................................ 40

ARTICLE 12. DEFINITIONS....................................................................................... 41

Section 12.1      Certain Terms Defined ....................................................................... 41
Section 12.2      All Terms Cross-Referenced............................................................... 48

**SCHEDULES**

Schedule 1.1(i)   -   Assumed Business Contracts
Schedule 1.1(k)   -   Assumed Outbound IP Licenses
Schedule 1.2(q)   -   Excluded Assets
Schedule 1.3(b)   -   Assumed Liabilities
Schedule 1.4(n)   -   Excluded Liabilities
Schedule 1.5(a)   -   Estimated Cure Amount
Schedule 4.1(g)   -   Compliance with Law
Schedule 4.1(h)   -   Contracts
Schedule 4.1(i)   -   Material Permits
Schedule 4.1(j)   -   Acquired Intellectual Property
Schedule 11.5   -   Brokers and Finders
Schedule 12.1(a)   -   Tradenames
Schedule 12.1(b)   -   Permitted Liens

**EXHIBIT**

Exhibit 1      -     Bidding Procedures Order
Exhibit 2      -     Trademark License Agreement

# AMENDED AND RESTATED
## ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of October __, 2020, is entered into by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("ROC"), each of the subsidiaries of ROC set forth on the signature pages to this Agreement (collectively with ROC, "Seller"), and the Roundhill Group, LLC ("Buyer"), or a Buyer Acquisition Vehicle as assignee in accordance with Section 11.1. Capitalized terms used in this Agreement are defined or cross-referenced in Article 12.

## *RECITALS*

A.      Buyer and Seller entered into that certain Asset Purchase Agreement (the "Initial Agreement") dated as of September 26, 2020 (the "Effective Date").

B.      Buyer and Seller desire to hereby amend, pursuant to paragraph 45 of the Sale Order (as defined below), the Initial Agreement, it being the Seller's judgment that such amendment does not have a material adverse effect on the Seller's bankruptcy estates.

C.      Seller is engaged in the manufacture, design, marketing and sale of shotguns, rifles, handguns and modular firearms and related components and accessories other than the Marlin Business (the "Business"). On July 27, 2020 (the "Petition Date"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Alabama (the "Bankruptcy Court" and the case arising under such petition, the "Bankruptcy Case").

D.      On the Petition Date, Seller filed a Motion for (I) an Order Establishing Bidding Procedures and Granting Related Relief and (II) an Order or Orders Approving the Sale of the Debtors' Assets (the "Bidding Procedures Motion") pursuant to which Seller sought, and the Bankruptcy Court approved, the Bidding Procedures Order attached hereto as Exhibit 1 (the "Bidding Procedures Order").

E.      Buyer desires to purchase the Acquired Assets free and clear of Liens, Claims and Interests (other than Permitted Liens), except for assumption of the Assumed Liabilities from Seller, and Seller desires to sell, convey, assign and transfer to Buyer, the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

F.      Buyer, in exchange for the transfer to Buyer of the Acquired Assets, desires to provide certain consideration (as set forth below) to Seller.

G.      The Acquired Assets and Assumed Liabilities are assets and liabilities of Seller, which are to be purchased and assumed by Buyer pursuant to an order of the Bankruptcy Court approving such sale pursuant to Sections 105, 363 and 365 of the Bankruptcy Code (the "Sale

Order"), which order includes the authorization for the assumption by Seller and assignment to Buyer of certain executory contracts and unexpired leases and liabilities thereunder under Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with the applicable provisions of the Bankruptcy Code.

H.    This Agreement is conditioned upon Vista Outdoor, Inc. ("Vista") being the successful bidder for Debtors' ammunition business and related assets.

*STATEMENT OF AGREEMENT*

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer (a) agree that the Initial Agreement is hereby amended, restated and replaced in its entirety by this Agreement, and (b) otherwise agree as follows:

ARTICLE 1. PURCHASE AND SALE OF THE ACQUIRED ASSETS.

Section 1.1    Transfer of Acquired Assets.  At the Closing, upon and subject to the terms and conditions set forth in this Agreement, Seller shall sell to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in and to the Acquired Assets free and clear of all Liens, Claims and Interests (other than Permitted Liens and the Assumed Liabilities). For all purposes under this Agreement, the term "Acquired Assets" shall not include any Excluded Assets, and shall mean all of the other properties, assets, Interests and rights of Seller existing as of the Closing Date, of any kind or nature, real or personal, tangible or intangible, that in each case primarily relate to the ownership, operation and management of the Business, including, but not limited to:

(a)    The following real property (the "Owned Real Property"):

1.    Gun Factory
14 Hoefler Avenue[1]
Ilion, NY 13357

2.    Steam Plant Parcel
Accessible via Commerce Street[2]
Ilion, NY 13357

3.    Handgun Barrel Factory
5900 Highway 321 North
Lenoir City, TN 37771

---

[1] Parcel Nos.: 120.37-4-1, 120.37-4-3, 120.37-4-29, 120.37-4-71, 120.37-4-77, 120.37-4-81, 120.37-5-8, 120.37-5-16, 120.37-5-36, 120.45-1-20.1

[2] Parcel No.: 119.36-1-13.3

6

4.  Auxiliary Property
    6035 Hwy 321
    Lenoir City, TN 37771

(b)     all Leases pursuant to which Seller has the right to possess, use, lease or occupy (or grant others the right to possess, use, lease or occupy) any Leased Real Property used in Seller's ownership, operation and management of the Business, together with all security and other deposits related thereto, prepaid rent and appurtenances thereto and associated therewith (collectively, the "Assumed Leases");

(c)     all Leasehold Improvements of Seller located on the Leased Real Property that is subject to the Assumed Leases (the "Assumed Leased Real Property");

(d)     all of Seller's owned (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property (including without limitation consumables located at the premises of the Business) that is in any of the foregoing cases primarily used for the ownership, operation or management of the Business (the "Owned FF&E"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E;

(e)     all of Seller's (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts primarily used for the ownership, operation or management of the Business, that are in each case leased pursuant to any Contract (the "Assumed FF&E Leases" and the equipment, machinery, furniture, fixtures and improvements, tooling and spare parts so leased, the "Leased FF&E"), (ii) rights under the Assumed FF&E Leases, and (iii) to the extent assignable, rights to any warranties and licenses received from manufacturers and lessors of the Leased FF&E;

(f)     all of Seller's (i) owned cars, trucks and other motor vehicles primarily used in connection with the Business (the "Owned Motor Vehicles"), and (ii) rights to the warranties and licenses received from manufacturers and sellers of the Owned Motor Vehicles;

(g)     (ii) all proceeds and recoveries from, policies (but not, for the avoidance of doubt, any Insurance Policies themselves) to the extent attributable to any of the Acquired Assets only to the extent in respect of periods on or after the Effective Date) (the rights described in this Section 1.1(h) being collectively the "Assumed Policy Rights");

(h)     all Contracts set forth on Schedule 1.1(i) (collectively, the "Assumed Business Contracts" and, together with the Assumed FF&E Leases, the Assumed Inbound IP Licenses, the Assumed Outbound IP Licenses, and the Assumed Motor Vehicle Leases, the "Assumed Contracts");

Case 20-10883-CTG  Doc 983  Filed 03/05/21  Entered 03/05/21 14:30:35  Desc Main Document  Order Page  Page 23 of 99

(i)     to the extent transferable under applicable Law, all Permits issued to Seller that are primarily used in connection with the ownership, operation and/or management of the Business, and all pending applications therefor;

(j)     all (i) registered and unregistered Intellectual Property owned and primarily used by Seller in connection with the ownership, operation and/or management of the Business, other than Excluded Assets, and any and all corresponding rights that, now or hereafter, may be secured throughout the world (collectively, the "Acquired Intellectual Property"), and (ii) to the extent transferable under applicable Law, all agreements under which Intellectual Property is licensed to Seller and used primarily in connection with the ownership, operation and/or management of the Business, other than the Trademark License Agreement (collectively, the "Assumed Inbound IP Licenses");

(k)     the agreements listed on Schedule 1.1(k) under which Seller has granted licenses, sublicenses, or similar rights, permissions or franchises to use any Acquired Intellectual Property (the "Assumed Outbound IP Licenses");

(l)     all sales orders or other commitments of Seller to purchasers of goods, services or products produced or sold by the Business (the "Customer Orders");

(m)     all right, title and interest in and to all inventory, supplies and finished goods within the scope of the operations of the Business and located on the Owned Real Property and the Leased Real Property or (to the extent within the scope of the operations of the Business) in the possession of any third-party bailees (collectively, the "Inventory");

(n)     all (i) rights to refunds relating to, and prepaid expenses and deposits attributable to, any Purchase Orders, Customer Orders, Assumed Contracts and Inventory, and all rights under credit card merchant accounts, (ii) prepaid charges and deposits in respect of telephone, electricity, water and sewer and other utilities provided to the above-referenced Owned Real Property and the Assumed Leased Real Property, (iii) prepaid common area maintenance expenses relating to any Assumed Lease to the extent in respect of periods on or after the Closing Date and security deposits for any Assumed Lease, (iv) ordinary holdbacks (including ordinary credit card holdback payments or protection reserves) in connection with or relating to any Acquired Asset and (v) other deposits, prepaid charges and expenses paid by Seller and other rights of Seller in connection with or primarily relating to any Acquired Asset;

(o)     all goodwill, including all goodwill associated with the Business, with the Acquired Intellectual Property, and with any of the other Acquired Assets;

(p)     Claims held by Seller that relate to Acquired Assets;

(q)     all other tangible or intangible assets of Seller primarily used in connection with the ownership, operation and/or management of the Business;

8

(r)     to the extent permitted by applicable Law (and other than all Documents of Seller held by Seller or Seller's counsel related to the Retained Litigation), all Documents that are primarily used in, held for use in or intended to be used in, or that primarily relate to, the Acquired Assets, the Assumed Liabilities or the Business; provided, that Buyer shall provide Seller with reasonable access (during business hours with reasonable prior notice and without cost to Seller) to the same following the Closing to the extent reasonably necessary to permit Seller to wind-down and liquidate its estate after the Closing; and provided, further, that Seller shall keep such information confidential in accordance with all requirements of applicable Law;

(s)     all contents of the Remington Museum including all firearms of every nature which are owned by Seller, including but not limited to all antique, collectible, and historic firearms owned by Seller whether located at the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere;

(t)     all antique, collectible, and historic firearms owned by Seller whether not considered part of the Ilion, NY Remington Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere;

(u)     all antique, collectible, and historic firearms owned by Seller not considered part of the Ilion, NY Remington Arms Museum or at any other location or on loan or display elsewhere or located at any other location including firearms on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere;

(v)     all rights and title to the shares of capital stock (and any other equity interests or rights convertible into equity interests) (the "RLC Shares") of Remington Licensing Corporation, a Delaware corporation, that are owned by RA Brands, L.L.C., a Delaware limited liability company (provided, that, Buyer reserves the right, in its sole discretion to assign to a third party or classify the assets described in this subsection (h) as an Excluded Asset at any time prior to the Closing Date; provided further that any such deduction shall have no effect on the Purchase Price); and

(w)     all artwork owned by Seller wherever located, including all artwork on loan or display outside the company including but not limited to all artwork located at the Remington Arms Museum location including artwork on loan to Bass Pro Outdoor World, LLC, Buffalo Bill Center of the West, and elsewhere.

Section 1.2    Excluded Assets.  Except as provided in Section 1.1, the Acquired Assets shall not include any right, title or interest of any Person other than Seller in any property or asset, or Seller's right, title and interest in, to and under properties and assets not used in connection with the ownership, operation and/or management of the Business, and shall specifically exclude the following properties, Contracts, Leases, and other assets, interests and

9

rights of Seller (all such items not being acquired by Buyer being referred to in this Agreement as the "Excluded Assets"):

(a)     all rights of every nature and description (other than Assumed Policy Rights) under or arising out of all insurance policies of Seller (the "Insurance Policies"), including without limitation (i) with respect to Claims arising prior to the Effective Date (ii) to the extent of coverage of any Excluded Liabilities, (iii) under those insurance policies covering any tort liabilities that are not Assumed Liabilities, (iv) under the D&O Insurance, and (v) under those insurance policies covering liabilities and Claims against Seller and its affiliates relating to the Excluded Employee Liabilities);

(b)     any asset that is not owned or leased by Seller or not used or held for use in connection with the ownership, operation and management of the Business;

(c)     any minute books, stock ledgers, corporate seals and stock certificates of Seller, and other similar books and records that Seller is required by Law to retain and all Tax Returns, financial statements and corporate or other entity filings; provided that (i)Seller shall provide Buyer with reasonable access to the same following the Closing to the extent relating to the Acquired Assets and when reasonably requested by Buyer; and (ii) Buyer shall be entitled upon reasonable request to be provided with copies of all such records, at its own expense, and provided, further, that Seller shall notify Buyer before disposing of any such records and upon Buyer's reasonable request shall transfer them to Buyer;

(d)     all (i) prepaid premiums in respect of all Insurance Policies, (ii) retainers, prepayments or on-account cash paid to Seller's professionals and advisors, including any carve-out under any DIP Facility or cash collateral arrangements (whether retained in the Bankruptcy Case or otherwise), and (iii) other deposits, prepaid charges and expenses paid by Seller to the extent in connection with or relating to any Excluded Asset;

(e)     all rights to or claims for refunds, overpayments or rebates of Pre-Closing Taxes, including any refunds, overpayments or rebates of Pre-Closing Taxes for any Straddle Period, other than, in any of the foregoing cases, any such refunds, overpayments or rebates that are attributable to Taxes actually paid by Buyer;

(f)     all shares of capital stock (and any other equity interests or rights convertible into equity interests) issued by any Seller entity;

(g)     all Documents exclusively relating to any Excluded Asset provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then- applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(h)     all Documents exclusively relating to any Employees who do not become Transferred Employees; provided that, to the extent permitted by applicable

10

Law, Seller shall make copies of such Documents available to Buyer if reasonably related to addressing or defending any such Employees' claims against Buyer;

(i) subject to <u>Section 1.6</u>, any asset that requires the consent of a third party to be transferred, assumed or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities pursuant to <u>Section 1.4(a)</u>);

(j) all Employee Benefit Plans and all assets of, and Contracts exclusively relating to or associated with such plans;

(k) all Cash and all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(l) any rights of Seller under this Agreement or any Ancillary Agreement to which Seller is a party, including without limitation any rights relating to the Purchase Price;

(m) copies of all Historic Firearms Books and Records of Seller provided, that Seller shall provide Buyer with reasonable access at Buyer's sole cost and expense, including the ability to make copies (during business hours with reasonable prior notice and subject to then- applicable COVID Restrictions) to the same to the extent reasonably related to the Acquired Assets;

(n) all Documents of Seller held by Seller or Seller's counsel relating to (i) any litigation against Seller or (ii) the Excluded Employee Liabilities;

(o) the D&O Insurance, and all proceeds thereof;

(p) all rights of recovery, rights of set-off, rights of indemnity, contribution or recoupment, warranties, guarantees, rights, remedies, counter-claims, cross-claims and defenses related to any Excluded Liability;

(q) any properties, Contracts, Leases, or other assets, interests and rights of Seller that (i) do not relate to the ownership, operation or management of the Business or (ii) are otherwise set forth on <u>Schedule 1.2(q)</u>;

(r) all Avoidance Actions;

(s) Claims held by Seller against any party that are covered by, relate to or are based upon any Insurance Policies (including the D&O Insurance);

(t) all assets subject to an Ammunitions Business Bid (as defined in the Bidding Procedures Order);

11

(u)      all assets primarily used in the Marlin Business, including all trademarks, service marks and logos containing Marlin or an abbreviation or derivation thereof;

(v)      all trademarks, service marks and logos containing Remington or an abbreviation or derivation thereof;

(w)      all trademarks, service marks, logos and domain names related to the Non-Core Brands, and all Intellectual Property primarily used in connection with the products and services manufactured and sold under the Non-Core Brands;

(x)      the list of "Licensed Trademarks" affixed as Appendix B to the Trademark License Agreement between Vista Outdoor, Inc. and Buyer in substantially the form set forth in Exhibit 2 (the "Trademark License Agreement"); and

(y)      any real property owned by of Seller other than the Owned Real Property.

Section 1.3      Assumption of Liabilities.  At the Closing, Buyer shall assume, and Buyer agrees to thereafter pay, perform and discharge when due, and indemnify, defend and hold harmless Seller, its Affiliates and all of their respective Related Persons from and against, the following liabilities (all items in this Section 1.3 being, collectively, the "Assumed Liabilities"):

(a)      all liabilities and unperformed and unfulfilled obligations of Seller under the terms of any Assumed Contract or Assumed Lease (including all premium finance arrangements of Seller for Assumed Contracts), and the Cure Amount in connection with the assignment of the Assumed Leases and the Assumed Contracts to, and the assumption of the Assumed Leases and the Assumed Contracts by, Buyer;

(b)      all liabilities and obligations of Seller set forth on Schedule 1.3(b);

(c)      all liabilities and obligations for Post-Closing Taxes (including those relating to the Post-Closing portion of any Straddle Period);

(d)      all liabilities and obligations for Transaction Taxes; and

(e)      all liabilities under the CBA, as revised and amended to reflect the terms of Section 7.1 herein and to exclude any liability for unpaid wages, benefits or Pension Plan obligations.

Section 1.4      Retention of Liabilities.  Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of whatever nature, whether presently in existence or arising hereafter.  All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Seller (all such liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities").  The Excluded Liabilities include, without limitation, the following liabilities and obligations:

12

(a)     all liabilities and obligations under or relating to the Excluded Assets;

(b)     all liabilities and obligations of Seller under or relating to the Priority Term Loan, the FILO Facility, the Exit Term Loan or the Intercompany Note;

(c)     all liabilities and obligations relating to any Employee Benefit Plans (the "Excluded Employee Liabilities");

(d)     all liabilities and obligations for Pre-Closing Taxes (including those related to the Pre-Closing portion of any Straddle Period);

(e)     all liabilities and obligations of Seller arising under or incurred in connection with the negotiation, preparation, execution and performance of this Agreement, the Ancillary Agreements to which Seller is a party and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(f)     all liabilities of, and Claims against, Seller arising from and in connection with grants of restricted common unit/share awards and stock options by Seller;

(g)     any liabilities and obligations of Seller under this Agreement, or under any Ancillary Agreement to which Seller is a party;

(h)     all liabilities under any Qualifying Excluded Contracts and Leases;

(i)     all State of Alabama Project Development Liabilities;

(j)     all City of Huntsville Project Development Liabilities;

(k)     the Retained Litigation;

(l)     all other liabilities and obligations arising out of or relating to Seller's ownership, operation or management of the Business and the Acquired Assets prior to the Closing;

(m)     all liabilities and obligations under the Pension Plan and otherwise payable to employees not retained by Buyer; and

(n)     all liabilities set forth on Schedule 1.4(n).

Section 1.5     Assumed Leases and Assumed Contracts; Cure Amount.

(a)     At such time as is specified in the Sale Order, pursuant to Section 365 of the Bankruptcy Code, Seller shall assume and assign to Buyer and Buyer shall assume from Seller, the Assumed Leases and the Assumed Contracts. The amounts

13

necessary, pursuant to Section 365 of the Bankruptcy Code, to cure any and all defaults and to pay all actual or pecuniary losses that have resulted from any such defaults under any Assumed Lease or Assumed Contract (such aggregate amount, the "Cure Amount") shall be paid by Buyer, in each case as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Sale Order and this Agreement. Schedule 1.5(a) contains Seller's estimate as of the Effective Date of the Cure Amount. Buyer may, in its sole discretion (but subject to the limitations in Section 1.5(d)), amend Schedule 1.2(q) to indicate the rejection of any executory contracts at any time prior to the date of a final hearing to approve the sale of the Acquired Assets (the "Sale Hearing"), upon written notice to Seller; provided that the definition or interpretation of (i) "Acquired Assets" for the purposes of Section 1.3 only and (ii) "Assumed Liabilities" and "Excluded Liabilities" for any purposes under this Agreement, shall not reflect any such amendment without the prior written consent of Seller.

(b)     Seller shall timely serve the motion seeking entry of the Sale Order to all parties to Leases and Contracts and, subject to Section 1.6 and the performance of Buyer's obligations in Section 5.2, Seller shall use commercially reasonable efforts to cause the Assumed Leases and Assumed Contracts to be assumed by Seller and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and Seller shall comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign and delegate to Buyer all of Seller's rights and obligations under the Assumed Leases and Assumed Contracts.

(c)     Notwithstanding any provision in this Agreement to the contrary, if for any reason Buyer fails to pay the Cure Amount in respect of any Assumed Contract or Assumed Lease when due and payable pursuant to this Agreement, the Sale Order or any other Order of the Bankruptcy Court, (i) Seller shall be under no obligation whatsoever to pay or otherwise satisfy such Cure Amount or any other liability or obligation under such Assumed Contract or Assumed Lease, (ii) Buyer shall indemnify and hold harmless Seller in respect of such Cure Amount, liability or obligation as well as any expenses (including legal fees and expenses) incurred by Seller in defending any claim for payment of the Cure Amount or any other liability or obligation arising under such Contract or Lease asserted by the counterparty thereto and (iii) Seller may reject, and nothing in this Agreement shall prohibit Seller from rejecting, such Contract or Lease.

(d)     Notwithstanding any provision in this Agreement to the contrary, at any time prior to the Sale Hearing, Buyer may designate in writing to Seller any Contract or Lease as an Excluded Liability (and amend Schedule 1.2(q) for such purposes only), only if the rejection of such Contract or Lease would not give rise to a Claim in favor of the counterparty thereto having administrative priority or any other priority senior to a general unsecured Claim against the bankruptcy estate of Seller (the "Qualifying Excluded Contracts and Leases").  Seller may reject, and nothing in this Agreement shall prohibit Seller from rejecting, the Qualifying Excluded Contracts and Leases.

Case 20-10883-CTG   Doc 983-14   Filed 03/05/21   Entered 03/05/21 20:37:35   Desc Exhibit to Order   Page 30 of 99

Section 1.6    <u>Non-Assignment of Acquired Assets</u>.    Notwithstanding any provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Acquired Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any party thereto other than Seller (each such action, a "<u>Necessary Consent</u>"), would constitute a breach thereof (after giving effect to any waiver by the applicable counterparty, or any elimination of such approval, authorization or consent requirement by operation of the Sale Order) or in any way adversely affect the rights or obligations of Buyer thereunder and such Necessary Consent is not obtained and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required because the transfer thereof shall be deemed by the Bankruptcy Court to be (x) effective and (y) not a breach thereof, notwithstanding the failure to obtain such Necessary Consent.  In such event, Seller and Buyer will use their commercially reasonable efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Buyer as Buyer may reasonably request; <u>provided</u>, <u>however</u>, that Seller shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested (other than the applicable Cure Amount) or to initiate any litigation or legal proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if such Acquired Asset or an attempted assignment thereof would otherwise be ineffective or would adversely affect the rights of Seller thereunder so that Buyer would not in fact receive all such rights, Seller and Buyer will cooperate in a mutually agreeable arrangement, to the extent feasible and at no out-of-pocket expense to Seller or Buyer, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which Seller would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming Seller's obligations (to the extent otherwise constituting Assumed Liabilities hereunder), any and all rights of Seller thereunder.

Section 1.7    <u>Further Conveyances and Assumptions</u>.

(a)    Seller shall deliver to Buyer at the Closing such Employee Records as is reasonably necessary for Buyer to transition the Transferred Employees into Buyer's records, as well as all other Documents included in the Acquired Assets.

(b)    At the Closing, and from time to time thereafter, Seller and Buyer shall, and Seller and Buyer shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and to assure fully to Seller and its successors and permitted assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement, and to otherwise make effective or evidence the transactions contemplated by this Agreement.

15

Section 1.8    Conflicts with Other Bidders. In the event of any conflict regarding the Acquired Assets or Assumed Liabilities between this Agreement and agreements governing other sales of Seller's assets in the Bankruptcy Case (the "Other Agreements") defined herein or therein, Buyer shall cooperate in good faith with any other purchasers of Seller's assets pursuant to the Other Agreements, whether before or after the Closing Date, to ensure all assets or liabilities are adequately apportioned between the parties in order to reflect the intent of Buyer and any such other purchasers hereunder and thereunder. Without limitation to the foregoing, (a) upon the request of Seller, Buyer shall enter into a non-exclusive, perpetual, worldwide, royalty-free license in favor of the buyer or buyers of Non-Core Brands to use those patents reasonably requested and identified by Seller and (b) Buyer shall receive a non-exclusive, perpetual, worldwide, royalty-free license to use Patents Nos. 10,254,063 and 10,718,584 in the Business.

## ARTICLE 2. CONSIDERATION

Section 2.1    Consideration.    The aggregate consideration for the sale and transfer to Buyer of the Acquired Assets (the "Purchase Price") shall be:

(a)    Thirteen Million United States Dollars (US $13,000,000.00) (the "Gross Closing Cash Payment"), to be adjusted pursuant to Section 2.2(b), and paid and delivered in accordance with Section 3.3(a); and

(b)    assumption of the Assumed Liabilities.

Section 2.2    Good Faith Deposit.

(a)    Buyer has paid to Seller the amount of Five Million United States Dollars (US $5,000,000.00) by wire transfer of immediately-available funds (the "Good Faith Deposit").  The Good Faith Deposit shall not be subject to any Lien, attachment, trustee process or any other judicial process of any creditor of either of Seller or Buyer and shall be deposited in a segregated deposit account of Seller and held in trust to be administered solely in accordance with the terms of this Agreement and the Bidding Procedures Order.  Upon the Closing, the Good Faith Deposit shall be an Excluded Asset and shall not be subject to any restrictions under this Agreement.

(b)    If the Closing occurs, the Gross Closing Cash Payment shall be reduced by the amount of the Good Faith Deposit (such resulting amount, the "Net Closing Cash Payment"), to be paid and delivered in accordance with Section 3.3(a).

(c)    If this Agreement is terminated pursuant to Section 10.1, the Good Faith Deposit shall be repaid to Buyer or retained by Seller in the amounts and at the times set forth in Section 10.2(a) through Section 10.2(c).

## ARTICLE 3. CLOSING AND DELIVERIES

Section 3.1    Closing.  Subject to the terms and conditions set forth herein, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by the electronic exchange of documents and signatures, or such other place as may be agreed upon, at 7:00 a.m., local Pacific Time, on the third (3rd) Business Day following

16

the satisfaction or, to the extent permitted by this Agreement, waiver of each of the conditions set forth in Article IX of this Agreement (other than those conditions that, by their nature, are to be satisfied at the Closing, but subject to the satisfaction, or waiver to the extent permitted by this Agreement, of such conditions), or such other date as may be agreed to by Seller and Buyer, which date shall not be earlier than the first day following the entry of the Sale Order by the Bankruptcy Court (the "Closing Date").

Section 3.2    Seller's Deliveries.  At the Closing, Seller shall deliver or cause to be delivered to Buyer:

(a)    With the exception of all firearm-related Acquired Assets requiring Buyer to hold certain licenses or permits (the "Permitted Assets"), including but not limited to a Federal Firearms License, or similar license, issued by the Bureau of Alcohol, Tobacco, Firearms and Explosives, all of the Acquired Assets, together with one or more duly executed bills of sale, endorsed certificates of title and other evidence of transfer of motor vehicles and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by Buyer and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller; provided that Seller's conveyance of deliverables relating to the Owned Real Property shall be governed by Section 3.2(g).  Seller shall maintain possession of the Permitted Assets until a point-in-time when Buyer holds all requisite permits and/or licenses necessary to take possession of the Permitted Assets.  No later than five (5) Business days after Buyer holds permits and/or licenses required under applicable Law to take possession of the Permitted Assets, Buyer shall deliver written notice of obtaining such permits and Seller shall turn over all Permitted Assets to Buyer upon receipt of such notice.  Notwithstanding anything to the contrary in this Agreement, if Buyer is unable to obtain all requisite Permits sufficient under applicable Law to take possession of the Permitted Assets within seventy-five (75) days after the Effective Date (the "FFL Cutoff Date"), unless Buyer shall within 2 Business Days after the FFL Cutoff Day pay to Seller in immediately available funds the sum of Two Hundred and Fifty Thousand United States Dollars (US$ 250,000), in which event the FFL Cutoff Date shall for all purposes under this Agreement be one hundred (100) days after the Effective Date, then Seller may terminate this Agreement and retain the Good Faith Deposit, and if the Closing has already occurred, (1) Seller may in its sole discretion retain the Gross Closing Cash Payment as forfeited by Buyer and (2) Buyer shall either (a) return all of the Permitted Assets to Seller previously delivered by Seller to Buyer or (b) transfer all of the Permitted Assets to a third-party designee of Buyer with all requisite Permits sufficient under applicable Law to take possession of the Permitted Assets;

(b)    one or more duly executed assignment and assumption agreements for the Assumed Contracts and the Assumed Liabilities, in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "Assignment and Assumption Agreement");

(c)    one or more duly executed assignment and assumption agreements for the Assumed Leases, in form and substance customary for transactions

17

of this nature and reasonably acceptable to Buyer and Seller (each, an "<u>Assignment and Assumption of Lease</u>");

(d) one or more duly executed assignments of (i) the trademark and patent registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for recording in the U.S. Patent and Trademark Office (and equivalent offices in jurisdictions outside the United States), (ii) the Internet domain name registrations and applications included in the Acquired Intellectual Property registered in the name of Seller, in a form suitable for filing with all applicable domain name registries, and (iii) general assignments of all other Acquired Intellectual Property, in each case in form and substance customary for transactions of this nature and reasonably acceptable to Buyer and Seller (each, an "<u>Acquired Intellectual Property Assignment</u>");

(e) the officer's certificate required to be delivered pursuant to <u>Section 9.2(a)</u> and <u>Section 9.2(b)</u>;

(f) one or more affidavits executed by Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(g) quitclaim deeds, or their equivalent in the applicable state, for the Owned Real Property, executed by Seller; and

(h) a duly executed Limited Power of Attorney to enable Buyer to execute on Seller's behalf any further documents necessary to record the assignment to Buyer of Acquired Intellectual Property.

Section 3.3 <u>Buyer's Deliveries</u>.  At the Closing, Buyer shall deliver or cause to be delivered to Seller:

(a) cash in an amount equal to the Net Closing Cash Payment, by wire transfer of immediately available funds to the account or accounts of Seller identified by Seller in writing reasonably in advance of the Closing;

(b) one or more duly executed Assignment and Assumption Agreements;

(c) one or more duly executed Acquired Intellectual Property Assignments;

(d) the officer's certificate required to be delivered pursuant to <u>Section 9.1(a)</u> and <u>Section 9.1(b)</u>; and

(e) such other documents, instruments and certificates as Seller may reasonably request to transfer, assign and delegate the Assumed Liabilities to Buyer in accordance with the terms and conditions hereof.

18

## ARTICLE 4. <u>REPRESENTATIONS AND WARRANTIES</u>

Section 4.1 <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer as follows:

(a) <u>Corporate Organization</u>. Each entity comprising Seller is duly formed or incorporated and validly existing and in good standing under the laws of its respective state of domicile. Subject to any necessary authority from the Bankruptcy Court, each entity comprising Seller has the requisite corporate or limited liability company power and authority to conduct the Business as now being conducted and to carry out its obligations under this Agreement.

(b) <u>Qualification to do Business</u>. Each entity comprising Seller is duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c) <u>Authorization and Validity</u>. Each entity comprising Seller has the corporate or limited liability company power and authority necessary to enter into this Agreement and each Ancillary Agreement to which Seller is a party and, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder. The execution and delivery of this Agreement has been duly authorized, and at or before Closing the execution and delivery of the Ancillary Agreements to which Seller is a party will be duly authorized, by all necessary corporate or limited liability company action by the boards of directors or managers of Seller, and no other corporate or limited liability company proceedings are necessary for the performance by Seller of its obligations under this Agreement or the consummation by Seller of the transactions contemplated by this Agreement. This Agreement has been duly and validly executed and delivered by Seller, and at Closing the Ancillary Agreement to which Seller is a party will be duly and validly executed and delivered by Seller, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Buyer, is the Agreement is, and each of the Ancillary Agreements to which Seller is a party will be at Closing, is a valid and binding obligation of Seller enforceable against Seller in accordance with its terms.

(d) <u>No Conflict or Violation</u>. Neither the execution and delivery by Seller of this Agreement or any of the Ancillary Agreements to which Seller is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order) the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements to which Seller is a party, nor compliance by Seller with any of the provisions hereof or thereof, will (x) conflict with or result in any breach of any provision of the respective certificates of incorporation or formation of Seller or the respective by-laws or operating agreements of Seller, or (y) violate any provision of law, regulation, rule or other legal requirement of any Government ("<u>Law</u>") or any order, judgment or decree of any court or Government ("<u>Order</u>") applicable to Seller or any of its properties or assets, except, in either of the foregoing cases (x) and (y), for any conflict or violation as would not reasonably be expected to cause a Material Adverse Effect.

19

(e)   <u>Consents and Approvals</u>.  The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Seller is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Seller after the Closing in order for Buyer to own or operate any of the Acquired Assets; (ii) the entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)   <u>Title and Ownership</u>.  Except as would not have a Material Adverse Effect, Seller has good title to, or right by license, lease or other agreement to use, the Acquired Assets.  Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Acquired Assets to Buyer free and clear of all Liens, other than Liens included in the Assumed Liabilities and Permitted Liens.

(g)   <u>Compliance with Law</u>.  Except as set forth on <u>Schedule 4.1(g)</u> or would not otherwise reasonably be expected to cause a Material Adverse Effect, (i) Seller has operated the Business in material compliance with all applicable Laws, and (ii) except as may result from the Bankruptcy Case, Seller has not received written notice of any violation of any applicable Laws, nor is Seller in default with respect to any Order applicable to the Acquired Assets.

(h)   <u>Contracts and Leases</u>.  As of the Effective Date, other than as set forth on <u>Schedule 4.1(h)</u> or in motions or other pleadings or similar items filed with the Bankruptcy Court, neither Seller nor, to Seller's Knowledge, any other party to any of the Assumed Contracts or Assumed Leases has commenced any action against any of the parties to such Assumed Contracts or Assumed Leases or given or received any written notice of any material default or violation under any Assumed Contract or Assumed Lease that was not withdrawn or dismissed, except only for those defaults that will be cured in accordance with the Sale Order (or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of the Assumed Contracts and Assumed Leases).    Assuming due authorization, execution, delivery and performance by the other parties thereto, each of the Assumed Contracts and Assumed Leases is, or will be at the Closing, valid, binding and in full force and effect against Seller, except as otherwise set forth on <u>Schedule 4.1(h)</u>.

(i)   <u>Permits</u>.  <u>Schedule 4.1(i)</u> sets forth a complete and correct list of all material Permits currently held by Seller in connection with the Business ("<u>Material Permits</u>"), and all such Material Permits at the current locations of the Business are, except as would not cause a Material Adverse Effect, in full force and effect.

(j)   <u>Intellectual Property</u>. <u>Schedule 4.1(j)</u> sets forth an accurate and complete list of all registrations and applications for Acquired Intellectual Property owned by the Sellers. The Sellers are the sole and exclusive owners of the Acquired Intellectual Property owned by the Sellers (including as set forth on <u>Schedule 4.1(j)</u>) free

Case 20-10883-CTG   Doc 983   Filed 03/05/20   Entered 03/05/20 14:37:35   Desc Main
Document   Order Page 36 of 99

and clear of all Liens pursuant to the Sale Order. Except as limited by section 365(c)(1)(A) of the Bankruptcy Code, Sellers own all right, title and interest to, or are valid licensees with respect to, the Acquired Intellectual Property, and, at Closing, will convey the Acquired Intellectual Property to Buyer free and clear of Liens pursuant to the Sale Order. To the Sellers' Knowledge, (i) no Person is engaging in any activity that materially infringes, dilutes, misappropriates or violates any Acquired Intellectual Property and (ii) no claim has been asserted to any Seller in writing that the use of any Acquired Intellectual Property or the operation of the Business infringes, dilutes, misappropriates or violates the Intellectual Property of any third party.

Section 4.2    <u>Representations and Warranties of Buyer</u>.  Buyer represents and warrants to Seller as follows:

(a)    <u>Corporate Organization</u>.  Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the jurisdiction of its formation.  Buyer has the requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted and to carry out its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(b)    <u>Qualification to do Business</u>.  Buyer will as of the Closing Date be duly qualified to do business as a foreign limited liability company in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business(es) conducted by it makes such qualification necessary.

(c)    <u>Authorization and Validity</u>.  Buyer has the requisite corporate power and authority necessary to enter into this Agreement and each of the Ancillary Agreements to which Buyer is a party, and to carry out its obligations hereunder and thereunder, subject to the Bankruptcy Court's entry of the Sale Order, to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and those Ancillary Agreements to which Buyer is a party have been duly authorized by all necessary corporate action by the board of directors (or equivalent), and no other corporate proceedings are necessary for the performance by Buyer of its obligations under this Agreement and each of the Ancillary Agreements to which Buyer is a party, or the consummation by Buyer of the transactions contemplated hereby or thereby.  This Agreement and each of the Ancillary Agreements to which Buyer is a party have been duly and validly executed and delivered by Buyer, and at Closing each Ancillary Agreement will be duly and are validly executed and delivered by Buyer, and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution and delivery by Seller, the Agreement is, and each of the Ancillary Agreements will be at Closing, a valid and binding obligations of Buyer enforceable against it in accordance with their respective terms. Scott Soura is the sole member of Buyer and has as of the Closing ensured that Buyer and any Buyer Acquisition Vehicle has sufficient funds necessary to consummate the transactions contemplated by this Agreement.

21

(d)    No Conflict or Violation.  Neither the execution and delivery by Buyer of this Agreement or any of the Ancillary Agreements to which Buyer is a party, nor (subject to the Bankruptcy Court's entry of the Sale Order) the consummation of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the provisions hereof or thereof, will (i) conflict with or result in any breach of any provision of the certificate of incorporation or by-laws (or equivalent documents) of Buyer, (ii) violate any provision of Law, or any Order applicable to Buyer or any of its properties or assets, or (iii) automatically result in a modification, violation or breach of, or constitute (with or without notice or lapse of time or both) a default (or give rise to any right, including but not limited to, any right of termination, amendment, cancellation or acceleration) under, any of the terms, conditions or provisions of any contract, indenture, note, bond, lease, license or other agreement to which Buyer is a party or by which it is bound or to which any of its properties or assets is subject, except as would not materially and adversely affect the ability of Buyer to consummate the transactions contemplated by this Agreement or any of the Ancillary Agreements.

(e)    Consents and Approvals.   The execution, delivery and performance of this Agreement and the Ancillary Agreements to which Buyer is a party do not and will not require the consent or approval of, or filing with, any Government or any other Person, other than (i) as may be required to be obtained by Buyer after the Closing in order to own or operate any of the Acquired Assets; (ii) for entry of the Sale Order by the Bankruptcy Court; or (iii) for such consents, approvals and filings, of which the failure to obtain or make would not, individually or in the aggregate, have a material adverse effect on the ability of Buyer to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements to which Buyer is a party.

(f)    Adequate Assurances Regarding Assumed Contracts and Assumed Leases.  Buyer is and will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts and Assumed Leases.

(g)    Financial Capability.  Buyer and any Buyer Acquisition Vehicle currently has or at Closing will have available funds necessary to consummate the transactions contemplated by this Agreement, including the acquisition of the Acquired Assets and assumption of the Assumed Liabilities, and the payment therefor (i) to Seller of the Purchase Price and (ii) of any Cure Amount, and to perform its obligations under this Agreement and the Ancillary Agreements to which Buyer is a party on the terms and subject to the conditions contemplated hereby and thereby.

(h)    Investigation by Buyer.  Buyer has conducted its own independent review and analysis of the Business, the Acquired Assets and the Assumed Liabilities, operations, technology, assets, liabilities, financial condition and prospects of the Business as formerly carried on by Seller and acknowledges that Seller has provided Buyer with reasonable access to the personnel, properties, premises and records of the Business for this purpose.  Buyer has conducted its own independent review of all Orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in

22

connection with the Bankruptcy Case. In entering into this Agreement, Buyer has relied solely upon its own investigation and analysis, and Buyer (i) acknowledges that neither Seller nor any of its Affiliates or Related Persons makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Buyer or its Affiliates or Related Persons, except for the representations and warranties contained in <u>Section 4.1</u> (which are subject to the limitations and restrictions contained in this Agreement); and (ii) agrees, to the fullest extent permitted by Law, that none of Seller, its Affiliates or any of their respective Related Persons shall have any liability or responsibility whatsoever to Buyer or its Affiliates or Related Persons on any basis (including, without limitation, in contract or tort, under federal or state securities Laws or otherwise, but excluding misrepresentation or concealment arising from actual fraud of Seller) based upon any information provided or made available, or statements made, to Buyer or its Affiliates or Related Persons (or any omissions therefrom), including, without limitation, in respect of the specific representations and warranties of Seller set forth in this Agreement, except, with regard to Seller, for the representations and warranties contained in <u>Section 4.1</u> and, with respect to such representations and warranties, subject to the limitations and restrictions contained in this Agreement.

Section 4.3    <u>Warranties Exclusive; Schedules.</u>

(a)    The representations and warranties contained in <u>Article 4</u> are the only representations or warranties given by the parties to this Agreement and all other express or implied warranties are disclaimed. Without limiting the foregoing, the Acquired Assets are otherwise conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, SELLER AND SELLER'S AFFILIATES AND THEIR RESPECTIVE RELATED PERSONS HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING (A) ANY USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) ANY FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES, (C) ANY OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS OR (D) THE CONDITION OF THE ACQUIRED ASSETS INCLUDING, WITHOUT LIMITATION, COMPLIANCE WITH ANY ENVIRONMENTAL LAWS OR OTHER LAWS. SELLER AND SELLER'S AFFILIATES AND RELATED PERSONS HAVE MADE NO REPRESENTATIONS OR WARRANTIES IN ANY OTHER AGREEMENT.

(b)    The disclosure of any matter or item in any schedule hereto shall not be deemed to constitute an acknowledgement that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

Section 4.4    <u>Survival of Representations and Warranties.</u>    None of the representations or warranties of Seller set forth in this Agreement or any Ancillary Agreement or

23

in any certificate delivered pursuant to Section 9.2(a) or Section 9.2(b) shall survive the Closing (and, for the avoidance of doubt, all covenants set forth in this Agreement or any Ancillary Agreement shall survive in accordance with their respective terms).

## ARTICLE 5. COVENANTS OF THE PARTIES

Section 5.1    Covenants of Seller.  Seller covenants as follows:

(a)    Commercially Reasonable Efforts.  Between the Effective Date and the Closing Date, Seller shall use commercially reasonable efforts to (except as may be disclosed to Buyer) (i) obtain all necessary consents, waivers, authorizations and approvals of all Governments, and of all other Persons, required to be obtained by Seller in connection with the execution, delivery and performance by it of this Agreement and the Ancillary Agreements to which Seller is a party, (ii) take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements, and (iii) maintain the Acquired Assets substantially in accordance with Seller's current practices and procedures (as adjusted for the effects of any COVID Restrictions).

(b)    Access to Properties and Documents; Confidentiality.  Seller shall afford to Buyer, and to the accountants, counsel and representatives of Buyer, reasonable access (subject to any COVID Restrictions) during normal business hours throughout the period from the Effective Date until the Closing Date (or the earlier termination of this Agreement pursuant to Article 10) to all Documents of Seller relating to the Acquired Assets and the Assumed Liabilities.  Upon reasonable prior notice, Seller shall also afford Buyer reasonable access, taking into account any COVID Restrictions and Seller's resources and other commitments, during normal business hours, to all Acquired Assets, and to Seller's executive officers, accountants, counsel, employees and other representatives, throughout the period prior to the Closing Date (or the earlier termination of this Agreement pursuant to Article 10).  The rights of access contained in this Section 5.1(b) are granted subject to, and on, the following terms and conditions:  (i) any such investigation shall not include physical testing or sampling and will be conducted in a reasonable manner; (ii) all information provided to Buyer or its agents or representatives by or on behalf of Seller or its agents or representatives (whether pursuant to this Section 5.1(b) or otherwise) will be governed and protected by the Confidentiality Agreement, dated as of September 8, 2020, by and between Buyer and ROC (the "Confidentiality Agreement"); and (iii) such rights of access shall not affect or modify the conditions set forth in Article 9 in any way. Buyer shall indemnify, defend and hold harmless (i) Seller, (ii) the lessors of any Leased Real Property, and (iii) Seller's and such lessors' respective Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or its accountants, counsel and representatives entry upon the Leased Real Property in connection with their exercise of the right of access pursuant to this Section 5.1(b), and (B) any and all other activities undertaken by Buyer or its accountants, counsel and representatives with respect to any such Leased Real Property in connection with their exercise of the right of access pursuant to this Section 5.1(b).

Case 20-10883-CTG    Doc 983-4    Filed 03/05/21    Entered 03/05/21 14:37:35    Desc Exhibit to Order    Page 40 of 99

(c)    Operation of the Business.  Except as otherwise contemplated or permitted by this Agreement or the Ancillary Agreements, would not constitute a Material Adverse Effect, or with the prior consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), or in connection with any Order relating to the Bankruptcy Case, between the Effective Date and the Closing Date, Seller shall (i) use commercially reasonable efforts to safeguard and maintain the Acquired Assets in their condition as of the Effective Date (except for ordinary wear and tear) and prevent any destruction thereof or material damage thereto between the Effective Date and the Closing Date, (ii) not enter into, materially amend or terminate any Assumed Contract or Assumed FF&E Lease outside of the ordinary course of business where such amendment or termination would have a material and adverse effect on the value of the Acquired Assets taken as a whole and (iii) notify Buyer of any notices relating to or proposed changes affecting Seller's insurance policies covering any of the Acquired Assets. Notwithstanding the foregoing, nothing in this Agreement shall restrict Seller from rejecting any Contract or Lease that is not an Assumed Contract or Assumed FF&E Lease.

Section 5.2    Covenants of Buyer.  Buyer covenants as follows:

(a)    Commercially Reasonable Efforts.    Buyer shall use all commercially reasonable efforts to (i) obtain all consents and approvals of all Governments, and all other Persons, required to be obtained by Buyer to effect the transactions contemplated by this Agreement and the Ancillary Agreements, and (ii) take, or cause to be taken, all action, and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective in an expeditious manner the transactions contemplated by this Agreement and the Ancillary Agreements.

(b)    Adequate Assurances Regarding Assumed Contracts and Assumed Leases.  With respect to each Assumed Contract and Assumed Lease that (i) is not a Qualifying Excluded Contract and Lease, Buyer shall provide adequate assurance of the future performance of such Assumed Contract or Assumed Lease by Buyer and (ii) is a Qualifying Excluded Contract and Lease, Buyer shall undertake reasonable efforts to provide adequate assurance of the future performance of such Assumed Contract or Assumed Lease by Buyer; provided that, for clarity the failure to provide adequate assurance shall not be a breach of this Section 5.2(b)(ii) if Buyer has undertaken reasonable efforts to provide such assurance.  Buyer agrees that it will promptly take all actions as are reasonably requested by Seller to assist in obtaining the Bankruptcy Court's entry of the Sale Order, including, without limitation, furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making Buyer's employees and representatives available to testify before the Bankruptcy Court.

(c)    Cure of Defaults.  Buyer shall, without any adjustment to the Purchase Price, as of the Closing or, in respect of any Assumed Lease or Assumed Contract for which the Bankruptcy Court does not enter an Order fixing the Cure Amount until after the Closing, then immediately following the entry of such Order, cure any and all defaults under the Assumed Contracts and Assumed Leases (other than

25

Qualifying Excluded Contracts and Leases), including paying the applicable Cure Amount, which defaults are required to be cured under the Bankruptcy Code, so that such Assumed Contracts and Assumed Leases may be assumed by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(d)     Performance under Assumed Contracts and Assumed Leases. Buyer shall (i) from and after the Closing Date, assume all obligations and liabilities of Seller under the Assumed Contracts and Assumed Leases, (ii) from and after the Closing Date, take all actions necessary to satisfy its obligations and liabilities under the terms and conditions of each of the Assumed Contracts and Assumed Leases, and (iii) indemnify, defend and hold harmless Seller, Seller's Affiliates, and all of their respective Related Persons from and against any damages, losses, costs, expenses and other liabilities arising out of a breach of this Section 5.2(d) or any of Buyer's other covenants contained in this Agreement or any Ancillary Agreements to which Buyer is a party.

(e)     Indemnification for Use of Real Property.  Buyer shall indemnify, defend and hold harmless (i) Seller, (ii) the lessors of any Leased Real Property, and (iii) Seller's and such lessors' respective Affiliates and Related Persons from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and disbursements) suffered or incurred by such Persons in connection with (A) Buyer's or Buyer's agents' or representatives' entry upon the Owned Real Property or the Leased Real Property in connection with their exercise of the right of access pursuant to Section 5.1(b), and (B) any and all other activities undertaken by Buyer or Buyer's agents or representatives with respect to any such Owned Real Property or Leased Real Property.

(f)     Released Claims.  Effective as of the Closing Date, Buyer, on behalf of itself and its Affiliates and each of their respective employees, directors, officers, shareholders, and advisors, hereby covenants and agrees that it shall not (i) assert any Claims that constitute Acquired Assets to the extent such Claims have been, or are at any time thereafter, released by or on behalf of Seller or any other Person pursuant to the Plan, an Order of the Bankruptcy Court, or otherwise or (ii) pursue, prosecute or assert any rights related to any Claims against employees, officers of directors of Seller, including by way of offset or recoupment.

Section 5.3     Real Property Matters. From and after the Effective Date until the Closing (or the earlier termination of this Agreement pursuant to Article 10), Seller shall, at no out-of-pocket cost or expense to Seller, use commercially reasonable efforts to assist Buyer in obtaining the following:

(a)     a commitment for a 2006 ALTA Owner's Title Insurance Policy for all real property to be purchased by Buyer (such policy together with a copy of all documents referenced therein, the "Title Commitment"), issued by a title insurance company satisfactory to Buyer (the "Title Company"), provided that, (A) any failure to obtain the Title Commitment for any reason other than Seller's failure to assist Buyer pursuant to this Section 5.3 shall not be a breach of or default under of this Agreement, and (B) Buyer obtaining the Title Commitment or

Case 20-10883-CTG    Doc 983-1    Filed 03/05/21    Entered 03/05/21 20:37:35    Desc Disclosure Order Page 42 of 99

a title insurance policy ("<u>Title Policy</u>") resulting therefrom, or any other form of title insurance, shall not be a condition to Buyer's performance of its obligations under this Agreement or Buyer's consummation of the transactions contemplated by this Agreement; and

(b)     a survey for all real property to be purchased by Buyer, dated no earlier than the Effective Date, prepared by a surveyor licensed in the jurisdiction where each real property to be acquired by Buyer is located and conforming to 2016 ALTA/ACSM Minimum Detail Requirements for Land Title Surveys (the "<u>Survey</u>").

## ARTICLE 6. <u>ADDITIONAL AGREEMENTS</u>

Section 6.1     <u>Bankruptcy Matters</u>.

(a)     <u>Backup Bidder</u>.   In the event that Buyer is designated as the "Backup Bidder" in accordance with and as defined in the Bidding Procedures Order, Buyer agrees that it will keep the Backup Bid (as defined in the Bidding Procedures Order) open and irrevocable until the earlier of 5:00 p.m. (prevailing Central Time) on the date that is sixty (60) days after the date of entry of the Bankruptcy Court's Order approving the Alternative Transaction and the closing date of the Alternative Transaction.  Notwithstanding anything to the contrary in this Agreement, Seller may also identify and enter into agreements respecting (x) a "back-up" bid relating to an Alternative Transaction, and/or (y) a liquidation sale of all or a portion of the Inventory and the other assets of Seller, in either case to become effective in the event Buyer does not perform in accordance with the terms of this Agreement.

(b)     <u>Notice to Holders of Liens, Claims and Interests</u>.  Seller has provided notice of the intent to seek entry of the Sale Order to all holders of Liens, Claims and Interests in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the Bankruptcy Court and any other applicable Order of the Bankruptcy Court.

(c)     <u>Entry of Sale Order</u>.  Seller has filed with the Bankruptcy Court one or more motions which, collectively, seek the entry of the Sale Order. The Sale Order provides that, without limitation and notwithstanding anything to the contrary in this Agreement (including any Assumed Contract), Buyer is not liable for, and is taking the Acquired Assets free of, any Excluded Liability.  Seller and Buyer shall use reasonable best efforts to cooperate, assist and consult with each other to secure the entry of the Sale Order, and to consummate the transactions contemplated by this Agreement, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement.  In the event that any Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), Seller and Buyer will cooperate in determining and pursuing the response to any such appeal, petition or motion and Seller and Buyer shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or

Case 20-10883-CTG   Doc 983-1   Filed 03/05/21   Entered 03/05/21 14:37:35   Desc Exhibit to Order   Page 43 of 99

motion.  For purposes of this <u>Section 6.1(c)</u> only, commercially reasonable efforts shall without limitation require each party to this Agreement to pay its costs and expenses reasonably required in connection with preparing and seeking entry of the Sale Order by the Bankruptcy Court and resolution of any appeal therefrom.

Section 6.2     <u>Transition Arrangements</u>.

(a)     <u>Access Covenant</u>.  Upon reasonable request from Seller, during reasonable hours, and subject to the terms of the Confidentiality Agreement, Buyer will for a period of two (2) years following the Closing Date provide to Seller, and the accountants, counsel and representatives of Seller, including any administrator of the Plan or Seller's estate, such access to the pre-closing books and records relating to the Business as is reasonably necessary to permit Seller to monetize any Excluded Assets and otherwise liquidate its estate after the Closing and confirmation of the Plan and to conclude the Bankruptcy Case, including the administration of the Plan, reconciliation and litigation of claims and making of distributions contemplated under the Plan or otherwise.  Such access will include (a) reasonable access to Buyer's personnel, information technology systems and books and records and (b) the use of office space for individuals and office support of appropriate secretaries or clerks for employees of Seller engaged in such wind-down and liquidation process.  Buyer will provide such services free of any charges, fees or rents, provided that Seller will reimburse Buyer for reasonable out-of-pocket costs and expenses incurred by Buyer in connection with providing such services (which for the avoidance of doubt will not include salaries paid to Buyer's consultants or employees or Buyer's overhead but may include temporary service workers (at customary and reasonable hourly costs) if needed based upon the reasonable time demands of the regular work of Buyer's employees and the reasonable time demands of Seller's employees engaged in the liquidation).

(b)     <u>Transitional License</u>.  Effective upon the Closing, for a period not to exceed one hundred and eighty (180) calendar days, Buyer shall grant Seller a non-exclusive, royalty-free right and license to use the Acquired Intellectual Property, including the Business Name, in connection with the wind-down and liquidation of Seller's estate and the conclusion of the Bankruptcy Case, including for purposes of administering a plan of liquidation of the Excluded Assets, reconciling claims and making distributions.

(c)     <u>Transitional Regulatory Matters</u>.  From the Effective Date until the Closing Date, Buyer and Seller shall each use commercially reasonable efforts to cooperate in the registration of Buyer as licensee, as of and conditional upon the Closing, under the ATF Licenses.  Without limitation to the foregoing, Buyer shall file all required applications for the ATF Licenses by the close of business on the date that is seven (7) calendar days after the date of entry of the Sale Order, and shall within one Business Day thereafter provide Buyer reasonable evidence of same.

Section 6.3     <u>Further Assurances</u>.  At the request and the sole expense of the requesting party, either party shall, at any time after the Closing Date, execute and deliver such

Case 20-10883-CTG   Doc 983-1   Filed 03/05/21   Entered 03/05/21 14:30:35   Desc Disclosure Order   Page 44 of 99

documents as the other party or its counsel may reasonably request to effectuate the purposes of this Agreement.

## ARTICLE 7. <u>EMPLOYEES AND EMPLOYEE BENEFITS</u>

Section 7.1 <u>Transferred Employees</u>. Within seventy-five (75) days after entry of the Sale Order, Buyer shall offer employment to at least two hundred (200) union Employees related to Debtors' non-Marlin-related firearms business at the Ilion facility. Each such offer shall include a waiver of any costs related to the termination of employment of such Employees by Seller in connection with the transactions contemplated by this Agreement (including without limitation any severance or WARN Act payments), as against Buyer, Seller and their respective Affiliates. If the Closing occurs, any such Employees who accept any such offer no later than five (5) days after the Closing Date are referred to in this Agreement as the "<u>Transferred Employees</u>".

Section 7.2 <u>Employment Tax Reporting</u>. With respect to Transferred Employees, Buyer and Seller shall use the standard procedure set forth in Revenue Procedure 2004-53, 2004-34 I.R.B. 320, for purposes of employment Tax reporting.

Section 7.3 <u>Benefits</u>. From and after the Closing (or with respect to any Transferred Employee who is on an approved leave of absence as of the Closing, from and after his or her return to work), Buyer shall, or shall cause an Affiliate of Buyer to, provide (whether under existing or newly-established Buyer compensation or benefits plans (collectively, the "<u>Buyer Plans</u>")) to each Transferred Employee and their eligible dependents benefits under the Buyer Plans that are no less favorable to the applicable Transferred Employee in the aggregate than the practice, plans, policies or Contracts in effect for such Transferred Employee immediately prior to the Closing, provided that Buyer shall not assume any unpaid or unfunded liabilities which may be owed to Transferred Employees for periods prior to retention or employment by Buyer. If applicable, for purposes of eligibility, vesting and the calculation of the eligibility for and amount of vacation, sick pay, severance or other benefits under the Buyer Plans providing benefits to Transferred Employees, Buyer shall credit each Transferred Employee with his or her years of service with Seller to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan; <u>provided</u>, <u>however</u>, that no such service recognition shall result in any duplication of benefits or apply to any defined benefit pension plans. In addition, to the extent it has the right to do so, Buyer shall use commercially reasonable efforts to (a) waive under any health or welfare plans maintained by Buyer for Transferred Employees any pre-existing condition limitations and eligibility waiting periods for Transferred Employees and their eligible dependents (but only to the extent such pre-existing condition limitations, eligibility waiting periods and evidence of insurability requirements were satisfied under Seller's comparable health plans as of the Closing Date), and (b) provide that dollar amount of all eligible expenses incurred by Transferred Employees and their eligible dependents during the calendar year in which the Closing Date occurs shall be taken into account for purposes of satisfying the applicable deductibles, co-payments or out-of-pocket limitations for such calendar year under the relevant Buyer's health or welfare plans.

29

Section 7.4    <u>WARN Act</u>.  Buyer and Seller agree that:

(a)    Except as provided under the terms of the amended and modified CBA referenced hereinabove, Buyer shall not, at any time prior to ninety (90) days after the Closing Date, effectuate a "plant closing" or "mass layoff" (as those terms are defined in the WARN Act) affecting the Transferred Employees without complying in full with the WARN Act.

Section 7.5    <u>Third Party Beneficiary</u>.  No provision of this <u>Article 7</u> shall (a) create any third party beneficiary or other rights in any Employee or former employee (including any beneficiary or dependent thereof) of Seller, Buyer or any other Person, (b) constitute or create, or be deemed to constitute or create, an employment agreement or employee benefit plan, (c) constitute or be deemed to constitute an amendment to any employee benefit plan sponsored or maintained by Seller or Buyer, or (d) alter or change the employment at-will status of any Employees.

ARTICLE 8. <u>TAXES</u>.

Section 8.1    <u>Taxes Related to Purchase of Assets</u>.  All recording and filing fees and all federal, state and local sales, transfer, excise, value-added or other similar Taxes, including, without limitation, all state and local Taxes in connection with the transfer of the Acquired Assets, but excluding all income taxes and other fees based upon gain realized by Seller as a result of the sale of the Acquired Assets (collectively, "<u>Transaction Taxes</u>"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and which are not exempt under Section 1146(a) of the Bankruptcy Code, shall be paid by Buyer. Buyer and Seller agree to cooperate to determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement, and Seller agrees to assist Buyer reasonably in the preparation and filing of any and all required returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

Section 8.2    <u>Cooperation on Tax Matters</u>.

(a)    Buyer and Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)    Buyer agrees to retain possession, at its own expense, of all accounting, business, financial and Tax records and information (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period of at least six (6) years from the Closing Date, and will give Seller notice and an

30

opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period. In addition, from and after the Closing Date, Buyer agrees that it will provide access to Seller and its attorneys, accountants and other representatives (after reasonable notice and during normal business hours and without charge) to those portions of books, records, documents and other information that relate solely to the Acquired Assets or the Assumed Liabilities as Seller may reasonably deem necessary to (x) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer or (y) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Seller. Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities as they existed on or before the Closing, unless such access cannot be limited to the appropriate information, in which case, Buyer may, at its reasonable discretion, retrieve electronic data compilations of the appropriate information.

(c)     If Seller receives any refund, overpayment or rebate of Taxes (including any refund, overpayment or rebate relating to any Straddle Period) that is attributable to Taxes paid by Buyer, it shall promptly, and in no case later than ten (10) Business Days after receipt thereof, pay such refund, overpayment or rebate over to Buyer net of any reasonable cost or expense incurred in connection with such refund, overpayment or rebate.

(d)     Seller shall prepare and file all Tax Returns for any Pre-Closing Taxes, whether or not such Tax Returns are required to be filed after the Closing Date, and Seller shall timely pay all Taxes reflected on such Tax Returns. Buyer shall prepare and file, or cause to be prepared and filed (with Seller's reasonable cooperation) all Tax Returns with respect to Post-Closing Taxes. Buyer and Seller shall reasonably cooperate in the preparation of any Tax Returns described in this Section 8.2(d).

(e)     Buyer and Seller will cooperate and Buyer shall use commercially reasonable efforts to cause the Buyer or any Buyer Acquisition Vehicle to be registered with the Alcohol and Tobacco Tax and Trade Bureau as a "manufacturer" for purposes of the Firearms Ammunition and Excise Tax on or before the Closing Date.

Section 8.3     Allocation of Purchase Price.  Promptly (and in any event within sixty (60) days) following the Closing Date, Seller shall deliver a schedule to Buyer allocating the Purchase Price among the Acquired Assets (the "Allocation"). Seller and Buyer will cooperate to resolve any disputes regarding the Allocation and to file with the Internal Revenue Service their respective Forms 8594 as provided for in Section 1060 of the Code on a basis consistent with the Allocation, and the Allocation shall be reflected on any Tax Returns required to be filed as a result of the transactions contemplated by this Agreement.

ARTICLE 9. CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES.

Section 9.1     Conditions Precedent to Performance by Seller.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which

Case 21-10883-CTG   Doc 9   Filed 03/06/21   Entered 03/06/21 20:37:35   Desc Main Document   Order   Page 47 of 99   Page 31 of 80

(other than the conditions contained in Section 9.1(c)(i) and Section 9.1(c)(ii)) may be waived by Seller in its sole discretion:

        (a)      Trademark License Agreement.  This Agreement is conditioned upon entry into the Trademark License Agreement, pursuant to which Vista will provide an exclusive license the use of certain Remington Brand-related Trademarks, for Buyer's continued use in segments of the Business outside of the Ammunitions Business following the Closing (such agreement or agreements being collectively, the "IP Back-License"), including Buyer's development, manufacture, marketing and/or sale of (1) Firearms; (2) Receivers; (3) Barrels; (4) Stocks; (5) Grips; (6) Rails; (7) Butts; (8) Triggers; (9) Safeties; (10) Iron Sights (excluding any electronic, or optical sights, and any scopes); (11) Flash suppressors; (12) Recoil compensators; (13) Heatshields; (14) Silencers; (15) Sight adjustment tools; (16) Gunsmithing tools and kits; (17) Books and manuals (firearms related); (18) Magazines; (19) Gun Cases and (20) anything that is or can be affixed to or installed within a firearm of any kind.

        (b)      Representations and Warranties of Buyer.  All representations and warranties made by Buyer in Section 4.2 shall be accurate in all material respects on and as of the Closing Date as if again made by Buyer on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a material adverse effect on Buyer's ability to perform its obligations hereunder, and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

        (c)      Performance of the Obligations of Buyer.  Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date (except with respect to the obligation to pay the Good Faith Deposit and the Purchase Price in accordance with the terms of this Agreement, which obligations shall be performed in all respects), and Seller shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Buyer, solely in such capacity on behalf of Buyer, to that effect.

        (d)      Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

        (e)      No Violation of Orders.  No preliminary or permanent injunction or other Order that declares this Agreement invalid or unenforceable in any respect or which prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

        (f)      Cure of Defaults.  At or prior to the Closing, any and all defaults under the Assumed Contracts and Assumed Leases (other than Qualifying Excluded Contracts and Leases) that are required to be cured under the Bankruptcy Code shall have been cured, so that such Assumed Contracts and Assumed Leases may be assumed

32

by Seller and assigned to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code.

(g)    Vista Closing.    The Closing, as defined in that certain Asset Purchase Agreement entered into by and between Seller and Vista Outdoor Inc. in connection with the auction held under the Bidding Procedures Order, shall have been consummated

(h)    Ilion Investment Reserve.    On or prior to Closing, Buyer shall have deposited no less than Two Million Dollars (US$2,000,000) (the "Reserve Amount") into a segregated reserve account, which Reserve Amount shall be used only to fund either (a) capital improvements and modernization costs of the Ilion, New York facility or (b) payment of salaries, wages, benefits, and the employer portion of payroll taxes in respect of such obligations and benefits for employees located at the Ilion, New York facility.

(i)    Buyer's Deliveries.    Buyer shall have delivered to Seller all of the items set forth in Section 3.3.

Section 9.2    Conditions Precedent to Performance by Buyer.    The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing Date, of the following conditions, any one or more of which (other than the conditions contained in Section 9.2(c)(i) and Section 9.2(c)(ii)) may be waived by Buyer in its sole discretion:

(a)    Representations and Warranties of Seller.    All representations and warranties made by Seller in Section 4.1 shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that do not result in a Material Adverse Effect, and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(b)    Performance of the Obligations of Seller.    Seller shall have performed all obligations required under this Agreement to be performed by it on or before the Closing Date, other than failures of performance (i) that do not result in a Material Adverse Effect or (ii) under those obligations of Seller set forth in Section 6.2(c), and Buyer shall have received a certificate, dated as of the Closing Date and signed by a duly authorized officer of Seller, solely in such capacity on behalf of Seller, to that effect.

(c)     Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order, and no Order staying, modifying, or amending the Sale Order shall be in effect on the Closing Date.

(d)     No Violation of Orders.  No preliminary or permanent injunction or other Order that declares this Agreement invalid in any respect or prevents the consummation of the transactions contemplated by this Agreement shall be in effect.

(e)     Trademark License Agreement.    Buyer and Vista shall enter into the Trademark License Agreement, which provides for, among other things, use by Buyer of all (i) registered and unregistered Intellectual Property owned or used by Seller in connection with the ownership, operation and/or management of the Business and any and all corresponding rights that, now or hereafter, may be secured throughout the world, and (ii) to the extent transferable under applicable Law, Intellectual Property licensed to Seller in connection with the ownership, operation and/or management of the Business (collectively, the "Vista Acquired Intellectual Property").

(f)     Seller's Deliveries.  Seller shall have delivered to Buyer all of the items set forth in Section 3.2.

## ARTICLE 10. TERMINATION.

Section 10.1    Conditions of Termination.  This Agreement may be terminated at any time before the Closing:

(a)     By mutual written consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Warranty Termination Date"), if the condition contained in Section 9.1(a) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(b) if Seller is then in material breach of this Agreement;

(c)     By Seller, by notice to Buyer, if Seller has previously provided Buyer with written notice of Buyer's failure to perform any material covenant of Buyer contained in this Agreement and Buyer has failed within five (5) days after such notice to perform such covenant; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(c) if Seller is then in material breach of this Agreement;

(d)     By Seller, by notice to Buyer, on or after the date that is 150 calendar days after the Petition Date (the "Approval Termination Date"), if any condition contained in Section 9.1(c) or Section 9.1(d) has not been satisfied or waived; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 10.1(d) if Seller is then in material breach of this Agreement;

(e)     By Buyer, by notice to Seller, on or after the Warranty Termination Date, if the condition contained in Section 9.2(a) has not been satisfied or

34

waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(e) if Buyer is then in material breach of this Agreement;

(f)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with written notice of a failure to perform any material covenant of Seller contained in this Agreement and Seller has failed within five (5) days after such notice to perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(f) if Buyer is then in material breach of this Agreement;

(g)     By Buyer, by notice to Seller, after the Approval Termination Date, if any condition contained in Section 9.2(c) or Section 9.2(d) has not been satisfied or waived; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 10.1(g) if Buyer is then in material breach of this Agreement;

(h)     By Buyer, by notice to Seller, or by Seller, by notice to Buyer, if the Bankruptcy Court enters an Order dismissing or converting the Bankruptcy Case into a case under Chapter 7 of the Bankruptcy Code, appointing a trustee in the Bankruptcy Case, or appointing an examiner with enlarged power related to the operation of the Business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or the occurrence of any of the foregoing;

(i)     By Seller, five (5) Business Days after notice to Buyer, if the Bankruptcy Court has not entered the Sale Order by the date that is 60 calendar days after the Petition Date;

(j)     Automatically, upon the earlier of (i) Seller consummating an Alternative Transaction, and (ii) sixty (60) days following the date upon which the Bankruptcy Court issues a Final Order approving an Alternative Transaction; and

(k)     As provided for in Section 3.2(a).

Section 10.2     Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 10.1, this Agreement shall become null and void and have no effect (other than Article 10, Article 11, and Article 12, which shall survive termination), with no liability on the part of Seller or Buyer, or their respective Affiliates or Related Persons, with respect to this Agreement, except for (i) the liability of a party for its own expenses pursuant to Section 11.4, (ii) the obligation of Buyer under Section 6.1(a) and (iii) any liability provided for in Section 10.2(b) through Section 10.2(d), inclusive.

(b)     If this Agreement is terminated pursuant to Section 10.1(a), Section 10.1(d), Section 10.1(e), Section 10.1(f), Section 10.1(g), Section 10.1(h),

35

Case 20-10883-CTG    Doc 983-4    Filed 03/05/21    Entered 03/05/21 14:37:35    Desc
Exhibit to Order    Page 51 of 99

Section 10.1(i) or Section 10.1(j), then the Good Faith Deposit shall, within three (3) Business Days, be returned by Seller to Buyer.

(c)     If this Agreement is terminated pursuant to Section 10.1(b), Section 10.1(c) or Section 3.2(a), then Seller may, at its sole election (i) within three (3) Business Days, retain the Good Faith Deposit, as liquidated damages (the "Break Fee"), or (ii) without limitation to Seller's remedies under clause (i) of this Section 10.2(c) require Buyer to specifically perform under the terms of this Agreement and each of the Ancillary Agreements to which Buyer is a party.

(d)     Notwithstanding anything to the contrary herein, but without limitation to the right to enforce covenants as set forth in Article VI (if the Closing shall have occurred) or the provisions of Section 3.2(a), (i) Seller's entitlement to the Break Fee (to the extent provided for in this Agreement) will constitute liquidated damages (and not a penalty) and, if Seller retains such amount, then notwithstanding anything to the contrary contained herein, such Break Fee shall be the sole and exclusive remedy available to Seller and any other Person against Buyer, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Buyer, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby, and (ii) Buyer's entitlement to the reimbursement of the Good Faith Deposit (to the extent provided for in this Agreement) shall be the sole and exclusive remedy (at law, in equity or otherwise) available to Buyer and any other Person against Seller, its Subsidiaries, and any of their respective Affiliates in connection with this Agreement and the transactions contemplated hereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise) and none of Seller, its Subsidiaries or any of their respective Affiliates shall have any further liability relating to or arising out of this Agreement or the transactions contemplated hereby. Each Party acknowledges that the agreements contained in this Section 10.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

## ARTICLE 11. MISCELLANEOUS.

Section 11.1     Successors and Assigns.  Prior to the Closing, neither Buyer nor Seller shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other, and any such attempted assignment without such prior written consent shall be void and of no force and effect; provided that if Buyer wishes, upon prior written notice to Seller, to assign its rights, obligations and liabilities hereunder no later than ten (10) days prior to the Closing Date to a Buyer Acquisition Vehicle, such prior written consent of Seller shall not unreasonably be withheld.  This Agreement shall inure to the benefit of and shall be binding upon the successors and permitted assigns of the parties to this Agreement.

Section 11.2     Governing Law; Jurisdiction.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the Laws of the State of Delaware

36

(without giving effect to the principles of conflicts of Laws thereof), except to the extent that the Laws of such State are superseded by the Bankruptcy Code. For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After Seller is no longer subject to the jurisdiction of the Bankruptcy Court, the parties to this Agreement irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having competent jurisdiction over the Northern District of Alabama.

Section 11.3  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE SUCH WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.3</u>.

Section 11.4  <u>Expenses</u>.  Except as expressly otherwise provided herein, each of the parties to this Agreement shall pay its own expenses in connection with this Agreement and the transactions contemplated by this Agreement, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated by this Agreement are consummated.  Buyer shall pay the cost of any surveys (without limitation to the restriction in <u>Section 5.1(b)(i)</u>), title insurance policies and title reports ordered by Buyer.

Section 11.5  <u>Broker's and Finder's Fees</u>.  Each of the parties to this Agreement represents and warrants that it has dealt with no broker or finder in connection with any of the transactions contemplated by this Agreement other than as set forth on <u>Schedule 11.5</u>, whose fees and expenses shall, as between the parties to this Agreement, be the responsibility of the party indicated on <u>Schedule 11.5</u>, and, to such party's Knowledge, no other broker or other Person is entitled to any commission or broker's or finder's fee in connection with any of the transactions contemplated by this Agreement or the Ancillary Agreements.

Section 11.6  <u>Severability</u>.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated by this Agreement in substantially the same manner as originally set forth at the later of the date this Agreement was executed or last amended.

Case 20-81688-CRJ11  Doc 983  Filed 03/05/21  Entered 03/05/21 14:30:35  Desc Main Document  Order Page 53 of 99  Page 337 of 980

Section 11.7    Notices.

(a)    All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) when transmitted via electronic mail to the applicable electronic mail address set forth below if confirmation of receipt is obtained promptly after completion of transmission; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service; or (iv) on the fifth $(5^{th})$ day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Remington Outdoor Company, Inc.
100 Electronics Blvd., SW
Huntsville, Alabama 35824
Attention: Ken D'Arcy
Email: ken.darcy@remington.com

With a copy in either case to (which copy alone shall not constitute notice):

O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California  90071
Attention: John-Paul Motley, Esq., and Stephen H. Warren, Esq.
Phone: (213) 430-6100 and (213) 430-7875, respectively
Email: jpmotley@omm.com and swarren@omm.com, respectively

If to Buyer:

Attention: Scott Soura
Email: soura@roundhillgroup.com
888 SE 3 Avenue, Suite 500
Fort Lauderdale, FL 33316

With a copy to (which copy alone shall not constitute notice):

Shulman Bastian Friedman & Bui, LLP
100 Spectrum Center Drive, Suite 600
Irvine, California 92618
Attention: James C. Bastian, Jr., Esq.
Email: jbastian@shulmanbastian.com

38

Case 2:18-bk-88883-CR11  Doc 983-1 Filed 03/05/20  Entered 03/05/20 15:40:37  Desc
Disclosure Order  Page 54 of 99

(b)    Any party may change its address for the purpose of this <u>Section 11.7</u> by giving the other party written notice of its new address in the manner set forth above.

Section 11.8    <u>Amendments; Waivers</u>.    This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by the parties to this Agreement, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 11.9    <u>Time of Essence</u>.    Time is of the essence in the performance of each and every term of this Agreement.

Section 11.10    <u>Specific Performance</u>.    The provisions of this Agreement are uniquely related to Seller's and its Affiliates' desire to consummate the transactions contemplated by this Agreement, and such transactions represent a unique business opportunity at a unique time for the Seller and its Affiliates.  As a result, irreparable damage would occur to Seller and its Affiliates in the event that any of the obligations of Buyer under this Agreement were not performed in accordance with their specific terms.  Although liquidated or other monetary damages may be available for the breach of covenants and undertakings contained in this Agreement, monetary damages would be difficult to ascertain and an inadequate remedy therefor.  Accordingly, if Buyer breaches or threatens to breach any provision of this Agreement, then without limitation to Seller's rights under clause (i) of Section 10.2(c) Seller shall be entitled to an injunction or injunctions, specific performance and any and all other equitable relief to prevent or restrain breaches or threatened breaches of this Agreement, this being in addition to any other remedies to which it is entitled at Law or equity.  If Seller seeks an injunction or injunctions to prevent breaches of this Agreement or seeking to enforce specifically the terms and provisions of this Agreement, Seller shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such Order or injunction.  Buyer irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security.  If any action or proceeding should be brought in equity to enforce the provisions of this Agreement, Buyer shall not allege, and hereby waives the defense, that there is an adequate remedy at Law.

Section 11.11    <u>Public Announcements</u>.    Promptly after the execution and delivery of this Agreement, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein.  Thereafter, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written consent of the other party (such consent not to be unreasonably withheld, conditioned or delayed) unless a press release or public announcement is required by Law or Order of the Bankruptcy Court.  If any such announcement or other disclosure is required by Law or Order of the Bankruptcy Court, the disclosing party agrees to give the nondisclosing party prior notice of, and an opportunity to comment on, the proposed disclosure.  Notwithstanding anything to the contrary in this <u>Section 11.11</u>, Seller (a) shall file

39

this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and (b) may disclose this Agreement to its equityholders and lenders to the extent required by the provisions of any of Seller's bylaws, credit agreements and other pre-existing contractual obligations.

Section 11.12 <u>Entire Agreement</u>. This Agreement (including the Ancillary Agreements referenced herein), the Sale Order and the Confidentiality Agreement contain the entire understanding between the parties to this Agreement with respect to the transactions contemplated by this Agreement and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All schedules to this Agreement and any documents and instruments delivered pursuant to any provision of this Agreement are expressly made a part of this Agreement as fully as though completely set forth in this Agreement.

Section 11.13 <u>Parties in Interest</u>. Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligations or liability of any third Persons to Seller or Buyer. This Agreement is not intended to nor shall give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 11.14 <u>Bulk Sales Laws</u>. Buyer waives compliance by Seller and Seller waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar laws of any state other than any Laws which would exempt any of the transactions contemplated by this Agreement from any Tax liability which would be imposed but for such compliance.

Section 11.15 <u>Construction</u>. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement. The parties to this Agreement have jointly participated in the negotiation and drafting of this Agreement. In the event of an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumptions or burdens of proof shall arise favoring any party by virtue of the authorship of any of the provisions of this Agreement. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form. As used in this Agreement, the word "including" and its derivatives means "without limitation" and its derivatives, the word "or" is not exclusive and the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole.

Section 11.16 <u>Counterparts and Facsimiles</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument. Executed signature pages to this Agreement may be delivered by electronic mail and such electronic copies will be deemed as sufficient as if actual signature pages had been delivered.

# ARTICLE 12. DEFINITIONS.

Section 12.1  Certain Terms Defined.  As used in this Agreement, the following terms have the following meanings:

"Affiliate" means, with respect to any Person, any Person directly or indirectly controlling, controlled by or under direct or indirect common control with such other Person.

"Alternative Transaction" means Seller consummating one or more transactions or series of transactions, whether a going concern sale, liquidation or otherwise, that involves a sale of all or substantially all of the Business or the Acquired Assets by Seller to a purchaser or purchasers other than Buyer.

"Ancillary Agreements" means, collectively, the Assignment and Assumption Agreements, Assignment and Assumption of Leases, Acquired Intellectual Property Assignments, quitclaim deeds, and other certificates, affidavits and releases delivered pursuant to Article 3.

"ATF" means the United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

"ATF Licenses" means all of those licenses issued by ATF as provided by the GCA and the GCA's implementing regulations that are necessary for Buyer to conduct the Business as currently conducted.

"Avoidance Actions" means any and all claims and remedies of Seller under Sections 510 and 542 through 553 of the Bankruptcy Code or under similar state laws including, without limitation, fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Huntsville, Alabama are authorized by Law or other governmental action to close.

"Business Name" means "Remington," either alone or in combination with other words, graphics or designs, including all rights in said term as a trade name, trade mark, corporate name, service mark and domain name, including without limitation those set forth on Schedule 12.1(a), and any confusingly similar variation, derivative or transaction thereof.

"Buyer Acquisition Vehicle" means a Creditworthy entity that is wholly-owned and controlled by Buyer's parent entity.

"Cash" means all cash and cash equivalents held by Seller, including all petty cash, register cash, undeposited checks, cash in transit and marketable securities, in each case as of immediately prior to the Closing (and including without limitation (i) the Good Faith Deposit, (ii) the Net Closing Cash Payment, (iii) any fee reserves or escrows established by Seller, and (iv) any cash in the Dominion Account (as defined in the Priority Term Loan)).

"CBA" means that certain Collective Bargaining Agreement between Remington Arms

41

Company, LLC and International Union, United Mine Workers of America (2016-2022), as amended or otherwise modified from time to time.

"City of Huntsville Project Development Liabilities" means all liabilities arising under (i) that certain Project Development Agreement dated as of February 27, 2014, by and among the City of Huntsville, Alabama, Madison County, Alabama, The Industrial Development Board of the City of Huntsville, and Seller, as amended or otherwise modified from time to time, (ii) that certain note issued by Seller to the City of Huntsville on February 27, 2014 in the original principal amount of $12,500,000 and (iii) that certain Mortgage and Security Agreement dated as of February 27, 2014, by Seller in favor of the City of Huntsville.

"Claims" encompasses the definition in Bankruptcy Code §101(5) and under this Agreement also includes any and all liabilities, rights, credits, defenses, allowances, rebates, choses in action, rights of recovery, set-off, causes of action, civil or criminal, any contributions received from or owed to charitable or other organizations, assertions of legal or moral responsibility, in each case known or unknown, pending or threatened, at law or in equity, direct or derivative, liquidated or unliquidated, matured or unmatured, disputed or undisputed, choate or inchoate, judgments, demands, rights of first refusal or offer, recoupment, rights of recovery, reimbursement, contribution, indemnity, exoneration, rights under products liability, alter ego, environmental, intellectual property (including any infringement thereof), tort, contract and any other legal or equitable basis of liability, charges of any kind or nature, debts arising in any way in connection with any agreements, acts or failures to act, and all pending, threatened, asserted or unasserted actions against Seller or any of its Affiliates, or any of their respective current or former officers, employees, agents or independent contractors, any of their assets or properties, the Business, or any of their operations or activities arising out of or relating to any matter, occurrence, action, omission or circumstance, and includes any Claims against Buyer under doctrines of successor liability or any other ground or theory (which Claim may also be an Interest or Lien).

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any contract, indenture, note, bond, lease, license, premium finance arrangement, purchase order, sales order or other agreement to which Seller is a party; provided that Contracts do not include any Lease or any employment or similar Contracts.

"Creditworthy" means sufficiently capitalized, to the reasonable satisfaction of Seller upon provision to Seller of substantiating documentary evidence, to be able to pay the Purchase Price.

"D&O Insurance" means the policy in effect as of the Effective Date that provides for insurance from liability for current and former directors and officers of Seller, including insurance from liabilities with respect to all claims (including, under "tail" insurance coverage, those claims brought within six (6) years from the Closing Date) arising out of or relating to events which occurred on or prior to the Closing Date (including in connection with the transactions contemplated by this Agreement).

"DIP Facility" means any debtor-in-possession financing advanced to Seller in the

42

Bankruptcy Case.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, surveys, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

"Employee Benefit Plans" means (a) all "employee benefit plans," as defined in Section 3(3) of ERISA, (b) all employment, consulting or other individual compensation agreements, and (c) all bonus or other incentive, equity or equity-based compensation, deferred compensation, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical, life insurance, scholarship programs or other plans, contracts, policies or arrangements that provide for compensation for employee benefits as to which Seller has any obligation or liability, contingent or otherwise.

"Employee Liabilities" means all liabilities of Seller to or with respect to all Employees whenever arising and liabilities of the type specified in Section 1114 of the Bankruptcy Code owing to retired employees of Seller, including, for the avoidance of doubt, under the CBA.

"Employee Records" means all employment and benefit records (in whatever form maintained) in the possession of Seller or its agents and pertaining to any Transferred Employee, or any spouse, dependent or other beneficiary of any such Transferred Employee.

"Employees" means all individuals, as of the date of this Agreement, who are employed by Seller (including Employees who are absent due to COVID Restrictions or vacation, family leave, short-term disability, COVID 19-related furloughs or absences or other approved leave of absence) in connection with the ownership, operation and management of the Business.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, Orders, regulations and other provisions having the force of law, all judicial and administrative Orders and determinations, and all common law concerning pollution or protection of human health and the environment, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any hazardous materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exit Term Loan" means that certain Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of February 21, 2020, and that certain Amendment No. 5, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent

43

and collateral agent and the lenders party thereto.

"FILO Facility" means that certain First Lien Last-Out Term Loan Agreement, dated as of May 15, 2018 (as amended by that certain Amendment No. 1, dated as of April 18, 2019, that certain Amendment No. 2, dated as of May 1, 2019, that certain Amendment No. 3, dated as of August 15, 2019, that certain Amendment No. 4, dated as of October 11, 2019, that certain Amendment No. 5 dated as of February 21, 2020, and that certain Amendment No. 6, dated as of March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto from time to time, Ankura Trust Company, LLC, as administrative agent and collateral agent and the lenders party thereto.

"Final Order" means an Order, ruling or judgment of any court of competent jurisdiction that has not been reversed, stayed, modified or amended, and as to which no appeal, petition for certiorari, motion or petition for rehearing or reargument is pending, and the deadline for any such filing has expired.

"GCA" means Gun Control Act of 1968 (Chapter 44 of Title 18, United States Code § 921 et seq).

"Government" means any agency, division, subdivision, audit group, procuring office or governmental or regulatory authority in any event or any adjudicatory body thereof, of the United States, or any state, county or municipality thereof, including the employees or agents thereof.

"Historic Firearms Books and Records" means all historic books and records relating to the sale of firearms included in the Acquired Assets, including all records required to be kept pursuant to parts 447, 478, and, 479 of title 27, Code of Federal Regulations.

"Income Tax" means any Tax based on, imposed on or measured by income, gross receipts or profits, including any interest, penalty or other addition with respect thereto.

"Income Tax Return" means any Tax Return with respect to Income Taxes.

"Intellectual Property" means (1) all intellectual property arising from or in respect of the following: (a) all patents and applications therefore, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (b) all trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, Internet domain names and corporate names and general intangibles of a like nature, including the Business Name, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, (c) copyrights and registrations and applications therefore and works of authorship, and mask work rights, (d) all Software of Seller, (e) confidential information, know-how, trade secrets and inventions, and (f) all other intellectual property, (2) Seller's rights pursuant to any Contract with Remington Licensing Corporation and (3) all claims or causes of action arising out of or related to past, present or future infringement or misappropriation of Seller's rights or interests in intellectual property that is not an Excluded Asset and any related remedies, including, without limitation, the right to sue for past, present or

44

future infringement, misappropriation, or violation of rights related to the Intellectual Property and collect damages therefor.

"Intercompany Note" means that certain Amended and Restated Promissory Note issued on April 18, 2019, for the principal amount of $100,000,000, by Remington Arms Company, LLC in favor of FGI Holding Company, LLC.

"Interests" means all rights and entitlements of any nature including, without limitation, security interests, assignments of Liens or Claims, licenses, leases, contract rights, indentures, instruments, licenses, options, escheatment, abandoned property, unclaimed property, covenants, conditions, zoning, planning and any other restrictions, easements, encroachments, Permits or other interests in property or limitations on the use of real property or irregularities in title, rights of first refusal, rights to injunctive or other legal relief, any attributes of ownership, rights or restrictions of any kind and nature, whenever incurred, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, matured or unmatured, legal or equitable (which Interests may also be Liens or Claims).

"Knowledge" or any other similar term or knowledge qualification means, with respect to (i) Seller, the actual conscious knowledge of either of Ken D'Arcy (President and Chief Executive Officer of ROC) or Mark Little (Vice President and Chief Financial Officer of ROC), as of the date the applicable representation or warranty is made or deemed made under this Agreement and (ii) Buyer, the actual conscious knowledge of Scott Soura (Manager of Buyer), as of the date the applicable representation or warranty is made or deemed made under this Agreement.

"Leased Real Property" means all leasehold or subleasehold estates and other rights of Seller to possess, use or occupy (or to grant others the right to possess, use or occupy) any land, buildings, structures, improvements, fixtures or other interest in real property, in each of the foregoing cases, to the extent possessed, used or occupied in connection with the Business.

"Leasehold Improvements" means all buildings, structures, improvements and fixtures that are owned by Seller and located on any Leased Real Property, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Lease for such Leased Real Property.

"Leases" means all leases, ground leases, subleases, licenses and other agreements, including all amendments, extensions, renewals, and other agreements with respect thereto, pursuant to which Seller has the right to possess, use, lease or occupy (or to grant others the right to possess, use or occupy) any Leased Real Property.

"Lien" means any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement, other than (a) a lessor's interest in, and any mortgage, pledge, security interest, encumbrance, lien (statutory or other) or conditional sale agreement on or affecting a lessor's interest in, property underlying any leases; (b) any imperfection of title with respect to any asset that does not materially interfere with the present occupancy, use or marketability of such asset and the continuation of the present occupancy or use of such asset; and (c) such covenants, conditions, restrictions, easements, encroachments or encumbrances that

Case 20-81688-CRJ11 Doc 983 Filed 03/05/21 Entered 03/05/21 14:37:35 Desc Main Document Order Page 145 of 99 80

are not created pursuant to mortgages or other financing or security documents, or any other state of facts, that do not materially interfere with the present occupancy or use of an asset.

"Marlin Business" means the design, development, testing, manufacture, marketing, sale and distribution of Marlin brand products (including discontinued products and those yet to be launched) using the Marlin name.

"Material Adverse Effect" means a state of facts, event, change or effect on the value of the Acquired Assets that results in a material and adverse effect on the value of the Acquired Assets taken as a whole, but excludes any state of facts, event, change or effect caused by events, changes or developments relating to (A) changes resulting from, or from any motion, application, pleading or Order filed relating to, the Bankruptcy Case; (B) any action of Seller taken pursuant to, or any failure of Seller to take any action prohibited by, any Order of the Bankruptcy Court, this Agreement or any of the Ancillary Agreements to which Seller is a party; (C) the public disclosure of this Agreement or any of the Ancillary Agreements or any of the transactions contemplated hereby or thereby, (D) changes, after the Effective Date, in United States generally accepted accounting principles, (E) changes in general United States economic, monetary or financial conditions, including changes in prevailing interest rates, credit availability, and the credit markets generally, as well as changes in the commercial real estate markets in the geographic regions in which Seller operates the Business, (F) changes in the firearms, ammunition or sporting goods industries in general, (G) any acts of God, natural disasters, terrorism, armed hostilities, sabotage, war (whether or not declared) or (H) any occurrence, outbreak, escalation or worsening of, or furloughs or Government actions (including any quarantine, "shelter in place", "stay at home", workforce reduction, social distancing, shut down, closure, sequester or any other applicable Law, order, directive, guideline or recommendation by any Government of competent jurisdiction (collectively, "COVID Restrictions")) instituted in response to, any epidemic, pandemic or other disease (including without limitation the COVID-19 virus).

"Non-Core Brands" means Bushmaster, DPMS, Dakota, Tapco, H & R, Stormlake, AAC and Parker.

"Owned Real Property" means all land and all buildings, structures, fixtures and other improvements located thereon, and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights thereto, owned by Seller and used in the ownership, operation or management of the Business, but only to the extent set forth in Section 1.1(a).

"Pension Plan" means Remington Arms Company, LLC Pension and Retirement Plan, (f/k/a Remington Arms Company, Inc. Pension and Retirement Plan), as amended from time to time, whereby the Marlin Firearms Co. Employees' Pension Plan (a/k/a Marlin Firearms Company Employees Pension Plan), as amended from time to time, was merged into the Remington Arms Company, LLC Pension and Retirement Plan.

"Permit" means any permit, license, authorization, registration or certificate obtained from any Government.

Case 20-81688-CRJ11 Doc 983 Filed 03/05/21 Entered 03/05/21 20:37:35 Desc Main Document Order Page 62 of 99

"Permitted Liens" mean: (a) all Liens set forth on Schedule 12.1(b); (b) Liens and Interests consisting of (X) current Taxes and assessments, Liens for Taxes that are not yet delinquent or that are being contested in good faith, reservations in patents, and all easements, rights-of-way, encumbrances, Liens, covenants, conditions, restrictions, obligations, liabilities and other matters as may appear on record, and similar matters that would be disclosed by an accurate ALTA/ACSM survey of the Owned Real Property, and (Y) the applicable zoning and use regulations or other Laws of any Government; (c) purchase money Liens securing payments under capital lease arrangements; (d) all terms, conditions and restrictions under any applicable Permits; and (e) the rights under the Acquired Intellectual Property granted under (1) that certain Trademark License Agreement, by and between RA Brands and Crossman Corporation, a Delaware corporation, dated as of January 18, 2016, as amended by Amendment #1 to Trademark License Agreement, dated as of June 4, 2019 and as amended, supplemented and modified from time to time, (2) that certain Trademark License Agreement, by and between RA Brands and Gator Cases Inc., a Florida corporation, dated as of November 5, 2019, as amended by Amendment #1 to Trademark License Agreement, dated as of August 19, 2020 and as amended, supplemented and modified from time to time, and (3) that certain Exclusive Trademark License Agreement, by and between RA Brands and Buck Knives, Inc., a Nevada corporation, dated as of January 18, 2017, as amended, supplemented and modified from time to time.

"Person" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"Plan" means a Joint Chapter 11 Plan filed by Seller with the Bankruptcy Court.

"Post-Closing Taxes" means any Taxes, other than Transaction Taxes, imposed on the Acquired Assets in respect of a taxable period (or portion thereof) beginning after the close of business on the day prior to the Closing Date.

"Pre-Closing Taxes" means any Taxes paid, payable, or that become payable, in connection with Seller or any of its Affiliates or relating to the Business, in respect of a taxable period (or portion thereof) ending as of the close of business on the day prior to Closing Date.

"Priority Term Loan" means that certain Loan and Security Agreement, dated as of April 18, 2019 (as amended by that certain Amendment No. 1, dated May 1, 2019, that certain Amendment No. 2, dated June 24, 2019, that certain Amendment No. 3, dated August 15, 2019, that certain Amendment No. 4, dated October 11, 2019, that certain Amendment No. 5, dated February 21, 2020, and that certain Amendment No. 6, dated March 27, 2020, and as it may be further amended, supplemented or otherwise modified from time to time), by and among FGI Operating Company, LLC, the guarantors party thereto, Cantor Fitzgerald Securities, as administrative agent and initial collateral agent, and the lenders party thereto.

"Related Person" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, investment bankers or representatives of any such Person.

"Retained Litigation" means all litigation and Claims arising or related to events prior to

47

the Closing.

"Seller D&Os" means the current or former directors and officers insured under the D&O Insurance.

"Software" means any and all (a) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (b) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (c) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, (d) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (e) all Documents related to any of the foregoing.

"State of Alabama Project Development Liabilities" means all liabilities under that certain Project Agreement dated as of February 17, 2014, by and between the State of Alabama and ROC, as amended or otherwise modified from time to time.

"Straddle Period" means any taxable period beginning prior to, and ending after, the Closing Date.

"Subsidiary(ies)" means, when used with respect to any specified Person, any other Person (a) of which the specified Person or any Subsidiary thereof is a general partner, (b) of which the specified Person or a Subsidiary thereof own at least a majority of the securities or other interests having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions for such other Person of which owns the specified person or a Subsidiary thereof, or (c) that is directly or indirectly controlled by the specified Person or any Subsidiary thereof.

"Tax Return" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, worker's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other obligations of the same or a similar nature, whether arising before, on or after the Closing Date; and "Tax" shall mean any one of them.

Section 12.2   All Terms Cross-Referenced.   Each of the following terms is defined in the Section set forth opposite such term:

| **Term** | **Section** |
| --- | --- |
| Acquired Assets | Section 1.1 |

48

Acquired Intellectual Property .......................................................................Section 1.1(j)
Acquired Intellectual Property Assignment.................................................Section 3.2(d)
Affiliate ........................................................................................................ Section 12.1
Agreement......................................................................................................*Preamble*
Allocation...................................................................................................... Section 8.3
Alternative Transaction ................................................................................ Section 12.1
Approval Termination Date ........................................................................Section 10.1(d)
Assignment and Assumption Agreement......................................................Section 3.2(b)
Assignment and Assumption of Lease..........................................................Section 3.2(c)
Assumed Business Contracts ......................................................................Section 1.1(i)
Assumed Contracts ......................................................................................Section 1.1(i)
Assumed FF&E Leases ...............................................................................Section 1.1(e)
Assumed Leased Real Property ..................................................................Section 1.1(c)
Assumed Leases...........................................................................................Section 1.1(b)
Assumed Liabilities ..................................................................................... Section 1.3
Assumed Motor Vehicle Leases ..................................................................Section 1.1(g)
Assumed Policy Rights .................................................................................Section 1.1(h)
Avoidance Actions ....................................................................................... Section 12.1
Bankruptcy Case ......................................................................................... *Recitals*
Bankruptcy Code ......................................................................................... *Recitals*
Bankruptcy Court ........................................................................................ *Recitals*
Bidding Procedures Motion ........................................................................ *Recitals*
Bidding Procedures Order ........................................................................... *Recitals*
Break Fee ....................................................................................................Section 10.2(c)
Business .......................................................................................................*Recitals*
Business Day................................................................................................ Section 12.1
Business Name............................................................................................. Section 12.1
Buyer............................................................................................................ Preamble
Buyer Acquisition Vehicle........................................................................... Section 12.1
Buyer Plans ................................................................................................. Section 7.3
Cash.............................................................................................................. Section 12.1
CBA .............................................................................................................. Section 12.1
City of Huntsville Project Development Liabilities...................................... Section 12.1
Claims .......................................................................................................... Section 12.1
Closing ......................................................................................................... Section 3.1
Closing Date................................................................................................. Section 3.1
Code ............................................................................................................. Section 12.1
Confidentiality Agreement...........................................................................Section 5.1(b)
Contract........................................................................................................ Section 12.1
COVID Restrictions ..................................................................................... Section 12.1
Creditworthy ................................................................................................ Section 12.1
Cure Amount.................................................................................................Section 1.5(a)
Customer Order............................................................................................Section 1.1(l)
Documents .................................................................................................... Section 12.1
Effective Date ..............................................................................................*Preamble*
Employee Benefit Plans ............................................................................... Section 12.1

49

Employee Liabilities ................................................................. Section 12.1
Employee Records ................................................................... Section 12.1
Employees ............................................................................... Section 12.1
Environmental Laws ................................................................ Section 12.1
ERISA ...................................................................................... Section 1.2
Excluded Assets ...................................................................... Section 1.2
Excluded Employee Liabilities ............................................ Section 1.3(f)
Excluded Liabilities ................................................................ Section 1.4
Final Order .............................................................................. Section 12.1
FFL Cutoff Date ................................................................... Section 3.2(a)
Good Faith Deposit .............................................................. Section 2.2(a)
Government ............................................................................. Section 12.1
Gross Closing Cash Payment .............................................. Section 2.1(a)
Intellectual Property ............................................................... Section 12.1
Intercompany Note ................................................................. Section 12.1
Interests .................................................................................. Section 12.1
Inventory ............................................................................. Section 1.1(n)
Insurance Polcies ............................................................... Section 1.2(a)
Law ....................................................................................... Section 4.1(c)
Leased FF&E ....................................................................... Section 1.1(e)
Leased Motor Vehicles ........................................................ Section 1.1(g)
Leased Real Property .............................................................. Section 12.1
Leasehold Improvements ........................................................ Section 12.1
Leases ..................................................................................... Section 12.1
Lien ......................................................................................... Section 12.1
Material Adverse Effect .......................................................... Section 12.1
Material Permits ................................................................... Section 4.1(g)
Necessary Consent .................................................................. Section 1.6
Net Closing Cash Payment .................................................. Section 2.2(b)
Order ..................................................................................... Section 4.1(c)
Owned FF&E ....................................................................... Section 1.1(d)
Other Agreements .................................................................... Section 1.8
Owned Motor Vehicles ......................................................... Section 1.1(f)
Owned Real Property ............................................................... Section 12.1
Pension Plan ............................................................................ Section 12.1
Permitted Liens ....................................................................... Section 12.1
Person ...................................................................................... Section 12.1
Petition Date ................................................................................ *Recitals*
Plan .......................................................................................... Section 12.1
Pre-Closing Income Taxes ...................................................... Section 12.1
Priority Term Loan .................................................................. Section 12.1
Purchase Orders ................................................................... Section 1.1(m)
Purchase Price ........................................................................... Section 2.1
Qualifying Excluded Contracts and Leases ......................... Section 1.5(d)
Related Person ......................................................................... Section 12.1
Reserve Amount ............................................................... Section 9.2(b)(iii)

50

Retained Litigation.................................................................................. Section 12.1
ROC ......................................................................................................... Preamble
Sale Hearing.................................................................................... Section 1.5(a)
Sale Order .................................................................................................. *Recitals*
Seller ....................................................................................................... Preamble
Seller's Knowledge ................................................................................. Section 12.1
Software ................................................................................................. Section 12.1
State of Alabama Project Development Liabilities..................................... Section 12.1
Subsidiary(ies) ....................................................................................... Section 12.1
Tax Return ............................................................................................. Section 12.1
Taxes ..................................................................................................... Section 12.1
Transaction Taxes .................................................................................... Section 8.1
Transferred Employees ............................................................................. Section 7.1
WARN Act............................................................................................ Section 7.4(a)
Warranty Termination Date ................................................................... Section 10.1(b)

*[Signatures are on the following pages.]*

Case 20-10883-CTG   Doc 983-1   Filed 03/05/21   Entered 03/05/21 20:37:35   Desc
Exhibit to Order   Page 67 of 99

IN WITNESS WHEREOF, the parties to this Agreement have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

**BUYER**

The Roundhill Group, LLC

By: _____
Name:  Scott Sovra
Title:  Manager

S-1

**ROC**

REMINGTON OUTDOOR COMPANY, INC.

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer


**SUBSIDIARIES OF ROC**

FGI OPERATING COMPANY, LLC

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

FGI HOLDING COMPANY, LLC

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

BARNES BULLETS, LLC

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

REMINGTON ARMS COMPANY, LLC

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

RA BRANDS, L.L.C.

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

FGI FINANCE INC.

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

HUNTSVILLE HOLDINGS LLC

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

TMRI, INC.

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

REMINGTON ARMS DISTRIBUTION COMPANY,
LLC

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

32E PRODUCTIONS, LLC

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

GREAT OUTDOORS HOLDCO, LLC

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

OUTDOOR SERVICES, LLC

By: _____
Name: Ken D'Arcy
Title: Chief Executive Officer

**EXHIBIT 1**

(*See* attached copy of Bidding Procedures Order)

**EXHIBIT 2**

(*See* attached form of Trademark License Agreement)

Case 21-10883-CTG Doc 983 Filed 03/05/21 Entered 03/05/21 20:37:35 Desc Main Document Order Page 72 of 99

**DISCLOSURE SCHEDULES**

to

**AMENDED AND RESTATED**

**ASSET PURCHASE AGREEMENT**

by and among

**ROUNDHILL GROUP, LLC**

and

**REMINGTON OUTDOOR COMPANY, INC.**

and

**EACH OF THE SUBSIDIARIES OF REMINGTON OUTDOOR COMPANY, INC.**

**Dated as of October __, 2020**

These Disclosure Schedules (these "<u>Schedules</u>" and each a "<u>Schedule</u>") are furnished pursuant to the Amended and Restated Asset Purchase Agreement (the "<u>Agreement</u>"), dated as of October __, 2020, by and among Remington Outdoor Company, Inc., a Delaware corporation and debtor-in-possession ("<u>ROC</u>"), each of the subsidiaries of ROC set forth on the signature pages to the Agreement (collectively with ROC, "<u>Seller</u>"), and Roundhill Group, LLC ("<u>Buyer</u>"). All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Agreement, unless the context otherwise requires.

These Schedules are hereby incorporated in and made a part of the Agreement as if set forth in full therein and are an integral part of the Agreement. The information contained in these Schedules is disclosed solely for purposes of the Agreement, and no information contained herein shall be deemed to be an admission by any party to the Agreement to any third party of any matter whatsoever (including any violation of law or breach of contract). These Schedules and the information and disclosures contained herein are intended only to qualify and limit the representations, warranties or covenants of the Seller contained in the Agreement and shall not be deemed to expand in any way the scope or effect of any of such representations, warranties or covenants. In disclosing the information in these Schedules, Seller does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. The disclosures in these Schedules are to be taken as relating to the representations and warranties as a whole, notwithstanding the fact that these Schedules are arranged by sections corresponding to the sections in the Agreement, or that a particular section of the Agreement makes reference to a specific section of the Schedules, and notwithstanding that a particular representation and warranty may not make a reference to the Schedules. Disclosure of an item on one Schedule shall be deemed disclosure on all other Schedules.

Neither the specification of any dollar amount in any representation or warranty nor the disclosure of a document or information in these Schedules is intended, or shall be construed or offered in any dispute between the parties to the Agreement as evidence of, the materiality of such dollar amount, document or information, nor does it establish any standard of materiality upon which to judge the inclusion or omission of any similar documents or information in such Schedule or any other Schedule. The headings and descriptions of the disclosures herein are for convenience of reference only and are not intended and do not alter the meaning of any provision of the Agreement or these Schedules.

Case 20-81688-CRJ11 Doc 983 Filed 03/05/21 Entered 03/05/21 15:40:35 Desc Main Document Order Page 74 of 99

**<u>Schedule 1.1(i)</u>**
**<u>Assumed Business Contracts</u>**

None.

3

## Schedule 1.1(k)
## Assumed Outbound IP Licenses

1.   None

4

**Schedule 1.2(q)**
**Excluded Assets**

1. None.

**Schedule 1.3(b)**
**Assumed Liabilities**

1.   None

Case 21-10883-CTG   Doc 983-4   Filed 03/05/20/13   Entered 03/05/20/13 20:30:35   Desc
Exhibit to Order   Page 78 of 99

**Schedule 1.4(n)**
**Excluded Liabilities**

1. None

Case 20-10883-CRJ11 Doc 983 Filed 03/05/20 Entered 03/05/20 20:37:35 Desc
Exhibit to Order Page 79 of 99

**Schedule 1.5(a)**
**Estimated Cure Amount**

None

**Schedule 4.1(g)**
**Compliance with Law**

1. Administrative Order on Consent, issued by the Missouri Department of Natural Resources to Remington Arms Company, LLC, No. 14-HW-E005 with regard to hazardous materials handling, storage and disposal.

2. In March 2020, the Company received a pre-litigation settlement offer from Trex Properties LLC concerning the Detrex Corporation facility located in Charlotte, NC. The offer names Para USA LLC (a Company subsidiary) is a potentially responsible party pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) for alleged transport or disposal of hazardous materials at the Detrex facility. The offer demanded a $12,000 payment to release all CERCLA, state and natural resource damage claims. Because the Company could not confirm that Para USA LLC actually deposited waste at the Trex facility, it did not accept the offer; however, the Company cannot rule out potential liability as a potentially responsible party.

3. Citation and Notification of Penalty regarding inspection number 1350744 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated March 26, 2019 (Ilion, NY).

4. Citation and Notification of Penalty regarding inspection number 1353904 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated March 26, 2019 (Ilion, NY).

5. Citation and Notification of Penalty regarding inspection number 1130012 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated June 8, 2016 (Lexington, MO).

6. Citation and Notification of Penalty regarding inspection number 314352477 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated November 4, 2011 (Ilion, NY).

7. Citation and Notification of Penalty regarding inspection number 315538082 issued by the U.S. Department of Labor, Occupational Safety and Health Administration, dated August 31, 2011 (Lexington, MO).

8. Notice of Alleged Safety or Health Hazards issued by the U.S. Department of Labor, Occupational Safety and Health Administration, regarding Complaint Number 850727 (Lexington, MO).

Case 20-81688-CRJ11 Doc 983 Filed 03/05/21 Entered 03/05/21 20:37:35 Desc Main Document Order Page 81 of 99

**Schedule 4.1(h)**
**Contracts**

1. Seller received in August 2020 a proposed Settlement Agreement from the International Union, United Mine Workers of America regarding Grievance Nos. 32-2020 and 33-2020, alleging certain violations of the CBA.

Case 20-81688-CRJ11 Doc 983 Filed 03/05/21 Entered 03/05/21 13:30:35 Desc Exhibit to Order Page 82 of 99

# Schedule 4.1(i)

## Material Permits

### a. Special Tax Stamps and Federal Firearms Licenses

| Site | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ilion, NY | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Huntsville, AL | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Sturgis, SD | 2021 Special Tax Stamp | | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Lenoir City, TN | Federal Firearms License | 1-62-105-07-0A-07514 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Stormlake/Remington Arms |

### b. Import/Export

| Business Area | Type of License/Permit | License/Permit # | Regulator (Agency) | Name of Permittee(s) |
|---|---|---|---|---|
| Ammunition and Firearms | ITAR Registration | M23608 | U.S. Dept. of State, Office of Defense Trade Controls Compliance | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Borchers, S.A. Warehouse Distribution Agreement) | 050553995 (DA-0520-15) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Helmut Hofmann GMBH Warehouse Distribution Agreement) | 050672664 (DA-1349-18) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Jaguar Gruppen A/S Warehouse Distribution Agreement) | 050614380 (DA-2227-16) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |

11

| Ammunition and Firearms | Export License (Midarms, SPRL Warehouse Distribution Agreement) | 050583291 (DA-0001-16) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
|---|---|---|---|---|
| Ammunition and Firearms | Export License (Norma Precision AB Warehouse Distribution Agreement) | 050698288 (DA-0788-19) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Raytrade Pty Ltd. Warehouse Distribution Agreement) | 050569321 (DA-1597-15) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Raytrade UK Limited Warehouse Distribution Agreement) | 050672127 (DA-1340-18) | U.S. Dept. of State | Remington Arms Company, LLC |
| Ammunition and Firearms | Export License (Sako Ltd. Warehouse Distribution Agreement) | 050515421 (DA-1428-14) | U.S. Dept. of State | Remington Outdoor Company, Inc. Barnes Bullets, LLC |
| Ammunition and Firearms | Export License (Skenco Europe, Kft. Warehouse Distribution Agreement) | 050627594 (DA-0635-17) | U.S. Dept. of State | Remington Outdoor Company, Inc. Remington Arms Company, LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001414 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001470 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001473 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |

| | | | |
|---|---|---|---|
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001512 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202001516 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202002302 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202002684 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202003611 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202004581 | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202005830 (application pending) | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Application and Permit for Importation of Firearms, Ammunition and Implements of War | 202006481 (application pending) | U.S. Dept. of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives | Remington Arms Company LLC |
| Firearms | Export License | 050715420 | U.S. Dept. of State | Remington Arms Company, LLC |
| Firearms | Export License | 050710057 | U.S. Dept of State | Remington Arms Company, LLC |

13

**(1) TRADEMARKS**

| Country | Trademark | Registration Number | Owner |
|---|---|---|---|
| United States of America | Design Only (Bull's Eye Design) | 1,624,731 | Remington Arms Company, LLC |
| United States of America | TAMER | 1,842,873 | Remington Arms Company, LLC |
| United States of America | ULTIMATE MUZZLE-LOADER | 3,195,936 | Remington Arms Company, LLC |
| United States of America | VETERAN | 4,576,469 | Remington Arms Company, LLC |
| Mexico | VETERAN | 1368618 | Remington Arms Company, LLC |
| European Union (Community | VETERAN | 11606399 | Remington Arms Company, LLC |
| United States of America | EXPRESS BIT | 4,611,225 | RA Brands, L.L.C. |
| United States of America | FIELDMASTER | 346,422 | RA Brands, L.L.C. |
| United States of America | FIELDMASTER | 2,843,452 | RA Brands, L.L.C. |
| United States of America | LDA | 2,329,006 | RA Brands, L.L.C. |
| United States of America | MODEL 700 | 4,531,854 | RA Brands, L.L.C. |
| United States of America | MODEL 870 | 4,531,855 | RA Brands, L.L.C. |
| United States of America | MSR | 4,026,621 | RA Brands, L.L.C. |
| United States of America | NESIKA | 4,756,634 | RA Brands, L.L.C. |
| United States of America | P & Design | 1,882,081 | RA Brands, L.L.C. |
| United States of America | PARA | 2,716,330 | RA Brands, L.L.C. |
| United States of America | RANGEMASTER | 336,055 | RA Brands, L.L.C. |
| United States of America | SPEEDMASTER | 336,054 | RA Brands, L.L.C. |
| United States of America | SPORTSMAN | 3,998,213 | RA Brands, L.L.C. |
| United States of America | SPORTSMAN (Stylized) | 279,904 | RA Brands, L.L.C. |
| United States of America | SUPER CELL | 4,364,262 | RA Brands, L.L.C. |
| United States of America | SUPER MAG | 3,924,798 | RA Brands, L.L.C. |
| United States of America | SUPER SLUG | 3,687,791 | RA Brands, L.L.C. |
| United States of America | SUPER SLUG (Stylized) | 3,684,692 | RA Brands, L.L.C. |
| United States of America | TRINYTE | 3,644,916 | RA Brands, L.L.C. |
| United States of America | V3 | 5,301,793 | RA Brands, L.L.C. |
| United States of America | VERSA MAX | 4,029,749 | RA Brands, L.L.C. |
| United States of America | VERSAMAX | 3,935,038 | RA Brands, L.L.C. |
| United States of America | VERSAPORT | 4,007,056 | RA Brands, L.L.C. |
| United States of America | WINGMASTER (Stylized) | 541,094 | RA Brands, L.L.C. |

14

| | | | |
|---|---|---|---|
| United States of America | WOOD TECH | 4,602,778 | RA Brands, L.L.C. |
| United States of America | X-MARK PRO | 3,540,721 | RA Brands, L.L.C. |
| Canada | HANDI GRIP | TMA867719 | Remington Arms Company, LLC |
| Canada | ARMORLOKT | TMA805337 | RA Brands, L.L.C. |
| Canada | ERPC | TMA814526 | RA Brands, L.L.C. |
| Canada | NESIKA | TMA957938 | RA Brands, L.L.C. |
| Canada | SHOOT LIKE A GIRL....IF YOU CAN! | TMA784901 | RA Brands, L.L.C. |
| Canada | SUPER CELL | TMA899946 | RA Brands, L.L.C. |
| Canada | TRINYTE | TMA791056 | RA Brands, L.L.C. |
| Canada | VERSAMAX | TMA834026 | RA Brands, L.L.C. |
| Canada | VERSAPORT | TMA826341 | RA Brands, L.L.C. |
| Canada | WOODSMASTER | TMA774728 | RA Brands, L.L.C. |

**(2) PATENTS**

| Owner | Patent Number | Description |
|---|---|---|
| Remington Arms Company, LLC | 6,761,101 | FIREARMS RECEIVER BLOCK AND METHOD OF USING SAME |
| Remington Arms Company, LLC | 6,283,006 | DOUBLE ACTION PISTOL |
| Remington Arms Company, LLC | D580,007 | RIFLE RECEIVER TRIGGER GASKET |
| Remington Arms Company, LLC | D595,585 | RIFLE RECEIVER TRIGGER GASKET |
| Remington Arms Company, LLC | 7,810,271 | MODULAR RIFLE SYSTEMS AND METHODS |
| RA Brands LLC | 6,256,918 | FIRING PIN LOCKING ASSEMBLY FOR A SEMI-AUTOMATIC HANDGUN |
| RA Brands LLC | 6,341,442 | DOUBLE ACTION PISTOL |
| RA Brands LLC | 6,381,892 | DOUBLE ACTION PISTOL |
| RA Brands LLC | 6,415,702 | DOUBLE ACTION SEMI-AUTOMATIC HANDGUN |
| RA Brands LLC | 6,557,288 | COMPACT GOVERNMENT MODEL HANDGUN |
| RA Brands LLC | D 562,931 | HANDGUN GRIP |
| RA Brands LLC | 7,530,191 | SEMI-AUTOMATIC HANDGUN, MAGAZINE, AND FOLLOWER |
| RA Brands LLC | 6,293,040 | INTERCHANGEABLE WEAPON RECEIVER FOR ALTERNATE AMMUNITION |
| RA Brands LLC | 9,057,574 | THUMB SAFETY FOR MODEL 1911 HANDGUN |
| RA Brands LLC | 5,706,598 | MUZZLE LOADING GUN AND ADAPTOR |
| RA Brands LLC | 9,921,019 | GAS VENT FOR FIREARM |
| RA Brands LLC | 10,151,546 | SHOTGUN WITH MAGAZINE LOADING SYSTEM |
| RA Brands LLC | 10,228,202 | MAGAZINE WITH SPACERS FOR ACCOMMODATING MULTIPLE CALIBER AND/OR LENGTH ROUNDS |

15

| | | |
|---|---|---|
| RA Brands, LLC | 10,281,233 | RECOIL REDUCER |
| RA Brands, LLC | 5,806,226 | BOLT ASSEMBLY FOR ELECTRONIC FIREARM (RA-0281) |
| RA Brands, LLC | 5,987,798 | BOLT ASSEMBLY FOR ELECTRONIC FIREARM (RA-0281A) |
| RA Brands, LLC | 6,668,700 | ACTUATOR ASSEMBLY |
| RA Brands, LLC | 6,651,542 | ACTUATOR ASSEMBLY |
| RA Brands, LLC | 7,131,366 | ACTUATOR ASSEMBLY |
| RA Brands, LLC | 5,755,056 | ELECTRONIC FIREARM AND PROCESS FOR CONTROLLING AN ELECTRONIC FIREARM |
| RA Brands, LLC | RE38,794 | ELECTRONIC FIREARM AND PROCESS FOR CONTROLLING AN ELECTRONIC FIREARM |
| RA Brands, LLC | 6,785,996 | FIREARM ORIENTATION AND DROP SENSOR SYSTEM |
| RA Brands, LLC | 7,188,444 | FIREARM ORIENTATION AND DROP SENSOR SYSTEM |
| RA Brands, LLC | 5,799,433 | ROUND SENSING MECHANISM |
| RA Brands, LLC | 6,240,670 | LOCKING MECHANISM FOR FIREARMS |
| RA Brands, LLC | 6,256,917 | LOCKABLE SAFETY FOR FIREARMS |
| RA Brands, LLC | 6,052,935 | SHOTGUN CHOKE TUBE |
| RA Brands, LLC | 6,256,921 | ONE-PIECE SYNTHETIC UNDERCARRIAGE |
| RA Brands, LLC | 6,427,372 | ONE-PIECE SYNTHETIC UNDERCARRIAGE |
| RA Brands, LLC | 6,189,431 | SMALL CALIBER GUN BARREL |
| RA Brands, LLC | 5,551,180 | FIREARM BOLT LOCK MECHANISM |
| RA Brands, LLC | 5,664,355 | DETACHABLE AMMUNITION MAGAZINE |
| RA Brands, LLC | 5,718,074 | TRIGGER ASSEMBLY |
| RA Brands, LLC | 5,606,817 | MUZZLE-LOADING FIREARMS |
| RA Brands, LLC | 5,718,073 | MUZZLE LOADING RIFLE |
| RA Brands, LLC | 5,907,919 | BARREL AND RECEIVER ASSEMBLY |
| RA Brands, LLC | 5,755,052 | MAGAZINE FOR RIMMED AMMUNITION |
| RA Brands, LLC | 5,918,401 | BOLT ASSEMBLY COMPRISING EJECTION PORT COVER |
| RA Brands, LLC | 6,612,062 | CARRIER LOCKING DEVICE |
| RA Brands, LLC | 6,742,298 | CARRIER LOCKING DEVICE |
| RA Brands, LLC | 5,872,323 | GAS OPERATED FIREARM PISTON/PISTON SEAL ASSEMBLY |
| RA Brands, LLC | 6,305,115 | GEL RECOIL PAD |
| RA Brands, LLC | 7,814,695 | COMPOSITE RECEIVER FOR FIREARMS |
| RA Brands, LLC | 7,219,461 | BOLT ASSEMBLY WITH LOCKING SYSTEM |
| RA Brands, LLC | 7,775,149 | ACTION RATE CONTROL SYSTEM |
| RA Brands, LLC | 7,181,880 | ROLLER SEAR/HAMMER INTERFACE FOR FIREARMS |
| RA Brands, LLC | 7,866,079 | MODULAR BARREL ASSEMBLY |
| RA Brands, LLC | 7,059,078 | PROCESS FOR IMPRINTING A COMPOSITE VENTILATED RIB |

| | | |
|---|---|---|
| RA Brands, LLC | 7,334,364 | PROCESS FOR IMPRINTING A COMPOSITE VENTILATED RIB |
| RA Brands, LLC | 7,143,537 | FIRING PIN ASSEMBLY |
| RA Brands, LLC | 7,516,570 | FIRING PIN ASSEMBLY |
| RA Brands, LLC | 7,047,685 | FIRE CONTROL ADJUSTMENT SYSTEM |
| RA Brands, LLC | 7,162,823 | FIREARM STOCK CONNECTOR |
| RA Brands, LLC | 7,533,598 | SHELL STRIPPER ASSEMBLY |
| RA Brands, LLC | 8,112,930 | FIREARM WITH ENHANCED CORROSION AND WEAR RESISTANCE PROPERTIES |
| RA Brands, LLC | 8,065,949 | GAS-OPERATED FIREARM |
| RA Brands, LLC | 7,941,955 | PIVOTING, NON-DETACHABLE MAGAZINE |
| RA Brands, LLC | 7,946,214 | GAS SYSTEM FOR FIREARMS |
| RA Brands, LLC | 8,109,194 | CLAMPED GAS BLOCK FOR BARREL |
| RA Brands, LLC | 8,109,025 | TRIGGER ENGAGEMENT LINK FOR FIREARM |
| RA Brands, LLC | D598,516 | BARREL |
| RA Brands, LLC | 8,061,260 | GAS PLUG RETENTION AND REMOVAL DEVICE |
| RA Brands, LLC | 7,107,715 | BOLT ASSEMBLY WITH LOCKING SYSTEM |
| RA Brands, LLC | 13/348,349 | FIREARM WITH ENHANCED CORROSION AND WEAR RESISTANCE PROPERTIES |
| Remington Arms Company LLC | 8,522,465 | MODULAR FIREARM SYSTEM |
| RA Brands, LLC | D661,364 | GAS BLOCK |
| RA Brands LLC | 9,239,203 | MODULAR FIREARM SYSTEM |
| RA Brands, LLC | 8,539,708 | BARREL MOUNTING AND RETENTION MECHANISM |
| RA Brands, LLC | 8,418,393 | MAGAZINE CAP RETENTION SYSTEM |
| RA Brands, LLC | D685,873 | RECOIL REDUCER |
| RA Brands, LLC | 8,733,009 | MAGAZINE CUTOFF |
| RA Brands, LLC | 8,250,964 | GAS SYSTEM FOR FIREARMS |
| RA Brands, LLC | 8,726,557 | HAND GUARD ATTACHMENT SYSTEM FOR FIREARMS |
| RA Brands, LLC | 6,070,512 | HANDGUN AND METHOD OF OPERATING HANDGUN |
| RA Brands, LLC | 6,385,887 | MUZZLE LOADING FIREARM AND ADAPTOR |
| RA Brands LLC | 7,322,143 | SEMIAUTOMATIC HANDGUN |
| RA Brands LLC | 7,587,851 | RECEIVER GASKET |
| Remington Arms Company LLC | 8,429,844 | MODULAR FIREARM STOCK SYSTEM |
| RA Brands LLC | 8,443,712 | GAS-OPERATED FIREARM |
| RA Brands LLC | 8,782,943 | QUICK DETACH BARREL MOUNTING SYSTEM |
| RA Brands LLC | 8,800,422 | BOLT ASSEMBLY FOR FIREARMS |
| RA Brands LLC | 8,844,185 | BUTTSTOCK ASSEMBLY |
| RA Brands LLC | 8,850,735 | UPPER RECEIVER AND HAND GUARD WITH CABLE ROUTING GUIDE |

17

| Owner | Number | Title |
|---|---|---|
| RA Brands LLC | 8,887,426 | ELASTOMERIC EXTRACTOR MEMBER |
| RA Brands LLC | 8,887,616 | AUTO REGULATING GAS SYSTEM FOR SUPRESSED WEAPONS |
| RA Brands LLC | 8,931,137 | BUSHING FOR A FIREARM GRIP SCREW |
| RA Brands LLC | 8,950,313 | SELF REGULATING GAS SYSTEM FOR SUPPRESSED WEAPONS |
| RA Brands LLC | 9,057,572 | FIREARM EXTRACTION SYSTEM |
| RA Brands LLC | 9,097,475 | GAS-OPERATED FIREARM WITH PRESSURE COMPENSATING GAS PISTON |
| RA Brands LLC | 9,212,856 | GAS CUT-OFF SYSTEM FOR FIREARMS |
| RA Brands LLC | 9,234,717 | QUICK DETACH BARREL MOUNTING SYSTEM |
| RA Brands LLC | 9,328,981 | SELF REGULATING GAS SYSTEM FOR SUPPRESSED WEAPONS |
| RA Brands LLC | 9,347,719 | REPLACEABLE FEED RAMP |
| RA Brands LLC | 9,383,149 | GAS-OPERATED FIREARM WITH PRESSURE COMPENSATING GAS PISTON |
| RA Brands LLC | 9,383,154 | GAS VENT FOR FIREARM |
| RA Brands LLC | 9,410,764 | BUTTSTOCK ASSEMBLY |
| RA Brands LLC | 9,417,019 | FIRE CONTROL FOR AUTO-LOADING SHOTGUN |
| RA Brands LLC | 9,464,865 | HAND GUARD INSTALLATION MECHANISM |
| RA Brands LLC | 9,500,423 | METHOD AND MECHANISM FOR AUTOMATIC REGULATION OF GAS FLOW WHEN MOUNTING A SUPPRESSOR TO A FIREARM |
| RA Brands LLC | 9,562,730 | REPLACEABLE FEED RAMP |
| RA Brands LLC | 9,816,768 | GAS-OPERATED FIREARM WITH PRESSURE COMPENSATING GAS PISTON |
| RA Brands LLC | D,702,792 | FIREARM |
| RA Brands LLC | D,702,793 | FIREARM |
| RA Brands LLC | D704294 | BUTTSTOCK |
| RA Brands LLC | D716403 | FIREARM STOCK |
| RA Brands LLC | D741,978 | PORTION OF A FIREARM HANDGUARD |
| RA Brands LLC | 15/816,085 | GAS OPERATING SYSTEM WITH EXHAUST SYSTEM |
| RA Brands LLC | 15/233,477 | FIRE CONTROL FOR AUTO-LOADING SHOTGUN |
| RA Brands LLC | 62/845,579 | FIRE CONTROL SYSTEM FOR FIREARMS |
| RA Brands LLC | 62/849,551 | HINGE ASSEMBLY FOR A MOVEABLE FIREARM BUTTSTOCK |
| RA Brands LLC | 16/040,112 | SHOTGUN WITH MAGAZINE LOADING SYSTEM |
| RA Brands LLC | 16/141,543 | MOUNTING AND ATTACHMENT ASSEMBLY FOR FIREARM MUZZLE ACCESSORIES |

**(3) COPYRIGHTS**

**UNITED STATES COPYRIGHTS**

(1) Remington Arms Distribution Company, LLC: None

(2) Remington Arms Company, LLC:

| Reg. No. | Published | Registered | Description |
|---|---|---|---|
| TX-5-852-739 | May 20, 2002 | August 1, 2002 | The Remington Guide to Shotgun Basics. |
| VA-1-167-453 | July 1, 2001 | June 11, 2002 | Remington Artwork (3 CD-ROMs) |

(3) RA Brands, L.L.C.

| Reg. No. | Published | Registered | Description |
|---|---|---|---|
| GP99,836 | April 11, 1975 | July 11, 1975 | "PETERS BLUE BELT AWARD BELT BUCKLE" |
| GP99,826 | February 24, 1975 | July 10, 1975 | "PETERS LONG RUN AWARD BELT BUCKLE" |
| GP99,827 | February 24, 1975 | July 10, 1975 | "PETERS HIGH GUN TROPHY BELT BUCKLE" |
| GP99,828 | June 25, 1975 | July 10, 1975 | "PETERS GOLDEN DUCK BELT BUCKLE" |
| TX-4-508-826 | December 1, 1996 | April 8, 1997 | Remington Arms Company, Inc.: a Vision for American Industrial Enterprise" |
| GP95,854 | August 16, 1974 | September 10, 1974 | "REMINGTON'S BELT BUCKLE FOR 75TH ANNIVERSARY OF GRAND AMERICAN HANDICAP" |

19

| Reg. No. | Published | Registered | Description |
|----------|-----------|------------|-------------|
| AA186,575 | | August 3, 1979 | "ILLUSTRATED SKEET FUNDAMENTALS" |
| A215,733 | | | "THE MANUAL OF SPORTING AMMUNITION" |
| A249,243 | | | "REMINGTON ARMS IN AMERICAN HISTORY" |
| A369,076 | April 20, 1972 | September 20, 1972 | "OUTDOOR TIPS" |
| A461,872 | April 20, 1973 | June 8, 1973 | "REMINGTON ARMS IN AMERICAN HISTORY" |

## CANADIAN COPYRIGHTS AND INDUSTRIAL DESIGNS

(1) Remington Arms Distribution Company, LLC: None

(2) Remington Arms Company, LLC: None

(3) RA Brands, L.L.C.

Industrial Designs :

| Country | Title | Serial No. | Owner |
|---------|-------|------------|-------|
| Canada | BUTTSTOCK | 50133 | RA BRANDS, L.L.C. |

(4) Remington Outdoor Company, Inc.: None

20

**(4) DOMAIN NAMES**

| Domain Name | Account No. | Points To | Expiration Date | Account Holder |
|---|---|---|---|---|
| para-usa.com | 21043774 | ns1.supercp.com\|ns2.supercp.com | 1/19/2022 | Remington Arms Company, Inc. |
| paraord.com | 21043774 | Under Construction Page | 10/10/2022 | Remington Arms Company, Inc. |

21

<u>**Schedule 11.5**</u>
<u>**Brokers and Finders**</u>

1. Ducera Partners.

Case 20-18663-CR11  Doc 983-1  Filed 03/05/20  Entered 03/05/20 14:37:35  Desc Disclosure Order  Page 94 of 99

<u>**Schedule 12.1(a)**</u>
<u>**Tradenames**</u>

The information in Schedule 4.1(j)(1) is hereby incorporated by reference.

Case 21-10883-CTG Doc 983 Filed 03/05/13 Entered 03/05/13 20:37:35 Desc Main Document Page 95 of 99

**Schedule 12.1(b)**
**Permitted Liens**

1.   None.

Case 20-10883-CRJ11   Doc 983   Filed 03/05/20   Entered 03/05/20 13:40:35   Desc Main
Document   Order   Page 96 of 99

# Notice Recipients

District/Off: 1126–8          User: admin                    Date Created: 10/13/2020

Case: 20–81688–CRJ11          Form ID: pdf000               Total: 160

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| ba | Richard M Blythe | Richard_Blythe@alnba.uscourts.gov |
| op | Sarah Link Schultz | sschultz@akingump.com |
| aty | Alexandra K. Garrett | agarrett@silvervoit.com |
| aty | Alinor C. Sterling | asterling@koskoff.com |
| aty | Andrew J. Shaver | ashaver@bradley.com |
| aty | Andrew Philip Walker | walker.andrew@pbgc.gov |
| aty | Benjamin L. Locklar | ben.locklar@beasleyallen.com |
| aty | Benjamin Shaw Goldman | bgoldman@handfirm.com |
| aty | Bill D Bensinger | bdbensinger@csattorneys.com |
| aty | Brenton K. Morris | bmorris@bcattys.com |
| aty | Brian R Walding | bwalding@waldinglaw.com |
| aty | Charles R. Johanson, III | rjohanson@ehjlaw.com |
| aty | Christopher A. Jones | cajones@wtplaw.com |
| aty | Christopher T. Conte | ctc@helmsinglaw.com |
| aty | Clark R Hammond | chammond@wallacejordan.com |
| aty | Clyde Ellis Brazeal, III | ebrazeal@joneswalker.com |
| aty | Cullen K. Kuhn | ckkuhn@bryancave.com |
| aty | Daniel D Sparks | ddsparks@csattorneys.com |
| aty | David Elsberg | delsberg@selendygay.com |
| aty | David H. Arkoosh | david@arkooshlaw.com |
| aty | David Lewis Selby, II | dselby@baileyglasser.com |
| aty | David M. Bernard | dbernard@koskoff.com |
| aty | David W. Ross, Esq. | dross@babstcalland.com |
| aty | Derek F Meek | dmeek@burr.com |
| aty | Donald Bernstein | Donald.bernstein@davispolk.com |
| aty | Donald K. Ludman | dludman@brownconnery.com |
| aty | Edward J Peterson, III | epeterson.ecf@srbp.com |
| aty | Edwin Bryan Nichols | bnichols@waldinglaw.com |
| aty | Elizabeth S. Lynch | lynch@lynchsharp.com |
| aty | Eric J. Taube | eric.taube@wallerlaw.com |
| aty | Eric T Ray | eric.ray@wallerlaw.com |
| aty | Erica K. Dausch | edausch@babstcalland.com |
| aty | Erica R. Iverson | eiverson@selendygay.com |
| aty | Faith Gay | fgay@selendygay.com |
| aty | Frederick Darrell Clarke, III | fclarke@rumberger.com |
| aty | Gregory Michael Taube | greg.taube@nelsonmullins.com |
| aty | Hanna Lahr | hlahr@burr.com |
| aty | Hannah Leah Uricchio | uricchio.hannah@pbgc.gov |
| aty | Henry C. Shelton, III | henry.shelton@arlaw.com |
| aty | Howard Marc Spector | hspector@spectorcox.com |
| aty | Jacob H. Marshall | jmarshall@beneschlaw.com |
| aty | Jan M. Hayden | jhayden@bakerdonelson.com |
| aty | Jay R. Bender | jbender@babc.com |
| aty | Jeffrey W. Wisner | jwisner@koskoff.com |
| aty | Jeremy L Retherford | jretherford@balch.com |
| aty | Jesse S Vogtle, Jr | jesse.vogtle@wallerlaw.com |
| aty | Joanna Caitlin Berry McDonald | joanna.mcdonald@davispolk.com |
| aty | John Jeffery Rich | jrich@madisoncountyal.gov |
| aty | Jonathan E Raulston | jraulston@ehjlaw.com |
| aty | Jonathan Paul Hoffmann | jhoffmann@balch.com |
| aty | Jordan Garman | jgarman@selendygay.com |
| aty | Joshua D. Koskoff | jkoskoff@koskoff.com |
| aty | Justin B. Little | jlittle@rrllaw.com |
| aty | Kathleen M. LaManna | klamanna@goodwin.com |
| aty | Kevin Michael Capuzzi | kcapuzzi@beneschlaw.com |
| aty | Kimberly E. Neureiter | neureiter.kimberly@pbgc.gov |
| aty | Lawrence B Voit | lvoit@silvervoit.com |
| aty | Lindan J. Hill | lhill@gattorney.com |
| aty | Mark P. Williams | mpwilliams@nwkt.com |
| aty | Masten Childers, III. | mchilders@wtplaw.com |
| aty | Matthew M Cahill | mcahill@bakerdonelson.com |
| aty | Melissa W. Larsen | mwlarsen67@gmail.com |
| aty | Nicholas Christian Glenos | cglenos@bradley.com |
| aty | Paul Greenwood | paul.greenwood@wallerlaw.com |
| aty | Paul M. Hoffmann | paul.hoffmann@stinson.com |
| aty | R. Scott Williams | swilliams@rumberger.com |
| aty | Richard Patrick Carmody | richard.carmody@arlaw.com |
| aty | Rita L Hullett | rhullett@bakerdonelson.com |
| aty | Robert Kolodney | rkolodney@kanekessler.com |

| aty | Scott M Harrington | sharrington@dmoc.com |
| aty | Stephen B Porterfield | sporterfield@sirote.com |
| aty | Steven Pohl | spohl@brownrudnick.com |
| aty | Steven D Altmann | steve@nomberglaw.com |
| aty | Stuart H. Memory | smemory@memorylegal.com |
| aty | Stuart M Maples | smaples@mapleslawfirmpc.com |
| aty | Susan M Freeman | sfreeman@lrrc.com |
| aty | Tazewell Shepard | taze@ssmattorneys.com |
| aty | Tazewell Taylor Shepard, IV | ty@ssmattorneys.com |
| aty | Thomas Benjamin Humphries | thumphries@sirote.com |
| aty | Vivek Vijay Tata | vtata@selendygay.com |
| aty | William F. Godbold IV, IV | william.godbold@natstatelaw.com |
| aty | William M. Hancock | wmhancock@wolfejones.com |
| aty | William Wesley Causby | wcausby@memorylegal.com |

TOTAL: 83

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| db | Remington Outdoor Company, Inc. | 100 Electronics Boulevard SW | Huntsville, AL 35824 |
| cr | Franklin Advisers, Inc. | One Franklin Parkway | San Mateo, CA 94403 |
| sp | Stephen H. Warren | O'Melveny & Myers LLP | 400 South Hope Street | Los Angeles, CA 90071–2899 |
| sp | Karen Rinehart | O'Melveny & Myers LLP | 400 South Hope Street | Los Angeles, CA 90071–2899 |
| op | Bradley C Meyer | Ducera Partners LLC | 499 Park Avenue, 16th Floor | New York, NY 10022 |
| op | Colin M. Adams | M–III Advisory Partners, LP | 130 W 42nd Street, 17th Floor | New York, NY 10036 |
| sp | Nancy Mitchell | Times Square Tower | 7 Times Square | New York, NY 10036 |
| sp | Diana M. Perez | Times Square Tower | 7 Times Square | New York, NY 10036 |
| cr | Ankura Trust Company, LLC | c/o Benjamin S. Goldman | Hand Arendall Harrison Sale LLC | 1801 5th Avenue North | Suite 400 | Birmingham, AL 35203 |
| cr | United Mine Workers of America | c/o R. Scott Williams | 2001 Park Place North | Suite 1300 | Birmingham, AL 35203 UNITED STATES |
| cr | Pension Benefit Guaranty Corporation | Office of General Counsel | 1200 K St., NW | Suite 340 | Washington, DC 20005 |
| cr | CZ Acquisition, LLC | c/o Jesse S. Vogtle, Jr. | Waller Lansden Dortch & Davis, LLP | 1901 Sixth Ave N Suite 1400 | Birmingham, AL 35203 |
| cr | CZ Acquisition, LLC | c/o Paul H. Greenwood | Waller Lansden Dortch & Davis, LLP | 1901 Sixth Avenue N, Suite 1400 | Birmingham, AL 35203 |
| cr | Huntsville Utilities | c/o Maples Law Firm PC | 200 Clinton Avenue West | Suite 1000 | Huntsville, AL 35801 |
| cr | State of Alabama Department of Commerce | c/o Memory Memory & Causby | P.O. Box 4054 | Montgomery, AL 36103 |
| sp | Jennifer Taylor | O'Melveny & Myers LLP | Two Embarcadero Center 28th Floor | San Francisco, CA 94111–3823 |
| cr | St. Marks Powder, Inc. and General Dynamics Ordnance & Tactical Systems Canada Valleyfield | c/o Stephen Porterfield | 2311 Highland Avenue South | Birmingham, AL 35203 |
| intp | Corteva, Inc. | Ballard Spahr LLP | 919 Market Street, 11th Floor | Wilmington, DE 19801 |
| cr | Constellation NewEnergy Gas Division, LLC | c/o Eric T. Ray | Waller Lansden Dortch & Davis, LLP | 1901 Sixth Ave N, Suite 1400 | Birmingham, AL 35203 |
| cr | Oneida Molded Plastics, Inc | 104 South Warner Street | Oneida, NY 13421 |
| aty | Safety First Ammo, LLC | c/o Edward J. Peterson, Esquire | Stichter, Riedel, Blain & Postler, P.A. | 110 E. Madison St., Ste. 200 | Tampa, FL 33602 |
| cr | Kennametal, Inc. | Babst, Calland, Clements and Zomnir, P.C | Two Gateway Center | Pittsburgh, PA 15222 |
| cr | Official Committee of Unsecured Creditors of Remington Outdoor Company, Inc. | c/o Baker Donelson | 420 20th St. N. | Suite 1400 | Birmingham, AL 35203 |
| cr | Official Committee of Unsecured Creditors of Remington Outdoor Company, Inc. | Fox Rothschild LLP | 345 California St. Ste 2200 | San Francisco, CA 94104–2670 |
| cr | Oracle America, Inc. | Buchalter, A Professional Corporation | c/o Shawn M. Christianson | 55 2nd St., 17th Fl. | San Francisco, CA 94105 SAN FRANCISCO |
| cr | Eagle Bulk Shipping International (USA) Inc. | c/o Lindan Hill, Esq. | Gordon, Dana & Gilmore, LLC | 600 University Park Place, #100 | Birmingham, AL 35209 |
| cr | Eagle Bulk Shipping International (USA) Inc. | c/o Scott M. Harrington, Esq. | Diserio Martin O'Connor & Castiglioni | One Atlantic Street | Stamford, CT 06901 |
| intp | Howard Marc Spector | Spector & Cox, PLLC | 12770 Coit Road, Suite 1100 | Dallas, TX 75251 |
| cr | HORNADY MANUFACTURING CO. | c/o C. Ellis Brazeal III | JONES WALKER LLP | 400 20th St. N. Ste 1100 | Birmingham, AL 35203 |
| cr | KSE Outdoor Sportsman Group, LLC | c/o Lewis Roca Rothgerber Christie LLP | 201 E. Washington St. Suite 1200 | Phoenix, AZ 85004 |
| cr | Benjamin & Joann Harris | c/o Jack Shrader | Shrader Law Firm | 11212 N. May Avenue, Suite 405 | Oklahoma City, OK 73120 |
| intp | Royal Defence Co., Ltd | 77/122, 29th Fl. Sinn Sathorn Tower | Krungdhonburi Road | Klongtonsai, Klongsan | Bangkok | , 10600 THAILAND |
| intp | JJE Capital Holdings, LLC | Adams and Reese LLP | 1901 6th Avenue North, Stuie 3000 | Birmingham, AL 35203 |
| fa | M–III Advisory Partners, LP | 130 West 42nd St. | 17th Floor | New York, NY 10036 |
| cr | Vista Outdoor, Inc. | c/o Walding, LLC | 2227 1st Ave South | Suite 100 | Birmingham | Birmingham, AL 35233 |

| | | | | | |
|---|---|---|---|---|---|
| intp | Sturm, Ruger & Company, Inc. | c/o ENGEL, HAIRSTON & JOHANSON, P.C. | P.O. BOX 11405 | BIRMINGHAM, AL 35202 UNITED STATES | |
| intp | Huntsman Holdings, LLC | Reynolds, Reynolds & Little, LLC | c/o Justin B. Little, Esq. | P.O. Box 2863 | Tuscaloosa, AL 35403 |
| intp | Roundhill Group, LLC | c/o Shulman Bastian Friedman & Bui LLP | 100 Spectrum Center Drive | Suite 600 | Irvine, CA 92618 |
| cr | Madison County, Alabama | 100 North Side Square | Huntsville, AL 35801 UNITED STATES | | |
| aty | Aaron Gregory Martin Javian | Reed Smith LLP | 599 Lexington Avenue, 22nd Floor | New York, NY 10022 | |
| aty | Andrea S. Hartley, Esq. | Akerman LLP–Three Brickell City Centre | 98 Southeast Seventh Street, Ste 1100 | Miami, FL 33131 | |
| aty | Andreas P. Andromalos | Brown Rudnick LLP | One Financial Center | Boston, MA 02111 | |
| aty | Andrew M. Carty | Brown Rudnick LLP | Seven Times Square | New York, NY 10036 | |
| aty | Andrew V Alfano | Pillsbury Winthrop Shaw Pittman, LLP | 31 West 52nd Street | New York, NY 10019 | |
| aty | Chantelle D. McClamb | Ballard Spahr, LLP | 919 Market Street, 11th Floor | Wilmington, DE 19801 | |
| aty | Christopher P Hoffman | Reed Smith LLP | 599 Lexington Avenue, 22nd Floor | New York, NY 10022 | |
| aty | Claude Montgomery | Dentons US LLP | 1221 Avenue of the Americas | New York, NY 10020–1089 | |
| aty | Gary Svirsky | Times Square Tower | 7 Times Square | New York, NY 10036 | |
| aty | Gordon E. Gouveia | Fox, Rothschild LLP | 321 N. Clark St. Ste 1600 | Chicago, IL 60654 | |
| aty | James C Bastian | Shulman Bastian Friedman & Bui LLP | 100 Spectrum Center Drive, Ste. 600 | Irvine, CA 92618 | |
| aty | Janine Panchok–Berry | O'Melveny & Myers LLP | 7 Times Square | New York, NY 10036 | |
| aty | Jeffrey I. Kohn | O'Melveny & Myers LLP | 7 Times Square | New York, NY 10036 | |
| aty | Joanna F. Newdeck | Gump Strauss Hauer & Feld LLP | 2001 K Street, NW | Washington, DC 20006 | |
| aty | John Scalzo | Reed Smith LLP | 599 Lexington Avenue, 22nd Floor | New York, NY 10022 | |
| aty | John M. Craig | Law Office of Russell R. Johnson III PLC | 2258 Wheatlands Drive | Manakin–Sabot, VA 23103 | |
| aty | Jordan W. Garmon | Selendy & Gay PLLC | 1290 Avenue of the Americas | New York, NY 10104 | |
| aty | Joshua Margolin | Selendy & Gay PLLC | 1290 Avenue of the Americas | New York, NY 10104 | |
| aty | Joshua D. Morse | Pillsbury Winthrop Shaw Pittman, LLP | Four Embarcadero Center, 22nd Floor | San Francisco, CA 94111 | |
| aty | Kevin W. Barrett | Bailey & Glasser LLP | 209 Capitol St | Charleston, WV 25301 | |
| aty | Lacey E. Rochester | Baker, Donelson, Bearman, Caldwell & Ber | 420 20th Street N | Birmingham, AL 35203 | |
| aty | Lauren E. Macksoud | Dentons US LLP | 1221 Avenue of the Americas | New York, NY 10020–1089 | |
| aty | Lee Whidden | Dentons US LLP | 1221 Avenue of the Americas | New York, NY 10020–1089 | |
| aty | Maggie B. Burrus | Bailey & Glasser, LLP | 3000 Riverchase Galleria, Suite 905 | Birmingham, AL 35244 | |
| aty | Martha B. Chovanes | Fox Rothschild LLP | 2000 Market St., 20th Fl | Philadelphia, PA 19103 | |
| aty | Michael A. Sweet | Fox Rothschild LLP | 345 California St. Ste 2200 | San Francisco, CA 94104–2670 | |
| aty | Michael G. Menkowitz | Fox Rothschild LLP | 2000 Market St. 20th Fl. | Philadelphia, PA 19103 | |
| aty | Rachel S. Janger | O'Melveny & Myers LLP | 1625 Eye Street NW | Washington, DC 20006 | |
| aty | Richard A. Ramler | Ramler Law Office, P.C. | 202 West Madison Ave. | Belgrade, MT 59714 | |
| aty | Robert F. Elgidely | Fox Rothschild LLP | 2 south Biscayne Blvd, Suite 2750 | One Biscayne Tower | Miami, FL 33131 |
| aty | Russell R. Johnson, III | Law Firm of Russell R. Johnson III, PLC | 14890 Washington Street, 1st Floor | Haymarket, VA 20169 | |
| aty | Ryan O'Dea | Shulman Bastian Friedman & Bui LLP | 100 Spectrum Centere Drive, Ste. 600 | Irvine, CA 92618 | |
| aty | Sarah M. St. John | Shulman Bastian Friedman & Bui LLP | 100 Spectrum Center Drive, Ste 600 | Irvine, CA 92618 | |
| aty | Shane G. Ramsey | Nelson, Mullins, Riley & Scarborough, LL | 150 Fourth Avenue, North | Nashville, TN 37219 | |
| aty | Tobey Marie Daluz | Ballard Sparh, LLP | 919 Market Street, 11th Floor | Wilmington, DE 19801 | |
| aty | Valerie Bantner Peo | Buchalter Firm | 55 Second Street, Ste 1700 | San Francisco, CA 94105 | |
| aty | William F. Godbold, IV, IV | Natural State Law, PLLC | 900 S. Shackleford Road, Ste 705 | Little Rock, AR 72211 | |
| smg | Richard Blythe | BA Decatur | P O Box 3045 | Decatur, AL 35602 | |

TOTAL: 77