## MEMORANDUM OF POINTS AND AUTHORITIES

## SUMMARY OF ARGUMENT

1. For Plaintiff, the stakes of this Motion could not be higher – as Plaintiff stands to lose the totality of the firearms business it recently purchased should the Motion not be granted. However, this parade of horribles is entirely avoidable should the Court provide Plaintiff the injunctive relief it seeks. By and through this Motion, Plaintiff requests the Court to issue: (1) an emergency temporary restraining order pursuant to Federal Rule of Bankruptcy Procedure 7065, restraining Defendants, and all others acting for them, from interfering in any way with the Huntsville Acquired Property located at the Huntsville Facility; (2) a preliminarily injunction enjoining Defendants, and all others acting for them, from directly or indirectly transferring, selling, assigning, pledging, hypothecating, encumbering, dissipating or distributing the Huntsville Acquired Property; and (3) a preliminary injunction requiring Defendants, and all others acting for them, to deliver, or cause to be delivered, the Huntsville Acquired Property to Plaintiff. While the factual predicate and legal issues attendant to Defendants' bankruptcy are complex, the factual predicate and legal basis of the instant Adversary Action are relatively simple.

2. As this Court is aware, Plaintiff was the successful purchaser of Defendants' non-Marlin-related firearms business (*i.e.* the Acquired Assets[2]) pursuant to the Roundhill APA. Under Sections 1.7(b) and 3.2(a) of the Roundhill APA, Defendants were required to deliver, or cause to be delivered, to Plaintiff the Acquired Assets – including but not limited to the Huntsville Acquired Property. As of the filing of this Motion, Defendants have failed and refused to honor their obligation to "deliver" the Huntsville Acquired Property to Plaintiff. Being left with no other

---

[2] All capitalized terms not otherwise defined in this Summary of Argument shall have the meaning ascribed to same below.

option, and on March 5, 2021, Plaintiff initiated the Adversary Action against Defendants – seeking in relevant part, a declaratory judgment finding that the Removal Deadline is inapplicable and unenforceable. Due to Defendants' failure to "deliver" the Huntsville Acquired Property pursuant to the terms of the Roundhill APA – coupled with the undisputed evidence showing Defendants' efforts to thwart Plaintiff taking possession of the Huntsville Acquired Property – Plaintiff is likely to succeed on the merits of its claim against Defendants, will be irreparably harmed if the requested restraining order and injunctions are not immediately issued, the prejudice to Plaintiff far outweighs that of Defendants and granting the relief sought herein is in furtherance of public interest.

3. Therefore, and for the reasons stated in detail below, Plaintiff requests that this Court grant the Motion in its entirety and issue: (1) an emergency temporary restraining order pursuant to Federal Rule of Bankruptcy Procedure 7065, restraining Defendants, and all others acting for them, from interfering in any way with the Huntsville Acquired Property located at the Huntsville Facility; (2) a preliminary injunction enjoining Defendants, and all others acting for them, from directly or indirectly transferring, selling, assigning, pledging, hypothecating, encumbering, dissipating or distributing the Huntsville Acquired Property; and (3) a preliminary injunction requiring Defendants, and all others acting for them, to deliver, or cause to be delivered, the Huntsville Acquired Property to Plaintiff.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this Motion and the underlying Adversary Action pursuant to 28 U.S.C. §§ 157 and 1334. This Motion and underlying Adversary Action arise in, and are related to, Defendants' bankruptcy cases, which were commenced through the filing of

voluntary petitions for relief under Chapter 11 of the Bankruptcy Code by Defendants on July 27, 2020 in the Northern District of Alabama.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises under Title 11 or arises under or relates to a case under Title 11 which is pending in this District.

## RELEVANT PROCEDURAL HISTORY

6. Pursuant to the amended Sale Order (docket #983) entered on October 13, 2020, Plaintiff purchased the Acquired Assets (as defined in the Roundhill APA) for $13,000,000.00. A true and correct copy of the amended Sale Order including the Asset Purchase Agreement is attached as **Exhibit A** to the Declaration of Scott Soura (the "Soura Decl."). Plaintiff timely and fully paid the $13,000,000.00 purchase price under the Roundhill APA, and has timely and completely satisfied all other obligations under the Roundhill APA except as waived or excused by virtue of Defendants' numerous breaches of the Roundhill APA detailed in the complaint filed initiating the Adversary Action. Soura Decl. ¶ 4.

7. The Acquired Assets include, but are not limited to, "all of [Defendants'] owned (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts and any other tangible personal property (including without limitation consumables located at the premises of the Business) that is in any of the foregoing cases primarily used for the ownership, operation or management of the Business (the "Owned FF&E"), and (ii) to the extent assignable, rights to any warranties and licenses received from manufacturers and sellers of the Owned FF&E." Soura Decl. ¶ 5; **Exhibit A**.

8.     At the time Plaintiff and Defendants closed under the Roundhill APA, a considerable amount of Acquired Assets constituting the Huntsville Acquired Property were housed at, on, or in the Huntsville Facility. Soura Decl. ¶ 6; **Exhibit B**.

9.     Section 1.7(b) of the Roundhill APA, titled "Further Conveyances and Assumptions" provides that "[a]t Closing, and from time to time thereafter, Seller and Buyer shall, and Seller and Buyer shall cause their respective Affiliates to, execute, acknowledge and deliver all such further actions, as may be reasonably necessary or appropriate to sell, transfer, convey, assign and deliver fully to Buyer and its respective successors or permitted assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement…" (emphasis added). **Exhibit A**.

10.    Section 3.2(a) of the Roundhill APA, titled "Seller's Deliveries" provides that "[a]t the Closing, [Defendants] shall deliver or cause to be delivered to [Plaintiff]…all of the Acquired Assets, together with one or more duly executed bills of sale, endorsed certificates of title and other evidence of transfer of motor vehicles and instruments of conveyance appropriate for the applicable Acquired Assets, each as reasonably requested by [Plaintiff] and otherwise in form and substance customary for transactions of this nature and reasonably acceptable to [Plaintiff] and [Defendants]." **Exhibit A**.

11.    Similarly, Sturm, Ruger & Company, Inc. ("Ruger") entered into that certain asset purchase agreement (the "Ruger APA") whereby it acquired certain equipment and machines used in connection with Remington's "Marlin" firearms business. Soura Decl. ¶ 7. The Ruger APA, at Section 1.6(b), creates obligations between Ruger and Defendants identical to those between Plaintiff and Defendants pursuant to Section 1.7(b) of the Roundhill APA. *Id.*  Additionally,

Section 3.2(a) of the Ruger APA is substantively identical to Section 3.2(a) of the Roundhill APA. *Id.*

12.　　The Huntsville Acquired Property is included within the Acquired Assets that Defendants are required to "deliver or cause to be delivered" to Plaintiff. Soura Decl. ¶ 8.

13.　　Plaintiff and Defendants entered into an Amendment #2 to the Roundhill APA, adding Section 3.2(k) to the Roundhill APA, which provided:

> *Timely Removal. Notwithstanding the provisions of Section 3.2(a) and Section 3.2(i) of this Agreement, if Buyer has not physically removed all of the Huntsville Other Assets from the Owned Real Property at Huntsville, Alabama by the close of business, Central Time, on Monday, February 15, 2021, then Buyer and Seller hereby agree that Buyer must remove all of the Huntsville Other Assets from the Owned Real Property at Huntsville, Alabama by no later than the close of business, Central Time, on the date that is thirty (30) calendar days after the delivery by Seller, on or after Saturday, January 16, 2021, of a Notice to Buyer demanding removal by Buyer of the Huntsville Other Assets. If Buyer has not removed all Huntsville Other Assets on the Owned Real Property at Huntsville, Alabama by the close of business, Central Time, on the thirtieth (30th) calendar day after delivery of such Notice from Seller, then any Huntsville Other Assets remaining at the Owned Real Property at Huntsville, Alabama shall be automatically and permanently forfeited to Seller or Seller's assignees, and neither Seller nor any assignee thereof will thenceforth have any obligation to Buyer (or any assignee or successor thereof) with respect to any and all such remaining Huntsville Other Assets.*

14.　　Pursuant to an agreement among and between Plaintiff and Defendants, the deadline for removal of the Huntsville Acquired Property was extended to 5:00 pm on February 26, 2021 (the "Removal Deadline") so the parties could continue settlement discussions to resolve issues relating to, among other things, Plaintiff's assertion that the Removal Deadline under Section 3.2(k) is inapplicable and unenforceable due to Defendants' failure to make the Huntsville Acquired Property available for removal under Section 1.7(b) or Section 3.2(a). Soura Decl. ¶¶ 9-10. A true and correct copy of Amendment #2 to the Roundhill APA is attached as **Exhibit C** to the Soura Decl.

15. Prior to the Removal Deadline, Plaintiff removed sixteen (16) full fifty-three (53) foot semi-truck trailers of Huntsville Acquired Property (the "Removed Property"). Declaration of Billy Hogue (the "Hogue Decl.") ¶ 13. The Removed Property consisted of tools, equipment and personal property that did not require decommission, that did not require removal of walls or fixtures of the Huntsville Facility and that did not require a specialized moving crew. *Id.* To effectuate removal of the Removed Property, Plaintiff's representatives visited the Huntsville Facility on seven separate occasions and had between three (3) and eight (8) people on site full-time between February 8th and February 27th. *Id.* Due to Defendants giving priority to Ruger's removal of property, Plaintiff was not able to begin the process of removing the Huntsville Acquired Property, including the Removed Property, until February 8, 2021. *Id.*

16. On February 27, 2021, Defendants locked Plaintiff and their agents out of the Huntsville Facility and refuse to otherwise provide Plaintiff with access to, and possession of, the Huntsville Acquired Property. Hogue Decl. ¶ 14. As of February 27, 2021, the Huntsville Acquired Property that had not been removed from the Huntsville Facility would fill an estimated one-hundred and fifty-five (155) semi-truck loads – taking a crew of 10-12 specialized movers using heavy equipment (cranes, oversized forklifts, hydraulic jacks and other equipment). *Id.*

17. Up to and including March 4, 2021, Plaintiff and Defendants continued to negotiate in good faith to resolve the dispute regarding the Removal Deadline and the Huntsville Acquired Property. Soura Decl. ¶ 11. The parties hit an impasse in their negotiations on March 4, 2021, necessitating the above captioned adversary action to be initiated by Plaintiff on March 5, 2021 (the "Adversary Action"). *Id.* Notwithstanding the filing of the Adversary Action, the parties continued to pursue a mutually agreeable resolution of the disputes among and between each other. *Id.* However, and after the parties hit yet another settlement impasse after twelve days of good

faith efforts, on March 17, 2021, it became apparent to Plaintiff that immediate resolution of the issues raised in the Adversary Action would not occur in the foreseeable future without Court intervention, which predicated the filing of this Motion. *Id*.

## FACTS SUPPORTING THE RELIEF SOUGHT BY PLAINTIFF

18.     Due to unexpected delays that were caused primarily by logistical issues and decisions of Defendants, an actual and judiciable dispute has arisen as to the enforceability of Section 3.2(k) and the Removal Deadline. Soura Decl. ¶ 12.  Specifically, Plaintiff is in the position of potentially losing all of the Huntsville Acquired Property based upon Defendants' failure to comply with Sections 1.7(b) and 3.2(a) of the Roundhill APA, coupled with unilateral actions taken by Defendants to seriously jeopardize Plaintiff's ability to operate its firearms business. *Id*.

19.     Chuck Rink, COO of Remington Outdoor Company, was handling the preparation and decommissioning of the firearm equipment, including the Huntsville Acquired Property, sold by Defendants to various parties including Plaintiff. Hogue Decl. ¶ 3.  Mr. Rink prioritized Ruger's purchased equipment over the Huntsville Acquired Property and also chose the staffing levels at the Huntsville Facility. *Id*.

20.     Unfortunately, Mr. Rink unexpectedly passed away in late-November of 2020. Shortly after Mr. Rink's passing, Mr. Hogue, the VP of Operational Services & Project Management at the Huntsville Facility, replaced Mr. Rink for purposes of addressing the Huntsville Acquired Property. Hogue Decl. ¶ 4.  It took Mr. Hogue approximately two weeks to get up to speed before he determined that Mr. Rink significantly underestimated the amount of work required to make the Huntsville Acquired Property ready for removal from the Huntsville Facility. *Id*.

21.     Mr. Hogue determined that the Huntsville Facility staff was severely understaffed due to both Mr. Rink's underestimation of the amount of work needed to decommission the Huntsville Acquired Property and overly aggressive cuts in the Huntsville Facility workforce (coupled with staff at the Huntsville Facility leaving at an unexpectedly rapid pace to find new jobs before their originally anticipated end date). Hogue Decl. ¶ 5.

22.     On January 18, 2021, Defendants demanded that Plaintiff remove all Huntsville Acquired Property from the Huntsville Facility no later than February 17, 2021. Soura Decl. ¶ 14.

23.     Importantly, Defendants are obligated to decommission the Huntsville Acquired Property before same could be removed by Plaintiff – a point evidenced by Defendants' efforts to decommission the Huntsville Acquired Property. In late December 2020, Mr. Hogue received approval from Defendants to hire CR Mechanical to fill the gap left by the understaffing of estate employees. Hogue Decl. ¶ 6. CR Mechanical received a five-week contract that began on approximately January 18, 2021 and lasted through February 19, 2021. *Id*. During this time, CR Mechanical utilized a six-man team who expended a total of 1,198 hours. *Id*.; **Exhibit E**. At the completion of the CR Mechanical's contract, CR Mechanical had not finished the decommissioning process for the Huntsville Acquired Property and requested an extension of the contract for an additional week (with the associated cost) to complete the job. *Id*. Defendants rejected CR Mechanical's request, leaving a significant amount of Huntsville Acquired Property remaining to be decommissioned. *Id*.

24.     When the timeline for removal of the Huntsville Acquired Property is compared with the timeline of the CR Mechanical contract – even if CR Mechanical had been able to fully decommission all Huntsville Acquired Property within the five-week window – it becomes apparent that it would have been impossible for Plaintiff to comply with the Removal Deadline.

Hogue Decl. ¶ 6. Given the date that Defendants retained CR Mechanical, Defendants knew or should have known that the Removal Deadline they insisted upon was impossible to meet. *Id*.

25. For the individual pieces of the Huntsville Acquired Property that have been decommissioned, a short timeframe exists for these pieces of equipment to be filled back up with oil and brought on line before significant damage to that equipment's seals, gaskets and internal components occurs. Hogue Decl. ¶ 7.

26. The decommissioning process for the Huntsville Acquired Property is a multi-step process that must be completed by a qualified specialist. Hogue Decl. ¶ 8. The Huntsville Acquired Property cannot be moved until this process is complete. *Id*. Generally, the decommissioning process involves: (a) blocking each axis of movement with wood; (b) the draining of hazardous fluids (80-100 gallons per machine) and wiping the internal lines and tanks to prevent the dripping of hazardous materials during the transportation process; (c) disconnecting the machine from electricity; (d) disconnecting the machines from compressed air lines; and (e) disconnecting the machines from coolant lines. *Id*. In order to properly decommission the Huntsville Acquired Property, trained mechanics, electricians and plumbers are required. *Id*.

27. In order to grasp the magnitude of the time, effort, expense and manpower required for Plaintiff to remove the Huntsville Acquired Property, it is important to understand the size, volume and numerosity of the Huntsville Acquired Property. Hogue Decl. ¶ 9. The remaining Huntsville Acquired Property consists of hundreds of machines, many of which weigh thousands or tens of thousands of pounds (as noted above, it is estimated that the remaining Huntsville Acquired Property will fill 155 semi-truck trailers). *Id*.

28. As a direct result of the sheer size, volume and numerosity of the Huntsville Acquired Property, removal of same will require 10-12 specialized movers operating specialized

heavy equipment over thirty (30) working days. <u>Hogue Decl</u>. ¶ 10. However, the moving crew cannot move any piece of the Huntsville Acquired Property that had not been fully and completely decommissioned. *Id*. The specialized moving crew was to arrive at the Huntsville Facility from out of state with specialized heavy equipment and remain on-site until the job was complete (and a similar crew with similar equipment was to be on the receiving end of the Huntsville Acquired Property). *Id*. The moving crew needed to be able to maneuver oversized heavy equipment and load oversized trucks efficiently. *Id*. Accordingly, where necessary, the walls need to be opened and equipment decommissioned and prepared to be delivered to in order to start this process. *Id*. Due to Defendants' failure to deliver, or cause to be delivered, the Huntsville Acquired Property to Plaintiff – including but not limited to timely decommissioning same – Plaintiff was not provided reasonable or sufficient time to remove the Huntsville Acquired Property. *Id*.

29. Furthermore, in order to remove a significant portion of the Huntsville Acquired Property, interior, non-load bearing walls (some with and some without utilities in the walls) built after the Huntsville Acquired Property was put in place, would need to be removed. <u>Hogue Decl</u>. ¶ 11.

30. In furtherance of taking possession of the Huntsville Acquired Property, Plaintiff removed two portions of a wall at the Huntsville Facility, and shortly thereafter, Defendants and Defendants' agents reprimanded Plaintiff and instructed Plaintiff not to remove any additional walls or move any Huntsville Acquired Property attached to the Huntsville facility until further notice. <u>Hogue Decl</u>. ¶ 12. Defendants then set out a complex and unnecessarily onerous process of "negotiation" for the removal of walls and to detach Huntsville Acquired Property on a "case by case basis" for each affected piece of equipment. *Id*.

31.     Plaintiff's principals made frequent visits to the Huntsville Facility, but were unable

to get Defendants to honor their obligations under Section 1.7(b) of 3.2 (a) of the Roundhill APA.

<u>Soura Decl</u>. ¶ 13.  Furthermore, Plaintiff's representatives and agents were on site full-time at the

Huntsville Facility for several weeks attempting to work with Defendants and its staff to remove

the Huntsville Acquired Property, but were met with onerous conditions and unnecessary

restrictions imposed by Defendants that have  made it unduly difficult, if not impossible, to remove

the Huntsville Acquired Property. *Id*.

32.     Due to the aforementioned restrictions and conditions imposed by Defendants,

Defendants have failed take all post-Closing actions reasonably necessary to transfer, and have

ultimately failed "to deliver or cause to be delivered," the Huntsville Acquired Property to

Plaintiff.

33.     As a result of Defendants' failure to fully and completely comply with their duties

and obligations under Sections 1.7(b) and 3.2(a) of the Roundhill APA, Plaintiff vis-à-vis the

Adversary Action, seeks a declaratory judgment finding Section 3.2(k) and the Removal Deadline

inapplicable and unenforceable so as to avoid the irreparable harm Plaintiff will suffer should the

Huntsville Acquired Property improperly be deemed forfeited.  Unfortunately, Plaintiff will be

irreparably harmed if it were forced to wait until entry of judgment in the Adversary Action – thus

necessitating the temporary restraining order and preliminary injunctions sought in this Motion.

<u>**LAW APPLICABLE TO THE ISSUANCE OF A TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**</u>

34.     The issuance of injunctive relief is governed Federal Rule of Bankruptcy Procedure

7065 (adopting Federal Rule of Civil Procedure 65), which authorizes temporary restraining

orders, as well as preliminary and permanent injunctive relief.

35.     To obtain a temporary restraining order or a preliminary injunction, a movant must make the following four showings: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. <u>See</u> *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc); accord *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). A preliminary injunction is an "extraordinary and drastic remedy," and the movant bears the "burden of persuasion" to clearly establish all four of these prerequisites. <u>See</u> *Siegel*, 234 F.3d at 1176 <u>citing</u> *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). Notwithstanding an injunction being an extraordinary remedy, controlling law and the notions of equity support such relief being granted to Plaintiff based upon the facts of the instant dispute.

### <u>PLAINTIFF IS SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS</u>

36.     To secure preliminary injunctive relief, a petitioner must demonstrate a substantial likelihood of prevailing on at least one of the causes of action it has asserted. Preliminary injunctions are a tool appropriately used only to "grant intermediate relief of the same character as that which may be granted finally." *Kaimowitz v. Orlando*, 122 F.3d 41, 43 (11th Cir. 1997) <u>citing</u> *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220, 89 L. Ed. 1566, 65 S. Ct. 1130 (1945). Relevant to this Motion is Plaintiff's first claim for declaratory relief asserted in the Adversary Action – which dovetails into Plaintiff's second claim for injunctive relief.

37.     "Under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., federal courts are granted jurisdiction to adjudicate claims for declaratory relief to 'declare the rights and other legal relations of any interested party seeking such declaration.'" *ITL Int'l, Inc. v. Ninoshka, S.A.*, No.

01:10-cv-23493-JLK, 2011 U.S. Dist. LEXIS 82044, at *6-7 (S.D. Fla. July 27, 2011) <u>citing</u> 28 U.S.C. § 2201(a). "To determine when such rights and legal relations are properly pleaded, a court must consider 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Id*. <u>citing</u> *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007) (internal quotation omitted). "As such, for any action seeking declaratory relief, consideration must be given to the immediacy of any impending legal controversy between the parties in determining whether a justiciable right exists." *Id*.

38.     As detailed above, Section 1.7(b) requires Defendants "[a]t Closing, and from time to time thereafter" to take "all such further actions, as may be reasonably necessary or appropriate to…transfer…[and] deliver fully to Buyer…all of the properties…intended to be conveyed to [Plaintiff] under" the Roundhill APA. Furthermore, Section 3.2 of the Roundhill APA, titled "Seller's Deliveries" provides that "[a]t the Closing, [Defendants] shall deliver or cause to be delivered to [Plaintiff]…all of the Acquired Assets...." An actual and substantial controversy has arisen between Plaintiff and Defendants due to Defendants' failure to comply with Sections 1.7(b) and 3.2(a) of the Roundhill APA necessitating the immediate issuance of injunctive relief.

39.     The Huntsville Acquired Property primarily consists of over four hundred (400) separate pieces of extremely large and sensitive equipment. By and through Defendants' statements and actions, it cannot be reasonably disputed that, pursuant to Sections 1.7(b) and 3.2(a), Defendants were obligated to take all post-Closing steps to decommission the Huntsville Acquired Property so Plaintiff could remove it from the Huntsville Facility. As of the Removal

Deadline, Defendants have yet to complete decommissioning of the Huntsville Acquired Property – thus making it impossible for Plaintiff to take possession of same.

40.     Even if Defendants had fully and completely decommissioned the Huntsville Property by February 26, 2021, Plaintiff would have still been incapable of meeting the Removal Deadline for two reasons. Soura Decl. ¶ 15.  First, many important pieces of the Huntsville Acquired Property require removal of walls or fixtures affixed to the Huntsville Facility. *Id*.  Based upon the plain language of Section 1.7(b), removal of the impediments at the Huntsville Facility is arguably Defendants' obligation and duty. *Id*.  Notwithstanding, Plaintiff began the necessary removal of two portions of a non-load bearing wall at the Huntsville Facility, but was instantly met with reflective antagonism from Defendants. *Id*.  From that point forward, Defendants placed vague, unnecessary and onerous restrictions on Plaintiff's necessary removal of walls and fixtures of the Huntsville Facility – compliance with which would have been impossible by the Removal Deadline. *Id*.  Second,  removal of the Huntsville Acquired Property (above-and-beyond removal of certain walls at the Huntsville Facility) will take a team of 10-12 specialized movers a total of thirty (30) fulltime and consecutive working days. *Id*.  Given the extremely narrow window of time between February 26, 2021 and the Removal Deadline, Plaintiff could not have timely removed the Huntsville Acquired Property. *Id*.  Therefore, even if Defendants had hypothetically honored their duties and obligations under Section 1.7(b) and 3.2(a), it would have been too little too late – as Defendants would not have provided Plaintiff with sufficient time to effectuate and complete removal of the Huntsville Acquired Property by the Removal Deadline. *Id*.

41.     Defendants are likely to make two arguments disputing the impact of their failure to take all actions necessary to deliver the Huntsville Acquired Property to Plaintiff.  First, Defendants are likely to argue that Plaintiff could have removed, piecemeal, the Huntsville

Acquired Property that did not require decommissioning, that had already been decommissioned and/or that did not require the removal of walls at the Huntsville Facility. As an initial matter, Defendants' anticipated argument is nothing more than a red herring because such disregards the Removed Property and fact that the current dispute would still exist – namely that a substantial portion of the Huntsville Acquired Property would still be currently incapable of removal. While, in a vacuum, such a piecemeal course of action is theoretically possible for a small portion of the Huntsville Acquired Property, Defendants' anticipated argument disregards the practical reality of the process and procedure for removal. In particular, Plaintiff arranged a specialized rigging company to remove the Huntsville Acquired Property and was quoted a price to do so – a price quote predicated upon the removal taking place over 30 consecutive working days and conditioned upon the assets being prepared for the move. <u>Hogue Decl</u>. ¶ 17. If Plaintiff were to remove the Huntsville Acquired Property in a piecemeal fashion, it would not only exponentially increase the removal and transportation expenses, but it would also create numerous logistical difficulties associated with spreading the process out over such a protracted timeline. *Id*. Rigging companies were not willing to leave their crews or equipment idle onsite waiting for maintenance crews to decommission equipment and the cost and difficulty associated with the repositioning of the crews and equipment from site to site is significant. *Id*. Additionally, specialized crews, equipment and trucks at both ends needed to be reserved and coordinated. *Id*. Not only would the cost be substantially higher, but the length of time required to move would be lengthened by orders of magnitude as crews, equipment and trucks needed to be reserved and available. *Id*. Every rigging company willing to quote (both expense and timeframe) was premised on the Huntsville Acquired Property being in ready-to-move condition. *Id*. Removal and moving of the Huntsville Acquired Property requires specialized heavy equipment (oversized forklifts, cranes, hydraulic jacks, lifting

equipment and various rigging equipment) as well as a team of specialized moving crew from out of state at each end of the move. *Id.* Furthermore, the moving crew would need to leave its staff and equipment in place at the respective job site until the removal and moving is complete – as the cost of relocating this heavy equipment and crew is significant. *Id.*

42. Based upon the substantial increase in costs and logistical difficulties, if not impossibilities, associated with piecemeal removal of the Huntsville Acquired Property, such a process is wholly inconsistent with Defendants' obligation to take all further actions, as may be "reasonably necessary or appropriate" to transfer and deliver these assets to Plaintiff.

43. Second, Defendants are likely to assert that Section 3.2(k), contained within the second amendment to the Roundhill APA, absolves them of any duty to deliver the Huntsville Acquired Property because the Removal Deadline applies "[n]otwithstanding the provisions of Section 3.2(a)[.]" Defendants' second anticipated argument is misguided and incorrect for numerous reasons. When Plaintiff entered into the second amendment to the Roundhill APA, Plaintiff relied upon the fact that Defendants would still fully comply with their contractual obligations – including but not limited to those contained within Section 3.2(a). Soura Decl. ¶ 16. Due to Defendants' failure to fully and completely satisfy their obligations to deliver, or cause to be delivered, the Huntsville Acquired Property, Defendants are equitably estopped from enforcing Section 3.2(k) or the Removal Deadline. Additionally, and perhaps most importantly, Section 3.2(k) has no impact upon Defendants' obligations to take all post-Closing actions necessary to deliver the Huntsville Acquired Property to Plaintiff pursuant to Section 1.7(b). As a result of Defendants' failure to fully and completely satisfy their requirements under Section 1.7(b), the Removal Deadline is inapplicable and unenforceable.

44.     Therefore, Plaintiff has established a substantial likelihood of prevailing on the merits of its action for declaratory relief that the Removal Deadline and Section 3.2(k) are inapplicable and unenforceable.

## PLAINTIFF WILL SUFFER IRREPARABLE HARM

45.     Plaintiff will be irreparably harmed if Defendants are not prohibited from selling or disposing of the Huntsville Acquired Property, as well as if Defendants are not immediately required to deliver the Huntsville Acquired Property and make same available for removal by Plaintiff. Soura Decl. ¶ 17.

46.     Courts in the Eleventh Circuit have interpreted the concept of "irreparable harm" to mean that "speedy and urgent action" is needed to protect the moving party from irreparable harm "that cannot be remedied by money." See *Study Edge, LLC v. Skoolers Tutoring Ctr., LLC*, No. 1:17CV76-MW/GRJ, 2017 WL 6994563, at *5 (N.D. Fla. Dec. 8, 2017)("In short, 'the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits'…'A preliminary injunction requires showing 'imminent' irreparable harm')(internal citations omitted); see also *Guarantee Ins. Co. v. Brand Mgmt. Serv*., No. 12-61670-CIV-ROSENBAUM, 2012 U.S. Dist. LEXIS 192103, at *13-14 (S.D. Fla. Dec. 11, 2012) citing *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) ("Regarding the second prong, an injury is considered 'irreparable' only if it is one that cannot be remedied by money.").

47.     In late September of 2020, Plaintiff acquired Remington's non-Marlin firearms business from Defendants so it could continue manufacturing and selling some of the most iconic and sought after American-made firearms. Soura Decl. ¶ 18.   Part and parcel to Plaintiff's continued manufacturing and sale of Remington-brand firearms is possession and use of the

Huntsville Acquired Property. *Id.* Specifically, the Huntsville Acquired Property is necessary to manufacture not only components and parts for virtually all Remington firearms, it is also necessary to manufacture entire lines of Remington products. *Id.* While it is true Plaintiff purchased the Ilion facility, which contained numerous machines and pieces of equipment used for the manufacturing of firearms, the Huntsville Acquired Property is unique and has no Ilion counterpart. Soura Decl. ¶ 19. If Plaintiff is not immediately granted the injunctive relief sought herein, Plaintiff will be unable to reopen the Ilion facility and will be unable to operate its firearms business. Soura Decl. ¶ 20. If Defendants' required delivery of the Huntsville Acquired Property is delayed until judgment is entered in the Adversary Action, Plaintiff and the firearm business it operates will be forever destroyed – from the irreparable loss of business opportunity, to the irreparable loss of good will, to the total loss of the business itself – Plaintiff may find itself in a bankruptcy of its own without immediate relief.[3] *Id.*

48. "Although economic losses alone do not justify a preliminary injunction, 'the loss of customers and goodwill is an irreparable injury.'" *Woodard-Cm v. Sunlord Leisure Prods.*, No. 20-23104-CIV-WILLIAMS, 2020 U.S. Dist. LEXIS 173107, at *10 (S.D. Fla. Aug. 17, 2020) citing *BellSouth Telecomms., Inc.*, 425 F.3d at 970 (quoting *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991)). "Where plaintiff's potential economic loss thus threatens

---

[3] Irreparable harm will also result from not bringing decommissioned Huntsville Acquired Property back on line as soon as possible due to resulting damage to the equipment's seals, gaskets and internal components. While the aforementioned damage to the Huntsville Acquired Property may be reparable, such repairs will cause significant delays jeopardizing Plaintiff's business in the same way a delay associated with entry of judgment in the Adversary Action will. Furthermore, due to the specialized and unique nature of the individual pieces of equipment and customized tooling, coupled with required calibration and customized programing of same, it will take between twelve (12) and fourteen (14) months to replace the Huntsville Acquired Property. Similarly, this delay will cause the same irreparable harm as being forced to wait until entry of judgment in the Adversary Action. Soura Decl. ¶ 21; Hogue Decl. ¶ 7

his entire business, an injunction is appropriate even though the amount of direct financial harm is readily ascertainable." *Poster Exchange, Inc. v. National Screen Serv. Corp.*, 198 F. Supp. 557 (S.D. Ga. 1961), aff'd, 305 F.2d 647 (5th Cir. 1962).

49.     "The U.S. Supreme Court has recognized that the substantial loss of one's business and the threat of bankruptcy constitutes irreparable harm that warrants injunctive relief: [A]bsent preliminary relief [plaintiffs] would suffer a substantial loss of business and perhaps even bankruptcy. Certainly the latter type of injury sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S. Ct. 2561, 45 L. Ed. 2d 648 (1975). See also *Rhodes v. Gwinnett County, Georgia*, 557 F. Supp. 30, 33 n.9 (N.D. Ga. 1982) ('Where plaintiff's potential economic loss thus threatens his entire business, an injunction is appropriate even though the amount of direct financial harm is readily ascertainable.')." *Mesa Air Grp. v. Delta Air Lines, In*c., No. 1:08-CV-1334-CC, 2008 U.S. Dist. LEXIS 145306, at *36-37 (N.D. Ga. June 25, 2008) (subsequently affirmed) (emphasis added).

50.     By the time judgment is entered in the Adversary Action, Plaintiff will be irreparably harmed through the total loss of its business – thus rendering any judgment it obtains against Defendants meaningless. Soura Decl. ¶ 22. "While it is true that a preliminary injunction can be used to 'preserve the court's power to render a meaningful decision after a trial on the merits,' *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005), Plaintiffs [must] demonstrate here that, absent a preliminary injunction, a final decision in their favor would be meaningless." *Guarantee Ins. Co. v. Brand Mgmt. Serv.*, No. 12-61670-CIV-ROSENBAUM, 2012 U.S. Dist. LEXIS 192103, at *13-14 (S.D. Fla. Dec. 11, 2012).

51.    The harm Plaintiff will suffer should Defendants not be immediately compelled to deliver and provide access to the Huntsville Acquired Property is not a mere monetary injury. Quite to the contrary, the harm resulting from the total loss of Plaintiff's entire business is categorically irreparable.

## PLAINTIFF'S INJURY OUTWEIGHS ANY MONETARY HARM OF DEFENDANTS

52.    When the harm Plaintiff will suffer is compared to any prospective harm Defendants may suffer, the scales tip sharply towards Plaintiff. "This element requires a balancing of the relative harm as between the plaintiff and the defendants." *Henkel v. Lickman (in Re Lickman)*, 286 B.R. 821, 830-831, 2002 Bankr. LEXIS 1415, *13-26, 16 Fla. L. Weekly Fed. B

53.    As established above, the harm Plaintiff will suffer is immediate, non-monetary and irreparable. On the other hand, the harm – if any – that will befall Defendants is purely monetary. In particular, pursuant to the Roundhill APA, Defendants have already been paid for the estates' interest in the Huntsville Acquired Property. Should Defendants ultimately prevail in the Adversary Action, their only conceivable measure of damage would be: (1) the fees and costs Defendants will incur complying with their duties and obligations of Section 1.7(b) of the Roundhill APA; and (2) the net amount Defendants would have realized from the resale of the Huntsville Acquired Assets. Therefore, the balancing of harm between Plaintiff and Defendants clearly dictates that the requested injunctions are warranted.

## PUBLIC INTEREST SUPPORT GRANTING THE MOTION

54.    The temporary restraining order and injunctions requested in this Motion would not be adverse to the public interest. In fact, public interest is actually served by granting of all relief requested by Plaintiff. As an initial matter, equity and the law disfavor forfeiture. See *Smith v. Clubhouse Invs., Inc. (In re  Clubhouse Invs., Inc.)*, 451 B.R. 626, 635 (Bankr. S.D. Ga. 2010)

("Further, that presumption is bolstered by the oft-cited equitable maxim "equity abhors a forfeiture." and "It has also been stated that '[t]he law disfavors forfeitures . . ..').  Given that Defendants' improper enforcement of Section 3.2(k) of the Roundhill APA will result in forfeiture and resale of the Huntsville Acquired Property, Plaintiff asserts the requested injunctions are in the public's interest.

55.     Additionally "[t]he public interest is served by insuring that valid contractual provisions are enforced." *Charles Schwab & Co. v. McMurry*, No. 2:08-cv-534-FtM-29SPC, 2008 U.S. Dist. LEXIS 104140, at \*10-11 (M.D. Fla. Dec. 23, 2008).  The requested injunctions would enforce the valid and binding obligations Defendants have to Plaintiff pursuant to Section 1.7(b) and 3.2(a) of the Roundhill APA, and as such, are in the public's interest.

56.     Finally, Plaintiff's business operations, its vendor relationships, and Plaintiff's employment opportunities for third-parties protected by the requested injunctions are also in the public's interest. Soura Decl. ¶ 23; See also *Mesa Air Grp. v. Delta Air Lines, Inc*., No. 1:08-CV-1334-CC, 2008 U.S. Dist. LEXIS 145306, at \*38-39 (N.D. Ga. June 25, 2008) (subsequently affirmed) ("A preliminary injunction would serve the public interest by (i) preserving a going concern business, (ii) preserving the ongoing relationship that Mesa has with its vendors, (iii) allowing Mesa to honor its lease obligations with third parties, and (iv) saving the jobs of hundreds of employees who serve Delta under the Contract.").

57.     Therefore, the requested injunctions are in the public's interest because this relief avoids forfeiture, would enforce valid contractual terms and would preserve all facets of Plaintiff's firearms business.

## <u>CONCLUSION</u>

58.     For all the foregoing reasons, Plaintiff requests this Court grant the Motion in its entirety and issue: (1) an emergency temporary restraining order pursuant to Federal Rule of Bankruptcy Procedure 7065, restraining Defendants, and all others acting for them, from interfering in any way with the Huntsville Acquired Property located at the Huntsville Facility; (2) a preliminary injunction enjoining Defendants, and all others acting for them, from directly or indirectly transferring, selling, assigning, pledging, hypothecating, encumbering, dissipating or distributing the Huntsville Acquired Property; and (3) a preliminary injunction requiring Defendants, and all others acting for them, to deliver, or cause to be delivered, the Huntsville Acquired Property to Plaintiff.

**SHULMAN BASTIAN FRIEDMAN & BUI LLP**

DATED:  March  18, 2021          By:     _____*/s/ Ryan D. O'Dea*_____
                                                    James C. Bastian, Jr.
                                                    Ryan D. O'Dea
                                                    Attorneys for Plaintiff Roundhill Group LLC