## DECLARATION OF BILLY HOGUE

I, Billy Hogue, being duly sworn, declare and state as follows:

1.      I was the VP of Operational Services & Project Management at the Huntsville Facility for the Remington Outdoor Company and was overseeing the preparation, decommission and delivery of the Huntsville Acquired Property to Roundhill on behalf of Defendant.  I know each of the following facts to be true of my own personal knowledge and, if called as a witness, I could and would competently testify with respect thereto.

2.      I was hired by Remington in June 26, 2017.  From late November until February 12, 2021, I was handling the preparation, decommission and delivery of the Huntsville Acquired Property to Roundhill. Thereafter I was engaged by Roundhill to assist in the moving the Huntsville Acquired Property to Ilion, NY.

3.      Chuck Rink, COO of Remington Outdoor Company, was handling the preparation and decommissioning of the firearm equipment, including the Huntsville Acquired Property, sold by Defendants to various parties including Plaintiff.  Mr. Rink prioritized Ruger's purchased equipment over the Huntsville Acquired Property and also chose the staffing levels at the Huntsville Facility.

4.      Unfortunately, Mr. Rink passed away in late-November of 2020.  Shortly after Mr. Rink's passing, I replaced Mr. Rink for purposes of addressing the Huntsville Acquired Property. It took me approximately two weeks to get up to speed before I determined that Mr. Rink underestimated the amount of work required to make the Huntsville Acquired Property ready for removal from the Huntsville Facility.

5.      I determined that the Huntsville Facility staff was severely understaffed due to both Mr. Rink's underestimation of the amount of work needed to decommission the Huntsville

Acquired Property and overly aggressive cuts in the Huntsville Facility workforce (coupled with staff at the Huntsville Facility leaving at an unexpectedly rapid pace to find new jobs before their originally anticipated end date).

6.      Defendants are obligated to decommission the Huntsville Acquired Property before same could be removed by Plaintiff.  In late December 2020, I received approval from Defendants to hire CR Mechanical to fill the gap left by the understaffing of estate employees.  CR Mechanical received a five-week contract that began on approximately January 18, 2021 and lasted through February 19, 2021.  During this time, CR Mechanical utilized a six-man team who expended a total of 1,198 hours. Attached hereto as **Exhibit E** are true and correct copies of CR Mechanical invoices provided to me.  At the completion of the CR Mechanical's contract, on February 19, 2021, CR Mechanical had not finished the decommissioning process for the Huntsville Acquired Property and requested an extension of the contract for an additional week (with the associated cost) to complete the job.  Defendants rejected CR Mechanical's request, leaving a significant amount of equipment remaining to be decommissioned.  When the timeline for removal of the Huntsville Acquired Property is compared with the timeline of the CR Mechanical contract – even if CR Mechanical had been able to fully decommission all Huntsville Acquired Property within the five-week window – it becomes apparent that it would have been impossible for Plaintiff to comply with the Removal Deadline.  Given the date that Defendants retained CR Mechanical, Defendants knew or should have known that the Removal Deadline they insisted upon was impossible to meet.

7.      For the individual pieces of the Huntsville Acquired Property that have been decommissioned, a short timeframe exists for these pieces of equipment to be filled back up with oil and brought on line before significant damage to that equipment's seals, gaskets and internal

components occurs. Furthermore, the Huntsville Acquired Property is not easily replaceable. Due to the specialized and unique nature of the individual pieces of equipment and customized tooling, coupled with required calibration and customed programing of same, it will take between twelve (12) and fourteen (14) months to replace the Huntsville Acquired Property.

8. The decommissioning process for the Huntsville Acquired Property is a multi-step process that must be completed by a qualified specialist. The Huntsville Acquired Property cannot be moved until this process is complete. Generally, the decommissioning process involves: (a) blocking each axis of movement with wood; (b) the draining of hazardous fluids (80-100 gallons per machine) and wiping the internal lines and tanks to prevent the dripping of hazardous materials during the transportation process; (c) disconnecting the machine from electricity; (d) disconnecting the machines from compressed air lines; and (e) disconnecting the machines from coolant lines. In order to properly decommission the Huntsville Acquired Property, trained mechanics, electricians and plumbers are required.

9. In order to grasp the magnitude of the time, effort, expense and manpower required for Plaintiff to remove the Huntsville Acquired Property, it is important to understand the size, volume and numerosity of the Huntsville Acquired Property. The remaining Huntsville Acquired Property consists of hundreds of machines, many of which weigh thousands or tens of thousands of pounds (as noted above, it is estimated that the remaining Huntsville Acquired Property will fill 155 semi-truck trailers).

10. As a direct result of the sheer size, volume and numerosity of the Huntsville Acquired Property, removal of same will require 10-12 specialized movers using specialized heavy equipment over thirty (30) consecutive working days. However, the moving crew cannot move any piece of the Huntsville Acquired Property that had not been fully and completely

decommissioned. Due to Defendants' failure to deliver, or cause to be delivered, the Huntsville Acquired Property to Plaintiff – including but not limited to timely decommissioning same – Plaintiff was not provided reasonable or sufficient time to remove the Huntsville Acquired Property. The specialized moving crew was to arrive at the Huntsville Facility from out of state with specialized heavy equipment and remain on-site until the job was complete (and similar crew with similar equipment was to be on the receiving end of the equipment). The moving crew needed to be able to maneuver oversized heavy equipment and load oversized trucks efficiently. Accordingly, where necessary, the walls need to be opened and equipment decommissioned and prepared to be delivered to in order to start this process.

11. Furthermore, in order to remove a significant portion of the Huntsville Acquired Property, interior, non-load bearing walls (some with and some without utilities in the walls) built after the Huntsville Acquired Property was put in place, would need to be removed.

12. In furtherance of taking possession of the Huntsville Acquired Property, Plaintiff removed two portions of a wall at the Huntsville Facility, and shortly thereafter, Defendants and Defendants' agents instructed Plaintiff not to remove any additional walls or move any Huntsville Acquired Property attached to the Huntsville facility until further notice. Defendants then set out a complex and unnecessarily onerous process of "negotiation" for removal of walls and to detach Huntsville Acquired Property on a "case by case basis" for each affected piece of equipment.

13. Prior to the Removal Deadline, Plaintiff removed sixteen (16) full fifty-three (53) foot semi-truck trailers of Huntsville Acquired Property (the "Removed Property"). The Removed Property consisted of tools, equipment and personal property that did not require decommission, that did not require removal of walls or fixtures of the Huntsville Facility and that did not require a specialized moving crew. To effectuate removal of the Removed Property, Plaintiff's

representatives visited the Huntsville Facility on seven separate occasions and had between three (3) and eight (8) people on site full-time between February 8th and February 27th. Due to Defendants giving priority to Ruger's removal of property, Plaintiff was not able to begin the process of removing the Huntsville Acquired Property, including the Removed Property, until February 8, 2021.

14.     On February 27, 2021, Defendants locked Plaintiff and their agents out of the Huntsville Facility and refuse to otherwise provide Plaintiff with access to, and possession of, the Huntsville Acquired Property. As of February 27, 2021, the Huntsville Acquired Property that had not been removed from the Huntsville Facility would fill an estimated one-hundred and fifty-five (155) semi-truck loads – taking a crew of 10-12 specialized movers on each end of the move using heavy equipment (cranes, oversized forklifts, hydraulic jacks and other equipment).

15.     Even if Defendants had fully and completely decommissioned the Huntsville Property by February 26, 2021 (which they have not), Plaintiff would have still been incapable of meeting the Removal Deadline for two reasons. First, many important pieces of the Huntsville Acquired Property require removal of walls or fixtures affixed to the Huntsville Facility. Second, removal of the Huntsville Acquired Property (above-and-beyond removal of certain walls at the Huntsville Facility) will take a team of 10-12 specialized movers (at each end) a total of thirty (30) fulltime and consecutive working days. The specialized moving crew arrives in Huntsville from out of state with their specialized heavy equipment and remains on site until the job is complete and similar crew with similar equipment is on the receiving end of the equipment. The moving crew needs to be able to maneuver oversized heavy equipment and load oversized trucks efficiently. Accordingly, where necessary, the walls need to be opened and equipment decommissioned and prepared to be delivered to in order to start this process.

16.     Given the extremely narrow window of time between February 26, 2021 and the Removal Deadline, Plaintiff could not possibly have timely removed the Huntsville Acquired Property.  Therefore, even if Defendants had hypothetically honored their duties and obligations under Section 1.7(b) and 3.2(a) (which they did not), it would have been too little too late – as Defendants would not have provided Plaintiff with sufficient time to effectuate and complete removal of the Huntsville Acquired Property by the Removal Deadline.

17.     While, in a vacuum, such a piecemeal course of action is theoretically possible for a small portion of the Huntsville Acquired Property, Defendants' anticipated argument disregards the practical reality of the process and procedure for removal.  In particular, Plaintiff arranged a specialized rigging company to remove the Huntsville Acquired Property and was quoted a substantial price to do so – a price quote predicated upon the removal taking place over 30 consecutive working days.  If Plaintiff were to remove the Huntsville Acquired Property in a piecemeal fashion, it would not only exponentially increase the removal and transportation expenses, but it would also create numerous logistical difficulties associated with spreading the process out over such a protracted timeline. Rigging companies were not willing to leave their crews or equipment idle onsite waiting for maintenance crews to decommission equipment and the cost and difficulty associated with the repositioning of the crews and equipment from site to site is significant.  Additionally, specialized crews, equipment and trucks at both ends needed to be reserved and coordinated.  Not only would the cost be substantially higher, but the length of time required to move would be lengthened by orders of magnitude as crews, equipment and trucks needed to be reserved and available. Every rigging company willing to quote the job premised both the time and cost on the Huntsville Acquired Property being in ready-to-move condition. Removal and moving of the Huntsville Acquired Property requires specialized heavy equipment

(oversized forklifts, cranes, hydraulic jacks, lifting equipment and various rigging equipment) as well as a team of specialized moving crew from out of state at each end of the move. Furthermore, the moving crew would need to leave its staff and equipment in place at the respective job site until the removal and moving is complete – as the cost of relocating this heavy equipment and crew is significant.

18.     Based upon the substantial increase in costs and logistical difficulties associated with piecemeal removal of the Huntsville Acquired Property, such a process is wholly inconsistent with Defendants' obligation to take all further actions, as may be "reasonably necessary or appropriate" to transfer and deliver these assets to Plaintiff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 17th day of March, 2021, at ___HUNTSVILLE, ALABAMA___

_____
Billy Hogue